## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| M.M.M., ON BEHALF OF HIS MINOR CHILD, J.M.A., *ET AL.*,<br><br>Plaintiffs,<br><br>v.<br><br>JEFFERSON BEAUREGARD SESSIONS, III, ATTORNEY GENERAL OF THE UNITED STATES, *ET AL.*,<br><br>Defendants. | No. 1:18-cv-1759 (PLF) |

## SUPPLEMENTAL BRIEF IN SUPPORT OF
## DEFENDANTS' MOTION TO TRANSFER VENUE

### INTRODUCTION

In light of the Court's discussion of venue and transfer issues at the July 31 hearing on Plaintiffs' motion for a temporary restraining order, Defendants file this supplemental brief in support of transferring Plaintiffs' claims to the Southern District of California, so these claims can be considered with the pending class action relief ordered in *Ms. L. v. ICE*, No. 18-cv-428 (S.D. Cal.) (Sabraw, J.). If the Court transfers this case to the Southern District of California, Defendants will agree to extend their current pause of removals until the end of Monday, August 6, 2018, to allow Judge Sabraw to address this matter in an orderly way. As Judge Rakoff recently explained in transferring a second case filed on behalf of children to Judge Sabraw, "[t]he reason I transferred the other matter to Judge Sabraw is because this whole reunification process has many, many moving parts, and it doesn't make sense to have different judges in different districts trying to deal piecemeal with the issue. There should be one judge looking at it overall." (Exhibit 6 at 5).

This Court should transfer this case to the Southern District of California to be considered with *Ms. L*, a certified class action involving claims, issues, relief, and parties that substantially overlap with this case and in which, over a month ago, the district court issued a preliminary injunction that the present case, if permitted to proceed, will undermine and obstruct.  The court in *Ms. L* certified a nationwide class of parents who were separated from their children when they crossed the border.  The complaint here was filed by class members in *Ms. L* on behalf of their children, and raises issues already considered by the *Ms. L* court: centrally, whether parents who cannot remain in the United States—because they are subject to final removal orders and have not demonstrated an entitlement to pursue protection or relief from removal—are entitled to decide whether they wish to be removed with their children or leave their children behind in the United States to pursue their own avenue of immigration relief.

Parents are entitled to reunification prior to removal, according to the court in *Ms. L*, and because of that, the Court, at the request of class counsel, adopted an election form to evidence this choice.  Indeed, Judge Sabraw's own statements reflect his acknowledgment of parental rights in this very context. *See* Dkt 15-1 at 40, Ms. L, No. 18-cv-428, July 27, 2018 Status Conf. Tr. 39:19-40:2.  He explained that "under the law what matters is the parent," and that "this case has always been about is the due process right to family integrity."  *Id*.  He further explained the choice that is necessarily at issue here:  "[T]he parent that makes the decisions" and "[i] t is the parent's view, ultimately, whether to remove together or separately."  *Id*.  The form that plaintiffs here challenge reflects this determination.  And at the hearing this Court held this week, Plaintiffs acknowledged that parents could make this determination – and waive further immigration proceedings –on behalf of their children.

The core of Plaintiffs' challenge here involves the same election form required by the *Ms. L* court and the decision it represents. But Plaintiffs here—who are members of the *Ms. L* class and are represented by *Ms. L* class counsel on these claims—cannot, in this Court, collaterally attack that form and the decision it entails, however, by now effectively arguing that parents should not be able to make those decisions on behalf of their minor children (i.e., arguing that minor children have separate rights from those of their parents). Indeed, the *Ms. L* court is considering right now the proper interpretation of that very election form as part of a pending motion to stay removals. The *Ms. L* court granted a brief pause of class member parents pending the resolution of that issue.

In these circumstances here—where another court has issued class-wide injunctive relief, where the issues presented in this Court overlap with the issues before that other court, where the parties here are already class members subject to the other court's class-wide relief, where continued litigation here would undermine the class-wide injunctive relief, and result in inconsistent obligations, and where class members are attempted to collaterally attack another court's injunction and ongoing oversight of that injunction—transfer is plainly warranted. As Defendants have noted, the Southern District of New York has done exactly that in three cases brought there—including another case brought on behalf of a class of children of *Ms. L* class members, just like this case. "To permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads to the wastefulness of time, energy and money that [28 U.S.C.] § 1404(a) was designed to prevent." *Ferens v. John Deere Co.*, 494 U.S. 516, 531 (1990). Here, it is inconceivable that the convenience factors to be considered under Section 1404(a) would not militate towards transfer given the certification of the class in *Ms. L*, the entry of a nationwide injunction and ongoing compliance requirements, and

how far that litigation has already progressed.   Proceeding with another lawsuit "involving precisely the same issues" would be inefficient, sap the resources of the Court and the parties, interfere with compliance with the *Ms. L* injunction, and potentially result in inconsistent rulings on procedural, discovery, and substantive issues overlapping in both cases.   *Id.*   Transfer is also consistent with Section 1404 because Plaintiffs' choice of venue in the District of Columbia lacks an adequate nexus to the events in this case and is not the location of the relevant transactions or occurrences.   Plaintiffs' claim under 8 U.S.C. § 1252(e)(3) poses no obstacle to transfer.   Plaintiffs here do not properly invoke section 1252(e)(3) at all.   And even if they did, all of the reasons given above and below would still decidedly favor all other claims and holding the section 1253(e)(3)-related challenge in abeyance pending further litigation in the Southern District of California.

## BACKGROUND

This case was filed long after a previously filed class action, *Ms. L*, which was brought on behalf of the parents of separated children seeking to be reunified for purposes of custody and removal.   *Ms. L* is being litigated by a class that includes the very individuals that purport to bring this case on behalf of their children; those individuals are represented by class counsel on these claims; and those individuals have already secured class certification and an injunction requiring reunification with their children.   A subset of those very parents has nonetheless filed this suit, and without explaining why they should not be considered part of the *Ms. L* class.   The chronology of the cases shows that allowing this case to proceed in this Court will create conflict, confusion, and overlapping obligations, given the class-wide injunctive relief granted by another court.

**I. The First-Filed Case In The Southern District of California.**

On February 26, 2018, Ms. L filed suit in the Southern District of California.   *See Ms. L*, No. 18-428 (S.D. Cal.), Dkt. 1.   On March 9, the *Ms. L* plaintiffs filed an amended complaint, a

4

motion for preliminary injunction, and a motion for class certification.  *See Ms. L*, Dkt. 32, 35, and 48.  The *Ms. L* plaintiffs—parents of families separated after crossing the border—challenged that separation, requested reunification, and sought relief based on the Due Process Clause, the Administrative Procedure Act, and the impact of separation on asylum rights.  *See Ms. L*, Dkt. 1, 32, and 85.  On June 26, the *Ms. L* court certified a nationwide class of parents separated from their children and granted a class-wide preliminary injunction that was based on the plaintiffs' claim that the federal government's separation of children from their parents in immigration detention violated the Fifth Amendment.  *Ms. L*, Dkt. 82–83.  In granting class relief, and as relevant here, the *Ms. L* court's injunction required that class members be reunified with their children within 14 days of the court's order for children under 5, and within 30 days for all other children.  The injunction also bars future separations without certain findings, and bars removals of class member parents prior to reunification absent an affirmative, knowing, and voluntary waiver of reunification by a parent.  *Ms. L*, Dkt. 83, at 24.

The federal government is implementing the relief required by the *Ms. L* injunction.  *See Ms. L*, Dkt. 86, 88.  To that end, the *Ms. L* court has been holding regular status conferences, where the parties are required to provide the court with joint status reports.  *See Ms. L*, Dkt. 91, 95, 96, 97, 99, 101.  The most recent such conference was held on Friday, July 27, 2018, and the most recent such report was filed on July 26, 2018.  A further report and status conference are scheduled for later this week.

The *Ms. L* order addresses parents who were subject to final removal orders—normally because they had not established a "credible fear" of persecution after arriving at or illegally crossing the border.  Defendants were "enjoined from removing any Class Members without their child, unless the Class Member affirmatively, knowingly, and voluntarily declines to be reunited

with the child prior to the Class Member's deportation." *Ms. L*, Dkt. 83, at 24. The *Ms. L* class members sought and obtained court approval for an election form that implemented this provision of the injunction. *See Ms. L*, Dkt. 148-2 (Exhibit 1). They have more recently asked the district court to stay removals for seven days following reunification to permit this election to be made, and the district court has temporarily stayed removals for seven days following reunification while it considers this request. *Ms. L*, Dkt. 116.

## II. This Case.

Plaintiffs here are class members in *Ms. L* who raise issues already considered or under consideration by Judge Sabraw in *Ms. L.* Plaintiffs here raise the following four claims: (1) that Defendants have committed due process violations under the Fifth Amendment by separating parents from their children without affording Plaintiffs process under Section 240 through which to seek asylum (Claim I); (2) that Defendants have a mandatory, non-discretionary duty to provide Plaintiffs with a credible fear interview if they have indicated an intent to apply for asylum or a fear of persecution (Claim II); (3) that Defendants have violated the Administrative Procedure Act (APA) by the removal of Plaintiffs and other minor children from proceedings under Section 240 on the basis of coercive and misleading waiver forms (Claim III); and (4) that Defendants have denied Plaintiffs of their rights to pursue asylum in the United States through expedited removal policy under 8 U.S.C. § 1252(e)(3) and have violated the laws of Section 240 and/or Section 235 of the INA (Claim IV). *See* Compl. ¶¶ 108–30; Compl. at 40.

Plaintiffs in *Ms. L*, raise three claims: (1) that the separation of the class members from their children violates substantive due process and procedural due process under the Fifth Amendment; (2) the separation of class members from their children without any explanation or legitimate justification is arbitrary and capricious and so violates the APA; and (3) separation of

families violates federal law that provides for asylum and other protection from removal and class

members have a private right of action to challenge violations of their right to apply for asylum

under 8 U.S.C. § 1158(a). *See Ms. L.*, Dkt. 85 ¶¶ 83–97.

In short, the constitutional claims in this case and *Ms. L.* are largely the same. While

Claims II and III in this case are not identical to the claims in *Ms. L.*, they rest on similar theories

of due process and the APA, and are based on the same underlying facts. Even where the claims

do not directly line up, the issues, relief, and parties in this case substantially overlap with *Ms. L.*

## LEGAL STANDARD

Venue is proper in a case where a defendant is an officer or employee of the United States

in the district where: (A) any defendant resides; (B) a substantial part of the events or omissions

giving rise to the claim occurred; or (C) the plaintiff resides if no real property is involved in the

action. 28 U.S.C. § 1391(e)(1). But for the "convenience of parties and witnesses, in the interest

of justice, a district court may transfer any civil action to any other district or division where it

might have been brought." *Id.* § 1404(a).

A threshold question is whether the case could have been brought in the district to which

transfer is sought. *Stewart Org. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (citations omitted). If a

court determines that the case could have been brought in the district to which transfer is sought,

that court should next determine whether the case should be transferred by weighing private and

public interests regarding transfer. *See, e.g.*, *Bederson v. United States*, 756 F. Supp. 2d 38, 46

(D.D.C. 2010). The parties' private interests include the plaintiffs' choice of forum, defendants'

choice of forum, whether the claim arose elsewhere, convenience of the parties, convenience of

the witnesses, and ease of access to sources of proof. Public interests include the transferee's

familiarity with governing laws, relative congestion of the calendars of the potential transferee and

transferor courts, and local interests in deciding local controversies at home.  *Id.*  The moving party

bears the burden to establish cause to transfer the case.  *Trout Unlimited v. U.S. Dep't of Agric.*,

944 F. Supp. 13, 16 (D.D.C. 1996) (internal citations omitted).

## ARGUMENT

Rather than consider the merits of Plaintiff's claims, in accordance 28 U.S.C. § 1404,

principles of comity, and the orderly administration of justice, this Court should transfer this case

to the Southern District of California so that it can be hear by Judge Sabraw together with *Ms. L.*

**I.      This case should be transferred to the Southern District of California.**

   *A.     This Court should transfer this case to the Ms. L court because the requested relief
            would interfere with an injunction in an ongoing case, Ms. L that involves
            overlapping claims, issues, relief, and parties.*

As Defendants argued in opposing Plaintiffs' TRO motion, this case should be immediately

transferred to the Southern District of California because the claims, issues, relief, and parties in

this case substantially overlap and interfere with the reunification process being administered by

Judge Sabraw in *Ms. L*—and thus allowing this case to proceed would undermine compliance with

and administration of the *Ms. L* injunction.  *See* Dkt. 15, at 3–6.

As Defendants argued in opposing Plaintiffs' TRO motion, this case should be immediately

transferred to the Southern District of California because the claims, issues, relief, and parties in

this case substantially overlap and interfere with the reunification process being administered by

Judge Sabraw in *Ms. L*—and thus allowing this case to proceed would undermine compliance with

and administration of the *Ms. L* injunction.  *See* Dkt. 15, at 3–6.

The "usual rule" in this Circuit is that '[w]here two cases between the same parties on the

same cause of action are commenced in two different Federal courts, the one which is commenced

first is to be allowed to proceed to its conclusion first."  *UtahAmerican Energy, Inc. v. Dep't of*

8

*Labor*, 685 F.3d 1118, 1124 (D.C. Cir. 2012) (quoting *Wash. Metro. Area Transit Auth. v. Ragonese*, 617 F.2d 828, 830 (D.C. Cir. 1980)). The D.C. Circuit follows this rule because "[c]onsiderations of comity and orderly administration of justice dictate that two courts of equal authority should not hear the same case simultaneously." Id. (quoting *Wash. Metro.*, 617 F.2d at 830); *see Colo. River Water Conservation District v. United States*, 424 U.S. 800, 817 (1976) ("As between federal district courts . . . the general principle is to avoid duplicative litigation.").

The Court should apply the "usual rule" and transfer this case to Judge Sabraw. Plaintiffs seek relief that, if granted, would affirmatively interfere with the *Ms. L* litigation. In *Ms. L*, the court approved the use of an "Election Form," which allows an alien parent to elect that, "[i]f I lose my case and am going to be removed, I would like to take my child with me." Exhibit 1 at 2. In approving the use of the Election Form, the *Ms. L* court accepted the established principle that a parent can lawfully waive her child's potential rights to relief, including under the immigration laws. *See, e.g.*, Fed. R. Civ. P. 17(c)(1). Here, however Plaintiffs allege that the government has implemented a policy that unlawfully allows a parent to waive her child's "independent asylum and other statutory protection rights." Mem. 7. If the Court granted injunctive relief on the basis of that allegation, the government and the parents and children subject to Judge Sabraw's injunction would potentially be subjected to inconsistent orders. To avoid the risk of inconsistency, and in accordance with the principles of comity and orderly administration of justice, the Court should transfer this case to Judge Sabraw.

As we explained in our TRO opposition, the risk of conflicting orders and the possibility that all parties and the Government will be subject to inconsistent obligations and conflicting orders is all the reason necessary to transfer this case to Judge Sabraw. Plaintiffs in this case—who are class members in *Ms. L*—cannot seek to litigate a subset of issues directly implicated in *Ms. L*

by splintering those issues into two or more piecemeal litigations. Given the overlapping nature of the claims and relief being sought, it would be in the interest of justice for these claims to be heard by the *Ms. L* court under 28 U.S.C. § 1404(a). *See, e.g., Zbitnoff v. Nationstar Deed of Trust, LLC*, No. 16-cv-2947, 2016 WL 3926468, at *2 (S.D.N.Y. July 18, 2016) (transferring case due in part "in light of the prior, substantially similar litigation filed by Plaintiff in the Northern District of California," "and that Court's familiarity with [Plaintiff's] claims"); *see also Bent v. Zounds Hearing Franchising, LLC*, No. 15-cv-6555, 2016 WL 153092, at *6 (S.D.N.Y. Jan. 12, 2016) (noting that "transfer will 'substantially advance[] the interests of fairness, efficiency and judicial economy' by preventing duplicative proceedings, avoiding inconsistent results, and 'reducing the overall burden on the parties, non-party witnesses and the judicial system'" (citation omitted)); *Adams v. U.S. Bank, NA*, No. 12-cv-4640 , 2013 WL 5437060, at *6 (E.D.N.Y. Sept. 27, 2013) ("Where another court has familiarity with the parties and issues, it is in the interest of justice to transfer the case to that tribunal in order to alleviate the concerns of 'wastefulness of time, energy and money that § 1404(a) was designed to prevent.'" (quoting *Cont'l Grain Co. v. Barge FBL-585*, 364 U.S. 19, 26 (1960))).

> B.   *Plaintiffs' 8 U.S.C. § 1252(e)(3) claim (Claim IV) does not prevent transfer of this case to the Southern District of California because that claim is meritless and provides no basis for jurisdiction in this Court.*

Plaintiffs' § 1252(e)(3) claim (Claim IV) is no impediment to transfer of these claims to Judge Sabraw and provides no basis for jurisdiction in this Court.

Section 1252(e)(3) provides a narrow cause of action exclusively in this district court over so-called "systemic" challenges to the expedited removal regime, that be raised only individuals actually subject to a final order of expedited removal. *See* 8 U.S.C. § 1225(b), § 1252(e)(3). Specifically, section 1252(e)(3) provides for "judicial review of *determinations*

under section 1225(b) *and its implementation*" within "60 days" of that provisions

implementation, but shall be limited to determinations of "whether *such section, or any*

*regulation* issued to implement such section, is constitutional; or [] whether such a *regulation, or*

*a written policy directive, written policy guideline, or written procedure issued by or under the*

*authority of the Attorney General to implement such section*, is not consistent with applicable

provisions of this subchapter or is otherwise in violation of law." *Id.* § 1252(e)(3)(A), (B). By its

plain an unambiguous terms, a Plaintiff seeking to invoke this provision must be subject to a

"determination," *id.*, that is a final decision that inadmissible and subject to expedited removal,

*id.* at § 1225(b)(1)(B)(i), and must identify a  written regulation, policy directive, policy

guideline, or procedure *issued by or under the authority of the Attorney General to implement*

*such section. Am. Immigration Lawyers Ass'n v. Reno* ("*AILA*"), 18 F. Supp. 2d 38, 57 (D.D.C.

1998), *aff'd*, 199 F.3d 1352 (D.C. Cir. 2000)

Plaintiffs utterly fail to meet this pleading threshold, and so section 1252(e)(3) cannot be

an impediment to transfer. Plaintiffs purport to invoke section 1252(e)(3) by alleging vaguely

that the federal government has implemented an unlawful "policy of denying [them] their rights

to pursue asylum in the United States." Compl. (Dkt. 1), at 40 ¶ 2. But the only "policy" they

specifically point to is a document created by the parties involved in the *Ms. L* litigation, which,

under the supervision of Judge Sabraw, allows parents, including the named plaintiffs here, to

make a decision concerning what is in the best interests of their children. Plaintiffs identify no

authority for the proposition that such a document is a written policy, regulation, directive, or

procedure, let alone one "issued by or under the authority of the Attorney General to implement"

the provisions of 8 U.S.C. § 1225(b); *see AILA*, 18 F. Supp. 2d at 57 (rejecting allegations

concerning unwritten policies as basis for claim under section 1252(e)(3)). Instead, what is

required—and what Plaintiffs categorically fail to identify—is a written regulation, policy, or guidance issued by the Government as a means of implementing the expedited removal procedures. *See id.*

Plaintiffs attempt to create jurisdiction where none exists by alleging that "DHS, ICE and other Defendants promulgated, at some point after June, 2018, internal written directives implementing the reunification order in *Ms. L* and Executive Order 13841." Compl. ¶ 62. Plaintiffs go on to allege that these directives "ordered DHS and ICE personnel to effectuate the deportation of families as soon as practically possible following reunification by securing the parent's agreement to be deported with their child, extracting the child from removal proceedings under Section 240, and placing the child back in the custody of the parent so that they could be prepared for immediate deportation." *Id*. The complaint further alleges that the challenged policy "of denying Plaintiffs their rights to pursue asylum . . . is reflected in written statements and directives included but not limited to the DHS Fact Sheet . . . ." Compl. ¶ 132.

Plaintiffs vague insinuations of some unspoken policy do not come close to plausibly alleging any such written policy and so cannot be the basis for jurisdiction in this court declining to transfer this case to Judge Sabraw. *See Wash. Alliance of Tech. Workers v. DHS*, 892 F.3d 332, 347 (D.C. Cir. 2018) (affirming dismissal of claim where the "allegation … [wa]s unsupported by any factual allegations" (citing Ashcroft v. *Iqbal*, 556 U.S. 662, 678 (2009)). The DHS Fact Sheet that Plaintiffs reference is not new written guidance issued to implement the Attorney General's authorities under section 1225(b), but public-facing information concerning Defendants' compliance with Judge Sabraw's Order in *Ms. L*. Like the reunification election form, this "fact sheet" is not the type of new policy or directive that is subject to challenge only in this district under section 1252(e)(3).

At bottom, Plaintiffs seek to undermine the decisions of the parents in the *Ms. L* case concerning the welfare of *their* children, *see* Fed. R. Civ. P. 17, and convert that decision into some sort of new written policy concerning the Government's implementation of expedited removal under section 1225(b). That is plainly not the sort of written regulation or policy contemplated by the statute, and because the Court may, on its own motion, find that is lacks jurisdiction under section 1252(e)(3), there is no basis to delay transfer based on Plaintiffs' implausible invocation of section 1252(e)(3). *See* Fed. R. Civ. P. 12(h)(3).

C.       *To the extent this Court determines that Plaintiffs' § 1252(e)(3) is cognizable, in the alternative, this Court should sever and transfer the first three remaining claims (Claims I–III) to the Southern District of California.*

Even if Plaintiffs' § 1252(e)(3) claim is cognizable, the Court may sever and transfer the Plaintiffs' remaining three claims (Claims I–III) to Judge Sabraw given the obvious overlap between those counts and the issue being litigated in the *Ms. L* litigation.

The Court has discretion to "sever any claim against a party." Fed. R. Civ. P. 21. Courts have broad discretion in determining whether to sever claims under Rule 21. *Initiative & Referendum Inst. v. U.S. Postal Serv.*, 154 F. Supp. 2d 10, 13 (D.D.C. 2001); 4-21 *see Moore's Federal Practice* § 21.05 (2010) (collecting cases). A complaint that advances one or two legal theories applied to multiple, unique factual situations presents a clear case for the exercise of discretion under Rule 21. *See Davidson v. Dist. of Columbia*, 736 F. Supp. 2d 115, 119-22 (D.D.C. 2010); *see also M.K. v. Tenet*, 216 F.R.D. 133, 138 (D.D.C. 2002) (noting how courts should consider whether severance will reduce potential prejudice or confusion of the issues).

Although the D.C. Circuit has generally adopted a "strong policy against piecemeal" cases or appeals,[1] but recognizes an exception where it has dismissed certain claims, transferred the remainder of the case elsewhere, and no other review of the dismissed claims was possible. *See Murthy v. Vilsac*, 609 F.3d 460, 463–64 (D.C. Cir. 2010) (explaining how an exception to the court's view of partial transfers exists).

Severing Count I-III is plainly warranted and will allow the parties to litigate, and the courts to adjudicate, the claims in an efficient manner while reducing the possibility for conflicting decisions or rulings. This will promote judicial efficiency and avoid wasting substantial resources that would be required if the virtually similar claims were litigated in multiple courts. Rule 21 "'authorizes the severance of any claim, even without a finding of improper joinder, where there are sufficient other reasons' . . . . [such as where] they arise from different factual situations." *Khanna v. State Bar of Cal.*, No. C-07-2587 EMC, 2007 WL 2288116, at \*2 (N.D. Cal. Aug. 7, 2007) (quoting *Wyndham Assocs. v. Bintliff*, 398 F.2d 614, 618 (2d Cir. 1968)).

The fact that some of the Defendants may be properly venued here does not change the analysis. "Even when venue is proper as to all defendants, the court may sever a claim against a party and transfer it to a more convenient forum." 7 Wright& Miller, *Federal Practice and Procedure* § 1689, at 517 (collecting cases). Thus, where, as here, venue is improper or inconvenient as to some claims or parties, the court may sever those claims and transfer the severed claims to another district for the convenience of the parties and witnesses or in the interest of justice. *See, e.g.*, *FDIC. v. McGlamery*, 74 F.3d 218, 222 (10th Cir. 1996) (affirming the district

---

[1] *Force,* 795 F.2d 1067, 1070-71 (D.C. Cir. 1986) (per curiam) (affirming dismissal for lack of personal jurisdiction and concluding that the district court did not abuse its discretion in failing to *sua sponte* transfer "an individual claim" under § 1631 where neither party requested transfer and where a related suit was already pending in a district where personal jurisdiction could be obtained over the defendant).

court's order to transfer some, but not all, of plaintiff's claims because the court effectively severed the problematic claims under Federal Rule of Civil Procedure 21 prior to transfer); *accord Indymac Mortgage Holdings, Inc. v. Reyad*, 167 F. Supp. 2d 222 (D. Conn. 2001); *Tab Exp. Intern., Inc. v. Aviation Simulation Technology, Inc.*, 215 F.R.D. 621 (D. Kan. 2003); *Hallwood Realty Partners, L.P. v. Gotham Partners*, L.P., 104 F. Supp. 2d 279 (S.D. N.Y. 2000). Once the case is severed, the court has clear discretion to treat the new actions distinctly if appropriate. *See, e.g.*, *Chrysler Credit Corp. v. Country Chrysler, Inc.*, 928 F.2d 1509, 1519–20 (10th Cir. 1991). (noting that severance creates "two separate actions . . . ; a district court may transfer one action while retaining jurisdiction over the other")

In sum, the Court has clear authority to sever Count IV if it finds that claim is otherwise plausibly plead, and transfer the remainder of this case to Judge Sabraw.[2]

## II.      The fact that cabinet officials may be venued here is no impediment to transfer.

Plaintiffs offer no strong reason to keep this case venued here where Judge Sabraw, as this Court recognized, can grant full relief to the parties and has already greanted significant relief and continues to oversee ongoing reunification efforts. Indeed, the D.C. Circuit has cautioned repeatedly that against using federal agency headquarters' locations as the sole or primary basis for venue. *See Cameron v. Thornburgh*, 983 F.2d 253, 256–57 (D.C. Cir. 1993); *Pearson v. Rodriguez*, 174 F. Supp. 3d 210, 213–14 (D.D.C. 2016) ; *Aftab v. Gonzalez*, 597 F. Supp. 2d 76, 81 (D.D.C. 2009) (holding that, when the only connection to the District of Columbia "is that a

---

[2] Even if the Court retains the § 1252(e)(3) claim and does not decline jurisdiction, it would nevertheless lack jurisdiction to grant the stay of removal that Plaintiffs request. The Immigration and Nationality Act ("INA") deprives district courts of jurisdiction to enjoin the execution of a final expedited removal order, *see* 8 U.S.C. §§ 1252(a)(2)(A)(i), 1252(e)(1), (2), (4), and more generally forbids district courts from hearing any cause or claim that arises from the government's "decision or action . . . [to] execute removal orders," *id.* § 1252(g). These provisions foreclose the stay of removal that Plaintiffs request.

federal agency headquartered here is charged with generally regulating and overseeing the [administrative] process, venue is not appropriate in the District of Columbia" (citing *Al-Ahmed v. Chertoff*, 564 F. Supp. 2d 16, 19 (D.D.C. 2008))). And that is especially appropriate here where the sole statutory hook on which Plaintiffs rely, section 1252(e)(3) provides no plausible basis for jurisdiction, and therefore no reason whatsoever to litigate this case piecemeal from *Ms. L.*

That Plaintiffs allege that some portion of the relevant events may have occurred here is of no moment. First, all of the relevant events in this case either occurred in Texas or in an undisclosed location in the United States, not in the District of Columbia. Compl. (Dkt. 1) ¶¶ 68-104.; *see id.* ¶¶ 68-102 ("J.M.A. and his father were apprehended by border patrol agents around Eagle Pass, Texas," "J.M.A. was taken . . . to a shelter in San Antonio, Texas where he was detained" *Id.* ¶¶ 68-70; "E.A.H. and his father were apprehended by U.S. border patrol agents in McAllen, Texas," "E.A.H. was taken to Harlingen, Texas where he was detained"); *id.* ¶¶ 75-76; "D.B.G. and her mother were apprehended by immigration officers in Texas . . . ", "D.B.G. was taken on an airplane to Miami Florida." "D.B.G. and her mom are now detained together in Dilley, Texas." *Id* at ¶¶ 83-86); "[G.M.A.] then was taken to a shelter in New York where she was detained . . . ", "While in New York, G.M.A. had a foster mother . . . " *Id* at ¶ 92; "[A.M.C.] was driven to a shelter in Texas . . . " *Id* at ¶ 98; "L.A.A. was taken to Raymondville, TX where she was detained . . . " *Id* at ¶ 102.). The District of Columbia is thus neither the district of the Plaintiffs' residence nor the location of *any* portion of the events giving rise to their Complaint. *See, e.g.*, *Lamont v. Haig*, 590 F.2d 1124 (D.C. Cir. 1978) (ruling that venue may be laid in a district where a *substantial* portion of the acts or omissions giving rise to the action occurred, notwithstanding that venue also might lie in other districts, so long as the substantiality of the operative events is determined by assessment of their ramifications for efficient conduct of the suit).

Second, and more importantly, even had some decision relevant to these claims arisen in this district, that would be true of *Ms. L* and the three cases transferred from the Southern District of New York to Judge Sabraw. That some aspect of this case may derive from decisions promulgated in D.C. is besides the point. The point is that all these issues are already well-developed in *Ms. L*, and any decision in this case will raise the quintessential risk of inconsistent obligation or conflicting orders that Judges Rakoff and Furman had in mind when they transferred their cases to Judge Sabraw. Because section 1252(e)(3) is no impediment to transfer, this Court should do the same.

**III.    At least two other district judges have transferred cases to the *Ms. L* court that overlapped with the issues, claims, and relief in in *Ms. L*—including claims, like those here, brought on behalf of children in separated families—and this Court should do the same.**

Finally, it is worth emphasizing that three other cases, brought on behalf of separated children, have been transferred to the Judge Sabraw.  The reasons for those transfers strongly supports transfer here.

The first such transfer was the July 19, 2018 decision by Judge Furman in *N.T.C. v. ICE*, No. 18- 6428, Dkt. 20, slip op. (S.D.N.Y. July 19, 2018) (Exhibit 2).  The court in *N.T.C.* addressed whether a putative class action "brought on behalf of children who were separated from their parents and are now being held in New York State" should be able to "seek to ensure that each class member has a meaningful opportunity to pursue asylum."  *Id.* at 2.  Judge Furman "conclude[d] for several reasons that Plaintiffs' claims should be transferred to the Southern District of California to be considered in conjunction with the claims in *Ms. L*." *Id.* at 3. Those reasons warrant emphasis:

> *First*, the . . . two cases concern the same families:  Plaintiffs in this case seek relief on behalf of children whose parents are class members in *Ms. L*.  (*Compare* Order, *Ms. L*, ECF No. 82, at 17, *with* Compl., ¶ 66). *Second*, the relief Plaintiffs seek in this case is, at bottom,

directly related to the reunification process being supervised by Judge Sabraw.  In essence, Plaintiffs here contend that they have rights and interests distinct from the rights and interests of their parents and that the reunification process, and Judge Sabraw's own orders, do not adequately take their distinct rights and interests into account.  That may or may not be the case, but Judge Sabraw is in a better position than this Court to decide those questions and to modify his own orders if appropriate.  And *third*, in the absence of a single judge presiding over both cases, there is a real risk of inconsistent decisions and conflicting orders—a particularly intolerable risk given the gravity and urgency of the issues in these cases (and the prospect of similar litigation being filed in other states where children separated from their parents are being held).

*Id.* at 3–4.

Judge Furman recognized that permitting the putative class action in *N.T.C.* to continue in parallel to *Ms. L* would lead to duplicative litigation, wastefulness, and potential for conflicting court orders. He concluded that "the inconvenience to Plaintiffs . . . is *vastly* outweighed by the interests of justice, fairness, efficiency, and avoidance of conflict advanced by having a single judge presiding over both cases," and ordered the case transferred.  *Id.* at 4 (emphasis added). There is no reason why Plaintiffs' case here should be treated differently from *N.T.C.*'s putative class of children—whose interests Plaintiffs ostensibly wish to protect.

To similar effect is the July 24, 2018 order by Judge Rakoff in *E.S.R.B. v. Sessions*, No. 18-cv-6654, slip op. (S.D.N.Y. July 24, 2018) (Exhibit 3). The court in *E.S.R.B.* addressed whether a habeas petition brought by a group of children who were separated from their parents and being held in New York should be transferred to the Southern District of California.  As Judge Furman concluded in *N.T.C.*, Judge Rakoff determined that the claims should be heard by the *Ms. L* court and directed that the *E.S.R.B.* plaintiffs' claims be "transfer[red] . . . forthwith" to be considered in conjunction with the claims in *Ms. L. See* Exhibit 3 at 1.  Judge Rakoff's order illustrates why courts should transfer actions with substantial overlap between the parties and issues when one court has certified a class and granted class-wide relief relating to those overlapping issues: "I think the common sense of it is that these matters should, to the maximum extent possible, be

consolidated before as few judges as possible." *E.S.R.B.*, Transcript of Proceedings, at 33 (S.D.N.Y. July 24, 2018) (Exhibit 4). Additionally, Judge Rakoff immediately transferred the third such case to the *Ms. L* court in his July 27, 2018 order in *R.G.H. v. Sessions*, No. 18-cv-6791, slip op. (S.D.N.Y. July 27, 2018) (Exhibit 7).

Recognizing the importance of this issue and the gravity of what is contested in these cases, Judge Sabraw noted at a July 24, 2018 hearing in *Ms. L* that both Judges Furman and Rakoff discussed the potential for transfer with him regarding the cases, and as a result of those discussions, each judge determined that transfer was appropriate. *See Ms. L*, Transcript of Proceedings, at 41–42 (S.D. Cal. July 24, 2018) (Exhibit 5). Defendants encourage a similar consultation here.

In sum, the benefits of consolidating these cases, given the certified nationwide class in *Ms. L*, are apparent for the same reasons Judge Furman explained: "the classes in the . . . cases concern the same families"; "the relief Plaintiffs seek in this case is, at bottom, directly related to the reunification process being supervised by Judge Sabraw" and "Judge Sabraw is in a better position . . . to decide those questions and to modify his own orders if appropriate;" and "in the absence of a single judge presiding over both cases, there is a real risk of inconsistent decisions and conflicting orders—a particularly intolerable risk given the gravity and urgency of the issues in these cases (and the prospect of similar litigation being filed in other states where children separated from their parents are being held)." *N.T.C.*, 2018 WL 3472544, at *2. This Court should transfer this case forthwith to Judge Sabraw.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court transfer this case to the United States District Court for the Southern District of California.

Dated: August 1, 2018

CHAD A. READLER
Acting Assistant Attorney General
Civil Division

SCOTT G. STEWART
Deputy Assistant Attorney General

AUGUST E. FLENTJE
Special Counsel

WILLIAM C. PEACHEY
Director, Office of Immigration Litigation
District Court Section

JEFFREY S. ROBINS
Assistant Director, Office of Immigration Litigation
District Court Section

Respectfully submitted,

*/s/ Briana Yuh*
BRIANA YUH
Trial Attorney
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Washington, DC 20044
Telephone: (202) 532-4165
Facsimile: (202) 305-7000
Briana.Yuh@usdoj.gov

*Attorneys for Defendants*

# DEFENDANTS' EXHIBIT 1

**Notice of Potential Rights for**
**Certain Detained Alien Parents Separated from their Minor Children**

On June 26, 2018, a federal court issued a nationwide preliminary injunction in the case of *Ms. L v. I.C.E.*, ---F. Supp. 3d---, 2018 WL 3129486 (S.D. Cal. June 26, 2018).

You may be a class member who has rights under this lawsuit if:

- You are or were detained in custody by the U.S. Department of Homeland Security (DHS); and
- Your minor child was separated from you by DHS and is detained in the custody of the U.S. Department of Health and Human Services, Office of Refugee Resettlement (ORR), ORR foster care, or DHS custody.

If you are determined to be a class member:

- The government must reunify you with your child.
- You do NOT need to take any action to be reunified with your child.
- The government must reunify you by the following dates unless otherwise ordered by the Court:
    a.     If your child is younger than 5 years old, he or she must be reunified with you by July 10, 2018.
    b.     If your child is 5 or older, he or she must be reunified with you by July 26, 2018.
- You do NOT need to agree to removal from the United States in order to be reunified with your child.  You may continue to fight your case.  You should NOT be pressured to agree to removal in order to be reunified with your child.

You are not a class member if:

- You were apprehended by DHS in the interior of the United States;
- You have a criminal history other than illegal entry;
- You have a communicable disease;
- A determination is or has been made that you are unfit or present a danger to your minor child.

IMPORTANT:  Even if you are not a class member, if you were separated from your children, you may still have a right to be reunified with your child, and should contact the lawyers in this case by phone or by writing a letter.

If you have any questions about your potential rights, please contact the lawyers for the case at 646-905-8892 or write to the lawyers at this address:

Ms. L. Class Counsel
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, NY 10004

IMPORTANT

**Instructions:** This information on this page must be read to the alien parent in a language that he/she understands.  The Notice must be given to the alien parent at the same time as this form.  The alien parent should indicate which option he/she is choosing by signing the appropriate box below.

You DO NOT have to agree to removal from the United States in order to be reunified with your child.  Even if you continue to fight your case, the government must still reunify you.

IF YOU LOSE YOUR CASE AND THE GOVERNMENT IS GOING TO REMOVE YOU FROM THE UNITED STATES, you must decide at that time whether you want your child to leave the United States with you.

**Parent Name / Nombre de Padre:**_____
**Parent A # / A # de Padre:** _____
**Country of Citizenship / Pais de Ciudadania:** _____
**Detention Facility / El Centro de Detención:** _____
**Child(ren) Name(s) / Nombre de Hijo:** _____
**Child(ren) A # / A # de Hijo:** _____

CHOOSE ONE OPTION:

_____ If I lose my case and am going to be removed, I would like to take my child with me.

_____ If I lose my case and am going to be removed, I do NOT want to take my child with me.

_____ I do not have a lawyer, and I want to talk with a lawyer before deciding whether I want my child removed with me.

---

**Certificate of Service**

I hereby certify that this form was served by me at_____
                                                    (Location)
on _____ on _____, and the contents of this
        (Name of Alien)                  (Date of Service)

notice were read to him or her in the _____ language.
                                              (Language)

_____     _____
   Name and Signature of Officer              Name or Number of Interpreter (if applicable)

# DEFENDANTS' EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

                        :

N.T.C. et al.,                      :

                        :

                Plaintiffs,      :          18-CV-6428 (JMF)

                        :

        -v-                  :      MEMORANDUM OPINION

                        :         AND ORDER

U.S. IMMIGRATION AND CUSTOMS  :

ENFORCEMENT et al.,          :

                        :

               Defendants.     :

                        :

------------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  07/19/2018

JESSE M. FURMAN, United States District Judge:

        This case, which was filed on the evening of July 16, 2018, arises out of the

Government's much-criticized decision earlier this year to separate immigrant parents who enter

the United States from their children.  The policy has been the subject of intense political debate

and litigation, most prominently in a class action brought on behalf of immigrant parents in the

Southern District of California captioned *Ms. L. v. U.S. Immigration and Customs Enforcement*,

No. 18-CV-0428 (S.D. Cal.).  On June 6, 2018, the Honorable Dana M. Sabraw, who is ably

presiding over that litigation, concluded that the plaintiffs stated a legally cognizable claim for

violation of their substantive due process rights to family integrity, and on June 26, 2018, he

granted a class-wide preliminary injunction requiring the Government to reunite parents with

their minor children by July 26, 2018.  Since that time, Judge Sabraw has closely supervised the

reunification process and related matters.  Most relevant for present purposes, on July 16, 2018,

he temporarily imposed a seven-day waiting period before members of reunified families could

be removed from the country, relief that had been sought by the plaintiffs to ensure that parents

could consult with their children and counsel about legal options prior to removal.

This case differs from *Ms. L.* in at least one significant respect: It is brought on behalf of *children* who were separated from their parents and are now being held in New York State. Plaintiffs in this case argue that the Government plans to detain them in facilities that do not meet applicable legal standards or to repatriate them as a family unit with their parents, "thereby depriving each child of his or her ability to pursue [his or her own] individual asylum and other child immigrant claims." (Docket No. 1 ("Compl."), ¶ 3). Plaintiffs further claim that the Government has taken to moving children across state lines without warning to counsel and coercing parents into signing insufficiently informative waivers of their children's due process, asylum, and child immigrant rights. (*Id.*). Plaintiffs ultimately seek to ensure that each class member has a meaningful opportunity to pursue asylum or other claims or, in the alternative, that each class member has the opportunity to voluntarily, intelligently, and knowingly waive those claims; they also seek to preserve class members' ability to consult with their parents, close family, and counsel about these decisions. More immediately, they seek injunctive relief barring Defendants from removing any Plaintiff from New York State without providing (1) forty-eight hours' notice of the pending transfer and certain related information to the Plaintiff and his or her counsel; and (2) an opportunity for the Plaintiff class member to consult with a parent or close family member and counsel in order to protect the child's ability to make informed decisions about his or her legal rights and potential claims.[1]

---

[1]     On the evening of July 16, 2018, Judge Laura Taylor Swain, sitting in Part I, held a hearing on Plaintiffs' application for emergency relief and granted the application in part, prohibiting the Government from removing putative class members represented by Legal Aid from New York State without providing forty-eight hours' notice of the forthcoming removal to Plaintiffs and their counsel. The temporary restraining order expires today at 10 a.m. absent

These are substantial claims, but the question right now is not whether they have merit. Instead, the question is whether they should considered in this forum or by Judge Sabraw in the Southern District of California.  Having considered the parties' arguments — made during a hearing held on the record on July 17, 2018, and in letters submitted the next day, (Docket Nos. 14-16; *see also* Docket No. 11) — and (with the parties' consent) having consulted with Judge Sabraw, the Court concludes for several reasons that Plaintiffs' claims should be transferred to the Southern District of California to be considered in conjunction with the claims in *Ms. L.*

*First*, the classes in the two cases concern the same families: Plaintiffs in this case seek relief on behalf of children whose parents are class members in *Ms. L.* (*Compare* Order, *Ms. L.*, ECF No. 82, at 17, *with* Compl., ¶ 66).  *Second*, the relief Plaintiffs seek in this case is, at bottom, *directly* related to the reunification process being supervised by Judge Sabraw.  In essence, Plaintiffs here contend that they have rights and interests distinct from the rights and interests of their parents and that the reunification process, and Judge Sabraw's own orders, do not adequately take their distinct rights and interests into account.[2]  That may or may not be the case, but Judge Sabraw is in a better position than this Court to decide those questions and to modify his own orders if appropriate.  And *third*, in the absence of a single judge presiding over both cases, there is a real

_____

extension, modification, or vacatur by the undersigned.

[2]     For example, Plaintiffs claim that the mere act of reunification mandated by Judge Sabraw's orders may deprive them of access to protections set forth in the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, 122 Stat. 5044, as those protections apply only to unaccompanied minors (which they are now) and not to accompanied minors (which they would become upon reunification).  (*See* Docket No. 14 ("Pls.' Letter"), at 3-4).  Further, Plaintiffs contend that they "have independent rights . . . that are being extinguished, through apparent waivers" being signed by their parents — waivers that may have been approved by the *Ms. L.* Court.  (*Id.* at 7-8).

3

risk of inconsistent decisions and conflicting orders — a particularly intolerable risk given the gravity and urgency of the issues in these cases (and the prospect of similar litigation being filed in other states where children separated from their parents are being held).

The Court is, of course, mindful of the deference that is owed to a plaintiff's choice of forum. *See, e.g.*, *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 106-07 (2d Cir. 2006). The Court is also aware that transferring this case will cause some inconvenience to Plaintiffs and Plaintiffs' counsel, who are located in New York. (*See* Pls.' Letter 9). Nevertheless, the Court is confident that Judge Sabraw can and will take steps to mitigate that inconvenience. And in any event, the inconvenience to Plaintiffs and Plaintiffs' counsel is vastly outweighed by the interests of justice, fairness, efficiency, and avoidance of conflict advanced by having a single judge presiding over both cases. Accordingly, pursuant to Title 28, United States Code, Section 1404(a), the Court transfers this case to the Southern District of California. *See, e.g.*, *Cont'l Grain Co. v. The Barge FBL-585*, 364 U.S. 19, 26 (1960) ("To permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads to the wastefulness of time, energy and money that § 1404(a) was designed to prevent."); *Wyndham Assocs. v. Bintliff*, 398 F.2d 614, 619 (2d Cir. 1968) (recognizing a "strong policy favoring the litigation of related claims in the same tribunal"); *Stroud Prods. & Enters. v. Castle Rock Entm't*, No. 07-CV-8638 (HB), 2009 WL 2391676, at *3 (S.D.N.Y. Aug. 4, 2009) ("[T]rial efficiency and the interests of justice weigh heavily in favor of litigating all related causes of action . . . in a single forum." (citation omitted)). Further, to preserve the status quo, the temporary relief granted by this Court on July 17, 2018, (Docket No. 9), is extended to give Judge Sabraw an opportunity to consider Plaintiffs' request for broader emergency relief. The

parties should promptly present those issues to Judge Sabraw so that he can decide whether to

maintain, modify, or vacate the order granting temporary relief.

The Clerk of Court is directed to transfer this action forthwith to the United States

District Court for the Southern District of California, to be assigned to Judge Sabraw.  The Clerk

of Court is directed to effectuate the transfer immediately, notwithstanding Local Rule

83.1, and then to close the case in this Court.


SO ORDERED.

Dated: July 19, 2018
     New York, New York

                                         JESSE M. FURMAN
                                  United States District Judge

# DEFENDANTS' EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------x
E.S.R.B. by and through his next friend :
Meryl Ranzer, J.E.C.M. by and through   :
his next friend Carline Pinto, R.M.S.C. :
by and through his next friend Melissa  :
Borja, K.M.G., K.D.G., S.G.G., and      :
F.E.O.G. by and through their next      :
friend Rev. Elizabeth G. Maxwell,       :
I.M.Q.S. by and through her next friend :
Senator Brad Benjamin, and K.C.A. by    :
and through her next Friend Letitia     :
James,                                  :
                                        :
        Plaintiffs,                     :
                                        :        18-cv-6654 (JSR)
        -v-                             :
                                        :           ORDER
                                        :           ‾‾‾‾‾
JEFFERSON B. SESSIONS III, Attorney     :
General of the United States; DEPARTMENT:
OF HOMELAND SECURITY ("DHS"); KIRSTJEN  :
NIELSEN, Secretary of DHS; U.S. CUSTOMS :
AND BORDER PROTECTION ("CBP"); KEVIN K. :
MCALEENAN, Commissioner of CBP; U.S.    :
IMMIGRATION AND CUSTOMS ENFORCEMENT     :
("ICE"); RONALD D. VITIELLO, Acting     :
Director of ICE; U.S. CITIZENSHIP AND   :
IMMIGRATION SERVICES ("USCIS"); L.      :
FRANCIS CISSNA, Director of USCIS; U.S. :
DEPARTMENT OF HEALTH AND HUMAN SERVICES :
("HHS"); ALEX AZAR, Secretary, of the   :
Department of Health and Human Services;:
OFFICE OF REFUGEE RESETTLEMENT ("ORR"); :
and SCOTT LLOYD, Director of ORR,       :
                                        :
        Defendants.                     :
------------------------------------------x

JED S. RAKOFF, U.S.D.J.

        This motion comes before the undersigned, sitting in Part I,

because of the request for emergency relief. For the reasons stated

from the bench, see Transcript, 7/29/18, which are here incorporated

by reference, the Clerk of Court is directed to transfer this action

forthwith to the United States District Court for the Southern

District of California, to be assigned to Judge Sabraw as related to

Ms. L. v. U.S. Immigration and Customs Enforcement, No. 18-CV-0428.

The Clerk of Court is directed to effectuate the transfer immediately,

notwithstanding Local Rule 83.1, and then to close the case in this

Court.

      SO ORDERED

Dated:   New York, NY

        July 2<sup>y</sup>, 2018               JED S. RAKOFF, U.S.D.J.

# DEFENDANTS' EXHIBIT 4

I7O8ESRC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

ESRB,

                    Plaintiff,                 PART I

            v.

JEFFERSON BEAUREGARD SESSIONS,

                    Defendant.

------------------------------x

                                        July 24, 2018
                                        2:45 p.m.

Before:

                    HON. JED S. RAKOFF,

                                        District Judge

                            APPEARANCES

THE LEGAL AID SOCIETY
        Attorneys for Plaintiff
SARAH GILLMAN
GREGORY COPELAND
JENNIFER LEVY

GEOFFREY S. BERMAN
        United States Attorney for the
        Southern District of New York
MICHAEL J. BYARS
BRANDON M. WATERMAN
        Assistant United States Attorneys

I7O8ESRC

1      (Case called)

2      THE DEPUTY CLERK:  Will everyone please be seated, and

3      would the parties please identify themselves for the record.

4      MR. COPELAND:  Gregory Copeland of The Legal Aid

5      Society for the plaintiff petitioner.

6      MS. GILLMAN:  Sarah Gillman, The Legal Aid Society,

7      for the plaintiff petitioner.

8      MS. LEVY:  Jennifer Levy, The Legal Aid Society, for

9      the plaintiff petitioner.

10     MR. BYARS:  Assistant U.S. Attorney Michael Byars for

11     the respondent.

12     MR. WATERMAN:  Assistant U.S. Attorney Brandon

13     Waterman on behalf of the respondents.

14     THE COURT:  So I have received a copy of the proposed

15     order to show cause, as well as the memorandum of law in

16     support of the order to show cause and the underlying

17     complaint.

18     I would have thought that the proper way to proceed is

19     to give the government a short window to put in responding

20     papers, provided that the status quo remain as is during that

21     short period.

22     So I was thinking maybe the government could get in

23     their papers by Thursday morning, and we could hold oral

24     argument and if necessary -- well, we would hold oral argument

25     on Thursday afternoon, and if there was an evidentiary hearing

I7O8ESRC

1    that was needed, then we could hold that on Friday.

2          So any objections to that?

3          MS. GILLMAN:  No, your Honor, we do not object to

4    that.

5          MR. BYARS:  Your Honor, this schedule raises some

6    concern for the government.  As I am sure your Honor is aware,

7    the issue of the reunification of parents and children is under

8    active management by Judge Sabraw in the Southern District of

9    California.  The judge set a deadline Thursday for

10   reunifications to take place and the government is working to

11   make sure that that happens.

12          Last Monday, shortly before 8 p.m., the government was

13   notified of an action in Part I before Judge Swain.  We

14   appeared Monday night.  Judge Swain entered a temporary

15   restraining order.

16          THE COURT:  Are you talking about last week?

17          MR. BYARS:  Yes.  The case was sent to Judge Furman.

18   We saw him the next day.  Then on Thursday of last week, Judge

19   Furman entered an order transferring that case to the Southern

20   District of California, and I am happy to hand up a copy of the

21   order.

22          THE COURT:  I have a copy.  Thank you.

23          MR. BYARS:  I would like to draw your attention, your

24   Honor, if I may, to the bottom of page 4, in which Judge Furman

25   says, "To preserve the status quo, the temporary relief granted

I7O8ESRC

1   by the court on July 17, 2018, Docket No. 9, is extended to

2   give Judge Sabraw an opportunity to consider plaintiff's

3   request for broader emergency relief.  The parties should

4   promptly present those issues to Judge Sabraw so he can decide

5   whether to maintain, modify, or vacate the order granting

6   temporary relief."

7           I am hard-pressed to understand what Legal Aid is

8   asking for in this action that is not encompassed by Judge

9   Furman's direction, and it raises some very real practical

10  concerns.  On the day that we appeared before Judge Swain,

11  Judge Sabraw held a hearing.  Commander of Public Health

12  Service Jonathan White appeared and established to Judge

13  Sabraw's satisfaction that a 12-hour notice period prior to

14  transporting these children was not needed and would interfere

15  with the logistics of reuniting these children with these

16  parents.  I am not sure why these issues should be determined

17  anywhere else but in the Southern District of California.  And

18  I would note that all of the parents whose children are

19  represented here, all of these parents have told HHS that they

20  want their children, and they want them as soon as possible.

21          Now, the Southern District of California court was

22  open last night when we received notice from Legal Aid at 8:19

23  p.m., 5:19 p.m. California time.  That court was open.  It

24  would have been open after-hours.

25          THE COURT:  Are you sure it wasn't closed at 5 p.m.?

1    I don't know, but most courts do close at 5 p.m., and my many

2    wonderful trips to California suggest to me that working

3    overtime is not their favorite occupation.  So what makes you

4    think that court was open?

5         MR. BYARS:  Judge Sabraw has a jury trial ongoing.  I

6    am sure that Legal Aid could have reached out, certainly this

7    morning before today's hearing.  It's almost noon there.  There

8    is a hearing today on the case at 3 p.m.

9         THE COURT:  Just so I understand what your proposal

10   is.  Is your proposal that I transfer this matter forthwith to

11   Judge Sabraw?  Is your proposal that I simply deny the order to

12   show cause?  Is your proposal that I do all that without

13   hearing anything further from the government in terms of

14   written submissions?  I just want to be clear what you're

15   specifically asking for.

16        MR. BYARS:  I would ask for an immediate transfer of

17   this case to Judge Sabraw.  Absent that, then I think that the

18   case should be -- we can certainly brief the case, but I think

19   that any interim relief that your Honor were to consider here

20   is plainly going to delay reunifications of children with

21   parents who have asked to be reunified with their children, and

22   that should not happen.  It would contradict the court order

23   that Judge Sabraw has put in place requiring reunifications by

24   Thursday, and it's just going to slow everything down.

25        Moreover, it appears that what Legal Aid wants to do

I7O8ESRC

1   is to force the parents to come to New York in order to get

2   their children, and testify in a proceeding here to the

3   satisfaction of Legal Aid before they can do that.  That just

4   seems completely contrary to the case's active management in

5   the Southern District of California.  Legal Aid is not a

6   guardian ad litem here.  The parents here have indicated what

7   their decision is and their decision should be given effect.

8            THE COURT:  Let me hear from plaintiff's counsel.

9            MS. GILLMAN:  Thank you, your Honor.

10           So we come here today with a very simple ask.  We are

11   simply asking that our clients, the eight children that we have

12   brought this individual habeas action on behalf of, be given

13   the opportunity to have a meaningful conversation with their

14   parents before they make what would be the most important

15   decision in their young lives.  The government frames this as a

16   very simple issue of reuniting the parents and the children,

17   but the Legal Aid Society here is representing in this

18   particular action before your Honor eight individuals, who

19   range in age from 9 to 17, who were forcibly separated from

20   their parents.

21           The reason that we brought this action before your

22   Honor is because the government notified the plaintiff's

23   counsel that transfer of these children outside the

24   jurisdiction of New York was going to happen imminently.

25           Number one, we got this notification very late on

I7O8ESRC

1   Saturday night.  The plaintiffs are currently housed in

2   facilities that are run by the Office of Refugee Resettlement.

3   Those facilities are not open on the weekend, and so that made

4   any communication even with counsel seriously difficult.

5        Next, your Honor, again, we are dealing with children

6   between the ages of 9 and 17.  We are not making a big ask

7   here.  There is a group of children who are in our papers

8   before your Honor.  There's four children and one family.  So

9   we are talking about five parents for eight children.

10        THE COURT:  I guess what I am unclear about is the

11   government, if I understand it, says that all the children,

12   including, presumably, these eight, were being reunified with

13   their parents.  So if that's true, isn't that what you wanted?

14        MS. GILLMAN:  Your Honor, we do not oppose

15   reunification.  However, we are here representing the

16   individual children, eight of them, and in order to ensure that

17   their rights are protected, including, but not limited, the

18   right to seek any independent relief such as asylum, that they

19   have the opportunity to have a meaningful communication with

20   their parents.

21        THE COURT:  Presumably, the way to have that is, in

22   the first instance, by reuniting them.

23        MS. GILLMAN:  Your Honor, the reunification of our

24   clients, if it was to take place under the framework that the

25   government is proposing, would not allow for meaningful

I7O8ESRC

1    communication, number one, between the plaintiffs and their

2    counsel.  Number two, the defendants have not indicated where

3    these children and their parents are going to be reunited.

4    They have indicated sort of a suggestion as to where they are

5    going to be reunited.  But there is another issue at play here,

6    which is that these children cannot be placed in facilities

7    that are not in compliance with the *Flores* settlement.

8            THE COURT:  How did you come to represent these eight?

9            MS. GILLMAN:  The Legal Aid Society, part of our

10   office, your Honor, is comprised of a youth project.  The youth

11   project does outreach with children who are in the custody of

12   Office of Refugee Resettlement.  These eight children are from

13   a larger group of children that were part of litigation that

14   was brought last week, which the government made reference to,

15   and these children are being represented by the Legal Aid

16   Society through our youth project.

17           THE COURT:  Did these children request your

18   representation?

19           MS. GILLMAN:  Yes, they did, your Honor.

20           THE COURT:  In what form did they do that?

21           MS. GILLMAN:  The way that the youth project works is

22   that we receive referrals from agencies that go in and

23   initially meet with children in ORR custody.  And then once a

24   referral is sent to us, we go and meet with the individual

25   children at the facilities.  In this particular instance, the

1  facilities are in New York, and the children indicated what

2  their wishes were to us, and we have then followed through with

3  those wishes, in terms of what we have stated in the papers.

4          THE COURT:  Let me go back to defense counsel.

5          So with respect to these eight children, what form is

6  reunification taking and when?

7          MR. BYARS:  My understanding is that they would be

8  transported to meet with their parents on, I believe, as early

9  as tomorrow the transportation would take place.

10          THE COURT:  Transportation to where?

11          MR. BYARS:  Well, it depends on where their parents

12  are located, but, presumably, some of them are located in

13  Texas.

14          THE COURT:  And this is all pursuant to the order of

15  the California federal judge?

16          MR. BYARS:  It's all under the supervision of that

17  judge, yes, your Honor.

18          THE COURT:  Is the timetable one that that judge set

19  or not?

20          MR. BYARS:  The deadline for Thursday's reunifications

21  to be completed is set by the Southern District of California,

22  by Judge Sabraw.

23          THE COURT:  Let me go back to plaintiff's counsel.

24          If these children are all going to be taken as early

25  as tomorrow, and no later than Thursday, to be reunited with

1    their parents, I am at a loss to see why you object to that.

2         MS. GILLMAN:  Well, the issue, again, your Honor, is

3    that the government has not indicated what this reunification

4    means, meaning what happens after there is reunification with

5    the parents.  Does that mean that the child and the parent will

6    then be detained in a facility that is not compliant with the

7    *Flores* settlement?  Does the reunification mean that the parent

8    and child will be deported?

9         THE COURT:  Aren't those the kind of issues that are

10   before the judge in California?

11        MS. GILLMAN:  They are not, your Honor.  The *Ms. L*

12   class represents the parents and not children, and that's why

13   we had to come before your Honor on behalf of these eight

14   children.  If the children are sent, as per the plan of the

15   government, and as your Honor just previously asked defense

16   counsel, we don't know what is going to happen after they are

17   moved to be with their parents, and therein lies the problem.

18   Because of the fact that they were separated from their

19   parents, because of the fact that they were children --

20        THE COURT:  But if the judge in California is dealing

21   with reunification from the standpoint of the parents, doesn't

22   it make sense, if there are separate interests involving the

23   children, that those also be litigated before that same judge?

24        MS. GILLMAN:  Not in this particular instance, your

25   Honor.  Again, I am sorry that I keep repeating myself, but we

I7O8ESRC

1   are dealing with eight young children.  By virtue of the fact

2   that they were separated from their parents, they have

3   obviously experienced trauma.  We have one plaintiff in our

4   action before your Honor who suffers from attention deficit

5   disorder, who really has been suffering within the context of

6   the facility and the separation from his parent.  The *Ms. L*

7   litigation simply seeks to reunify, but it's not representing

8   the interests of the eight plaintiffs that come before your

9   Honor.

10          THE COURT:  If I were to transfer this case to

11  California, then you, or your California co-counsel, would

12  still have full standing to represent the interests of those

13  children there.

14          MS. GILLMAN:  Well, your Honor, I think there are a

15  couple of problems there.  Number one, as defense counsel

16  referenced, and as is set forth in our moving papers, they are

17  also under the requirements of the order that was issued by the

18  Honorable Swain last Monday.  Within that order, Judge Swain

19  required that there be meaningful communication and that

20  specifically the government advise within 48 hours of the

21  purpose of the release, detention, or repatriation.  We haven't

22  been advised of any of those things.

23          Moreover, again, the action here before your Honor

24  really just involves -- it's a very minimal ask.  We are simply

25  asking that the children be able to communicate with their

1    parents, and that that be facilitated by the parents being

2    brought to New York so they can actually engage in this

3    communication.  If they are transferred out of this

4    jurisdiction, it's going to be impossible for them to engage in

5    that meaningful communication.  Again, these children --

6         THE COURT:  That's what I am not fully understanding.

7    Why are they going to have any less meaningful communication in

8    Texas, for example, where I gather some will be reunited, than

9    here?

10        MS. GILLMAN:  Well, I think there's a few things.  The

11   first thing is we don't know what will happen to them upon

12   transfer to Texas.  So we don't know what the purpose is once

13   they get there.  Are they being deported?  Are they not being

14   deported?  Are they going to be able to proceed with their own

15   independent claims?  And again, that's not something we know.

16   We just simply don't know that.

17        The second thing is that their attorneys are here in

18   New York, and we think that it's incredibly important for them

19   to be able to consult with their parents and then have the

20   ability to consult with their attorneys.

21        Third, I think that again, as I referenced before, we

22   are not dealing with simply the transfer of -- just the general

23   transfer.  These are children, again, who are just going

24   through an incredibly difficult time, and if they are sent to

25   the detention facilities that the government -- again, we don't

1    exactly know what facilities they are; we don't know what

2    accommodations are there for these children.

3            These children right now are in facilities in New York

4    that, although it's very difficult for them, although they are

5    separated from their parents, although they are going through

6    trauma, at least in these facilities, these facilities are

7    compliant with the requirements of the *Flores* agreement, which

8    allows for certain accommodations to be made for these

9    children.  If these children are transferred across the country

10   to various detention facilities, we have no indication of what

11   those facilities will be.

12           Therefore, the idea that they can engage in meaningful

13   communication and meaningful consultation is virtually

14   impossible, because you're taking someone who has already been

15   traumatized, you're sending them from a facility that, although

16   not perfect, not their home, not with their parent, actually

17   does have some level of care that can address these child's

18   needs, and then you're transferring them out of that facility,

19   where they have already been transferred from their parents

20   forcibly, and they are put in a situation where we don't know

21   what is going to happen.

22           Again, we are simply asking for a very small ask, and

23   I think your Honor's --

24           THE COURT:  I am trying to get down to the

25   practicalities of this.  The government says it's under an

1    order from the judge in California to reunite children and

2    parents by Thursday.  And you say, if I understand you

3    correctly, that's fine, but they need to be reunited here

4    rather than someplace else so that they can have, in effect,

5    communication with you.

6           Do I have that right so far?

7           MS. GILLMAN:  Yes, your Honor.  I think we are also

8    asking that our clients' wishes be adhered to here.  If they

9    are transferred out of this jurisdiction, I don't think that

10   their wishes would be adhered to for all the reasons I

11   previously stated.

12          The other issue we have here, your Honor, and why we

13   had to come before you today --

14          THE COURT:  Isn't their single biggest wish to be

15   reunited with their parents?

16          MS. GILLMAN:  No, your Honor.  Some of the children

17   who are here before you today are actually very, very scared of

18   going back to their country, and they would like the right to

19   pursue their own independent claim for asylum.  But as your

20   Honor can understand, we are dealing with a situation where

21   these children are left in a situation where they are being

22   told you have to reunify with your parents, but you're not

23   really being told what that means, and where you're going, and

24   whether or not you're going to have the right to actually

25   proceed with your own application for relief.  And in the same

1   time, you're dealing with a group of children who have just

2   suffered trauma and will continue to suffer trauma.

3          And the problem with what the government is proposing,

4   and I guess their objection to what we have proposed to your

5   Honor, is that there hasn't been meaningful notice provided to

6   our clients.  Again, we received an e-mail notification very,

7   very late on Saturday evening, and that notification did not

8   provide any substance.  The only thing it provided was, we are

9   going to be transferring these children.

10         I think what your Honor proposed in the initial ask to

11  both the plaintiff and the defendant is more than reasonable.

12  We are, again, speaking about five parents here.  We are not

13  talking about thousands of parents.  We are talking about five

14  parents, eight children.  And all we want to do is make sure

15  that they have the opportunity to meaningfully engage with

16  their parents and make a decision after that is done.  And it's

17  just impossible to do if they are taken from New York and

18  transferred across the country.  I don't want to say across the

19  country in all cases, because I think some of these facilities

20  are in Texas, so I guess partially across the country.

21         THE COURT:  Let me hear from defense counsel.

22         MR. BYARS:  A couple of points, your Honor.

23         The Legal Aid attorneys sitting here today have

24  entered appearances -- at least Mr. Copeland and Ms. Gillman

25  have -- in the Southern District of California.  The case that

I7O8ESRC

1    they filed last week has been transferred to the Southern

2    District of California before Judge Sabraw.

3              THE COURT:  These children?

4              MR. BYARS:  The case that was filed in Part I last

5    week, the putative class action involving the interest of the

6    children that Ms. Gillman has been describing, that case has

7    been transferred by Judge Furman.

8              THE COURT:  Were any of these eight individual

9    plaintiffs in that case?

10             MR. BYARS:  My understanding, and you can perhaps

11   confirm with Legal Aid, but they were purporting to represent

12   70 children.  I understand that the eight that they are

13   speaking of now are eight out of the 70 children that were

14   potential class members in last week's action.

15             THE COURT:  Let me just stop you there to make sure

16   your adversary agrees with that.

17             Were these eight within the group that Legal Aid filed

18   on behalf of the 70?

19             MS. LEVY:  Yes, your Honor.  These clients were

20   clients of Legal Aid's, but the proceeding that we filed last

21   week was one that sought the 48 hours' notice; it did not seek

22   this relief on behalf of the plaintiff children.  What happened

23   was we filed that case.  We received minimal notice late on

24   Saturday night of 50 of our clients.

25             THE COURT:  I have heard about minimal notice on

1    Saturday night.  I, myself, was of course in chambers working.

2            Let me go back a step.  You filed an action on behalf

3    of 70 children, a class action that was filed initially before

4    Judge Furman; is that right?

5            MS. LEVY:  It was initially filed --

6            MS. GILLMAN:  Sorry, your Honor.  So the action was

7    initially before, of course, Judge Swain because she was the

8    Part I judge.

9            THE COURT:  Then it was assigned to Judge Furman.

10           MS. GILLMAN:  So the eight children that we are

11   speaking about here today were not individual plaintiffs in

12   that action.

13           THE COURT:  They were just members of the class.

14           MS. GILLMAN:  Yes.

15           THE COURT:  Did Legal Aid purport nevertheless to have

16   an attorney-client relationship with these eight in what they

17   presented to Judge Furman or Judge Swain?

18           In other words, it seems to me there is a difference

19   here between going in and saying, on behalf of Tom, Joe and

20   Mary, we are bringing a class action for the following 500

21   people.  If those 500 want their own separate lawsuit, they are

22   more than entitled to.  They, in effect, are opting out of the

23   class, or seeking additional or corollary relief.  If, on the

24   other hand, Legal Aid goes in, or a lawyer goes in in my

25   hypothetical and says, We have been authorized by not just Tom,

I7O8ESRC

1    Joe and Mary, but by the following 70 people to be their

2    lawyer, then it seems to me the representation was that they

3    will be bound by the relief in that action.  So I am not sure

4    which of these two scenarios this is.

5            MS. GILLMAN:  Can I have just a moment to consult with

6    my co-counsel?

7            THE COURT:  Yes.

8            MS. GILLMAN:  So, your Honor, when we went in last

9    week, the class was for all children in New York State who are

10   being held in the Office of Refugee Resettlement.  Subsequent

11   to that action being brought, the eight children that we are

12   here in court before your Honor about were referred to The

13   Legal Aid Society and are clients of The Legal Aid Society.

14           THE COURT:  That only partly answers my question.

15           The action filed before Judge Swain and Judge Furman

16   was a class action pursuant to Rule 23 or some similar rule?

17           MS. GILLMAN:  Yes, your Honor.

18           THE COURT:  Then I come back now to defense counsel.

19   If they were not the named plaintiffs, these eight, and they

20   were just members of the class, that doesn't in any way

21   preclude this lawsuit.

22           MR. BYARS:  I believe that these eight individuals

23   were on a list of 70 children that were provided to us.

24           THE COURT:  But that's like saying, if I brought a

25   securities class action and I said, Judge, John Jones is a

1   shareholder and here is a list of -- we don't have to guess, we

2   know who the other 69 shareholders are.  Here they are, and we

3   will seek certification of the class, and so we are bringing

4   this as a class action.  Until and unless that class is

5   certified, and maybe even then, those other 69 in my

6   hypothetical are free to bring whatever action they want.  They

7   are not in any way, shape or form precluded by the fact that

8   John Jones said he is representing the class.

9           So I would have to see the transcript, but they

10  brought the other action as a class action.  Nothing precludes

11  these other members of the class from seeking different or

12  alternative relief.

13          MR. BYARS:  Your Honor, just looking at page 2 of

14  Judge Furman's order, in a footnote it refers to Judge Swain's

15  granting emergency relief to prohibit the government from

16  removing putative class members represented by Legal Aid from

17  New York State without providing 48 hours' notice.  I think

18  that the eight individuals at issue in this case are on the

19  list of 70 that was provided by Legal Aid and would be part of

20  the putative class.  I think they are either represented by

21  Legal Aid or members of the putative class, but subject to the

22  relief granted by Judge Swain, and extended by Judge Furman,

23  and extended by Judge Furman with the specific direction that

24  this temporary relief would give Judge Sabraw an opportunity to

25  consider requests for broader emergency relief.  I think that

I7O8ESRC

1    is what is happening here.

2         THE COURT:  I don't see anything in a footnote that

3    detracts from the right of any individual member to seek the

4    relief that is being sought here.  Judge Swain ordered a

5    prohibition on the government from removing putative class

6    members represented by Legal Aid from New York State without

7    providing 48 hours' notice.  They are not seeking to remove

8    them from New York State.  They want them to stay in New York

9    State and have the parents brought here.  So there is no

10   contradiction there.  Moreover, I think the key adjective there

11   is "putative."  Nothing that I know in the law precludes

12   someone who has been brought in as a class member, but is not

13   an individual class representative, from saying, I don't want

14   to be part of that class, I want to opt out, I want my own

15   relief, which is, in effect, at best, at most, what is being

16   asked for here.  Now, whether it presents Legal Aid with a

17   conflict, that's a different question.

18        So I don't understand what in this footnote you think

19   creates a problem for what they are asking for here.

20        MR. BYARS:  I think what was directed in the footnote

21   was temporary emergency relief that applied to the eight

22   individuals who are seeking broader relief here.  And the

23   purpose of the transfer was to allow that to happen in such a

24   fashion so that the district judge that is actively managing

25   the reunification process could consider all of the issues that

1   are in this case as well as in the *Ms. L* case.

2          I note that, for example, one of the things that Judge

3   Sabraw has done is to institute a seven-day stay of removal

4   following reunification.  That's the kind of thing that the

5   judge can do there in order to try to provide for protections

6   for the reunification process.  Judge Sabraw is actively

7   involved in doing this.  In fact, in about two hours and 32

8   minutes he is going to be having another hearing in the *Ms. L*

9   case, and presumably will also be considering the *NTC* case as

10  well.  So there is a very real risk here of this action

11  delaying the directions of Judge Sabraw in the Southern

12  District of California case.  The order that he has directed

13  the government to reunify children with their parents by

14  Thursday evening is very --

15          THE COURT:  In a case where there is a potential

16  conflict between two federal judges, my normal practice would

17  be to, on consent of the parties, call the other judge and find

18  out whether there really is a conflict or not in the other

19  judge's mind.  So does anyone have any objection to my calling

20  Judge Sabraw right now?

21          MR. BYARS:  Your Honor, the government has no

22  objection, and we note further that Judge Furman actually did

23  the exact same thing last week.  He called Judge Sabraw to

24  figure out -- I don't know what they talked about, but he did

25  call him about the *NTC* case.

I7O8ESRC

1          THE COURT:  I am glad that the younger judges know in

2     advance to follow the path set by the older judges.

3          Any objection from Legal Aid?

4          MS. GILLMAN:  We have no objection to the Court

5     calling the judge in the *Ms. L* litigation, but we think it's

6     appropriate, given the claims that are being brought before

7     your Honor which involve the *Flores* settlement, for your Honor

8     to call Judge Gee, who is the judge in the *Flores* case.

9          THE COURT:  In which case?

10          MS. GILLMAN:  In the *Flores* case.  It's the *Flores*

11     settlement.  Your Honor, of course we have no objection to you

12     calling the *Ms. L* judge, but it would also be, I think,

13     appropriate and necessary, given the claims before this Court,

14     that you call Judge Gee.  We understand that in that case there

15     is a hearing scheduled before Judge Gee on Friday.

16          THE COURT:  A hearing on what?

17          MS. GILLMAN:  A hearing on these issues involving what

18     is going on with the children who are subject to the *Flores*

19     settlement, in terms of the reunification of the parents in the

20     *Ms. L* litigation.

21          THE COURT:  To move this along, let me go see if I

22     could reach Judge Sabraw.  If I decide as a result of that

23     conversation that I should also call Judge Gee, does the

24     government have any objection?

25          MR. BYARS:  Your Honor, I think the two are distinct.

I7O8ESRC

1  I think that Judge Gee, first of all, her proceeding on Friday

2  is necessarily after the deadline that's of real importance and

3  urgency here, which is the Thursday deadline.  I am not sure

4  how Judge Gee's views on the *Flores* settlement case would

5  inform the issues before the Court.

6       THE COURT:  That all may be true.  That's why I may or

7  may not feel the need to call Judge Gee.  But my question is,

8  just to move this along, because we are under various time

9  pressures, if after talking with Judge Sabraw I feel it would

10  be useful for the Court to call Judge Gee, do you have any

11  objection?

12       MR. BYARS:  No, your Honor.

13       THE COURT:  So we will take a short break and I will

14  try to reach one or both of those judges.

15       (Recess)

16       THE COURT:  So I had a very useful conversation with

17  Judge Sabraw, and before I rule I want to go back to the

18  government.

19       Tell me exactly what was the notice that you sent on

20  Saturday evening.

21       MR. BYARS:  I can check my phone.  I can tell you

22  exactly.

23       THE COURT:  Sure.

24       MR. BYARS:  Your Honor, there is a cover e-mail to Mr.

25  Copeland from an HHS attorney, and the cover e-mail says,

1   "Please find attached the list that ORR received from DHS of

2   children in the *NTC* class that are cleared for reunification

3   with their parent.  The spreadsheet indicates where the parent

4   is located and where the reunification will take place.  I

5   realize it is late on Saturday night.  However, we wanted to

6   provide this information to you as soon as possible in order to

7   comply with the 48-hour notice.  The federal field specialists

8   are arranging for transportation for the children.  HHS is also

9   instructed to provide the following information.  The

10  information merely reflects the intent of ICE --"

11          THE COURT:  Speak a little louder.

12          MR. BYARS:  "The information merely reflects the

13  intent of ICE at the current time, and based on currently

14  available information.  All custody and removal determinations

15  will be made at the time the minor and parent are detained in

16  ICE custody.  ICE is not bound by this initial information and

17  provides such information merely to inform The Legal Aid

18  Society pursuant to the injunction in the *NTC v. ICE*, case

19  number 18-6428, SDNY, filed July 16, 2018."

20          Then there is a spreadsheet.  It has, I think it's 70

21  names.  There's various information at the top.  There is an

22  identifying number, family name, given name, gender.  Then

23  there is a facility name, reunification site; a column for

24  final order yes or no, final order executable, final order

25  date, matching child first name, matching child last name, and

I7O8ESRC

| | |
|---|---|
| 1 | then an identifying number.  Then a column that says "want |
| 2 | child?"  A column for criminality, whether there has been a |
| 3 | conviction or charge or no charge, suspected of gang |
| 4 | affiliation, most serious conviction, most serious pending |
| 5 | charge, and various comments, and a custody decision.  So it |
| 6 | has all that information in the spreadsheet. |
| 7 | THE COURT:  Let me go back to plaintiff's counsel. |
| 8 | What is it that you think, if anything, the government |
| 9 | was required to provide in that notice that they didn't |
| 10 | provide? |
| 11 | MS. GILLMAN:  So, your Honor, the information that |
| 12 | they provided in that e-mail that was just read by Mr. Byars is |
| 13 | wholly insufficient.  In particular, the end part of that |
| 14 | e-mail I think frames the problem with the notice that was |
| 15 | required, in that it says "this information merely reflects the |
| 16 | intent of ICE at the current time."  The meaning of notice is |
| 17 | that the person actually gets real notice and the opportunity |
| 18 | to respond to that notice. |
| 19 | The other problem in that notification that Mr. Byars |
| 20 | just read is that it failed to indicate whether these children |
| 21 | were going to be facing long-term detention with their parents |
| 22 | in facilities that were noncompliant with the *Flores* settlement |
| 23 | and whether or not they were facing deportation upon |
| 24 | reunification. |
| 25 | If you would excuse me one moment, your Honor.  Sorry. |

I7O8ESRC

 1          THE COURT:  So the reason I asked this in part is that

 2    Judge Sabraw brought to my attention that he has put in place

 3    all sorts of provisions to address the very issues you just

 4    raised, that he was cognizant even before the action brought

 5    before Judge Swain and Judge Furman that the interests of the

 6    children are not necessarily coincident with the parents'

 7    interests at all times, but that at the same time

 8    reunification, at least in the short-term, was something he

 9    wanted to bring about promptly.  So he, as I understand it, has

10    arranged at each of the facilities where reunification is

11    taking place, pursuant to his order, that there will be present

12    people who will analyze and then report back to him on those

13    kinds of issues so that he can make an informed judgment.

14          He also told me something that I must say was quite

15    surprising to me, which was that Legal Aid had not made any

16    efforts to appear before him since Judge Furman transferred the

17    case other than filing a pro hac vice motion.  One would have

18    thought, given the exigencies that plaintiff's counsel has

19    raised, that since it's the same counsel in the class action,

20    that those matters would have been sought to be brought before

21    him on a highly expedited basis, as it was in this court.

22          Did you want to say anything about that?

23          MS. GILLMAN:  Your Honor, I think while we, of course,

24    appreciate the fact that Judge Sabraw has indicated that he has

25    put in place what he believes are -- I don't know how you want

1   to refer to them -- requirements, that still doesn't address

2   the issues that are before this Court.  The issue is that --

3   and why we specifically asked for your Honor to call Judge

4   Gee -- is that our individual clients that are appearing before

5   your Honor cannot have their interests properly represented in

6   the actions that are being taken by the *Ms. L* litigation,

7   because, again, the issue here is that --

8          THE COURT:  To the extent that they have interests

9   that are not being represented, now that the class action is

10  before Judge Sabraw, why haven't you taken emergency action to

11  bring those interests to his attention?

12         MS. GILLMAN:  Well, your Honor, to begin with, we,

13  again, got this e-mail notification from the government very

14  late on Saturday night.

15         THE COURT:  I understand that.  But Judge Furman's

16  order came down before that.

17         MS. GILLMAN:  Your Honor, can I have one moment.  I'm

18  sorry.

19         THE COURT:  Yes, of course.

20         MS. GILLMAN:  So, your Honor, again, not to repeat

21  myself, but if you will just excuse me I will do it one more

22  time.  We got this e-mail notification very late on Saturday

23  night.

24         THE COURT:  I must say that I made a point of bringing

25  that to Judge Sabraw's attention, because it seemed to me that

I7O8ESRC

1    that was arguably quite heavy-handed on the government's part,

2    but I am sure they would say they were trying to expedite

3    things as quickly as possible.  Nevertheless, it, at least on

4    its face, smacks a little bit of gamesmanship, but then so does

5    this action smack of gamesmanship.

6              MS. GILLMAN:  I will not repeat myself again.  We will

7    start from the late e-mail notification.  After receiving the

8    late e-mail notification, my colleagues at The Legal Aid

9    Society made efforts to reach out to government counsel to

10   clarify the ambiguity that is inherent in the notice that Mr.

11   Byars --

12             THE COURT:  Excuse me.  Forgive me.  So who called

13   whom?

14             MS. GILLMAN:  We reached out to the individual who

15   sent us the e-mail, and we --

16             THE COURT:  Who is the individual who sent the e-mail?

17             MS. GILLMAN:  My colleague, Mr. Copeland, is going to

18   do this.

19             MR. COPELAND:  These were mostly e-mail

20   communications.  It was with the Department of Health and Human

21   Services.  I think it's a Ms. Lisette Mestre reached out to me.

22             THE COURT:  I'm sorry.  The person who sent you the

23   e-mail, which we will hereinafter refer to as "the Saturday

24   night e-mail," was whom?

25             MR. COPELAND:  So --

I7O8ESRC

| | |
|---|---|
| 1 | THE COURT:  Is that not a question that can be |
| 2 | answered by a name? |
| 3 | MR. COPELAND:  Yes.  I think I said it.  Lisette |
| 4 | Mestre. |
| 5 | THE COURT:  Spell it for the record. |
| 6 | MR. COPELAND:  L-I-S-E-T-T-E, last name M E S T R E. |
| 7 | THE COURT:  Does that person give in the e-mail her |
| 8 | position? |
| 9 | MR. COPELAND:  Yes, your Honor.  She is an attorney |
| 10 | with the Office of General Counsel, Children, Families and |
| 11 | Aging, U.S. Department of Health and Human Services. |
| 12 | THE COURT:  OK.  Who was it from your end who then |
| 13 | e-mailed her with requests for more information, if that's what |
| 14 | happened? |
| 15 | MR. COPELAND:  That was me. |
| 16 | THE COURT:  So we have got the real party interest. |
| 17 | What did you ask her? |
| 18 | MR. COPELAND:  I asked her what -- I just want to make |
| 19 | sure I speak properly.  She had e-mailed me earlier on |
| 20 | Saturday, not just the Saturday night e-mail.  She sent me an |
| 21 | earlier e-mail that was asking for us to waive the protections |
| 22 | of the TRO as to two siblings that wanted to be reunited in |
| 23 | advance.  So that's how our communication started.  She |
| 24 | indicated that she was the lead counsel for Health and Human |
| 25 | Services on this case. |

1          So she sent me that.  We looked into that case,

2     determined that this was somebody that did indeed want to be

3     reunited on a more expedited basis, didn't have any of the

4     issues that we are facing with the eight children that we are

5     here in court for today.

6          So to respond to your question, I believe it was the

7     next morning, there was more communications between myself and

8     attorney Mestre.  Then at some point we learned that prior to

9     the expiration of the 48 hours, even going from the time of the

10    Saturday night e-mail, what would be 48 hours there, that one

11    of our clients had actually been moved, and I think that that

12    happened on early Monday.

13         So our understanding was that that was not complying

14    with the order.  So we reached out to attorney Mestre about

15    that, as well as indicating that we had these additional

16    clients that form, I think, the majority of the named

17    plaintiffs in this action, who we indicated we wanted to know

18    the status of whether or not they would be moved because we

19    were aware of the fact that they had expressed wishes to not be

20    reunited in detention or some other sort of issue in terms of

21    their reunification.

22         THE COURT:  Just so I am clear, you wanted to know,

23    number one, whether any of them were about to be imminently

24    moved, and if so, whether it's for purposes of detention or

25    deportation.  Do I have that right?

I7O8ESRC

1        MR. COPELAND:  That is correct, your Honor.

2        THE COURT:  What was the response?

3        MR. COPELAND:  There was further communication with

4   Ms. Mestre that didn't address that request yesterday, in terms

5   of we had also provided other individuals that were part of the

6   TRO that also wanted to waive.

7        Then we received an e-mail yesterday evening, I

8   believe it was from the Department of Justice's -- one of the

9   lead attorneys in the *Ms. L* litigation, I believe his name is

10  August -- I am going to mispronounce his last name -- Lente, or

11  something of that nature, which essentially said that the

12  notice provided on Saturday night was compliant notwithstanding

13  the fact that we had raised the issue that given --

14       THE COURT:  So they had given you what they thought

15  was required, and they weren't giving you anything else, is

16  that the gist of it?

17       MR. COPELAND:  Basically, yes.

18       THE COURT:  Let me go back to the government.

19       I am not quite sure why you weren't giving more

20  information.

21       MR. BYARS:  Your Honor, I think HHS and Main Justice

22  were providing what they could to Legal Aid, and they believed

23  that they had satisfied the requirement.

24       THE COURT:  Well, there is a question of whether they

25  have satisfied the requirements and there is a question of

1   whether they are operating in the spirit of Judge Furman's

2   orders, Judge Swain's orders, and to the extent relevant, Judge

3   Sabraw's orders.  I don't understand why more of an attempt

4   couldn't have been given to answer some of those inquiries.

5        Do you have any objection to providing more

6   information?

7        MR. BYARS:  Your Honor, I do not know what information

8   can be provided.  I understand that this is a huge logistical

9   undertaking by numerous people to make this happen under the

10  timeline that's ordered by the Southern District of California.

11  So I am not able to say -- I do know that at the hearing, a

12  week ago Monday, the judge was impressed with Commander

13  Jonathan White's presentation about how logistically

14  complicated this was and, in fact, was satisfied, based on our

15  presentation, that even a 12-hour advance notice would be an

16  impediment to providing the quickest possible reunification of

17  child to parent.

18       So I really am unable to give you the kind of

19  blow-by-blow breakdown of this process in a way that Commander

20  White would be able to do.  And I think that that's really what

21  Judge Sabraw is trying to do in San Diego.

22       THE COURT:  Do you know anything about this one

23  instance that was referred to of someone who was moved on

24  Monday?

25       MR. BYARS:  I do not, your Honor.

I7O8ESRC

1          THE COURT:  All right.  So this is obviously a matter

2     of great importance.  It's important, first and foremost, to

3     the parents and to the children, whose interests may not always

4     coincide and therefore need to be separately expressed.  It's a

5     matter of great public interest.  It is a matter that also

6     impacts the proper effectuation of the orders now of several

7     different courts:  Judge Gee's approval of the *Flores*

8     settlement, Judge Sabraw's various orders requiring

9     reunification, Judge Swain and Judge Furman's temporary

10    restraining orders, and now the matter before this Court.

11         I think the common sense of it is that these matters

12    should, to the maximum extent possible, be consolidated before

13    as few judges as possible.  In my discussion before with Judge

14    Sabraw, he felt that what was being requested here, arguably,

15    conflicted with his orders, but he stressed that that was not

16    his determination to make, it was the determination to be made

17    by this Court.  But there is a certain lack of common sense in

18    not placing before a single judge, or at most two judges, the

19    coordination of what is unquestionably a substantial

20    undertaking of great importance.  The potential for conflict,

21    for even inadvertent conflict, is high in these kinds of

22    situations.  Therefore, I am going to forthwith transfer this

23    entire case to the Southern District of California to Judge

24    Sabraw.

25         I asked him how early he could hear from counsel in

1   this case.  He said he was holding a status conference today,

2   at 3 p.m. California time, which is 6 p.m. New York time,

3   therefore, about an hour and 20 minutes from now, and he would

4   be pleased to hear from counsel for the plaintiffs here about

5   the issues they have raised.  For example, he has set in place,

6   as I mentioned earlier, all sorts of provisions that he

7   believes are addressed to making sure that the interests of the

8   children are separately represented, but counsel in this case

9   is in a very good position to bring to his attention why they

10  don't think that may be true in the case of these nine children

11  or whatever.

12          So he invited the appearance of counsel in this case

13  at his hearing today.  I assume he means by telephone since he

14  knew they were in New York.  I forgot to ask him that

15  expressly, but I think it's implicit.  And if there are any

16  problems with that, you can come back to me and I will talk to

17  Judge Sabraw because that clearly was my understanding.

18          I will issue a written order within the next few

19  minutes transferring this case, but I think the most important

20  thing is for counsel for the plaintiffs to call Judge Sabraw's

21  chambers and arrange to be heard at 6:00 New York time, 3:00

22  his time, on your various requests.  In calling, his phone is

23  initially answered by his secretary who probably is less

24  familiar with this, so I would suggest you talk initially to

25  the law clerk who is handling this matter, who was also on the

1    phone during my conversation with Judge Sabraw so knows the

2    full representations that were made.  And as I say, if there is

3    for any reason, which I would think extremely unlikely, any

4    problem in facilitating that telephonic conversation, come back

5    to me and I will call Judge Sabraw and clear that up.

6              Is there anything else we need to take up today?

7              MR. BYARS:  Your Honor, I would just would ask that

8    you consider noting in your order, there is a local civil rule

9    83.1 that imposes a seven day --

10             THE COURT:  I am going to slavishly copy the wording

11   of Judge Furman, which addressed all that, and I am grateful to

12   Judge Furman for giving me a model to follow.

13             Anything else?

14             MR. BYARS:  I think just making sure that our case is

15   docketed and we get a docket number.

16             THE COURT:  Yes.  Of course.

17             Very good.  Thanks very much.

18             (Adjourned)

19

20

21

22

23

24

25

**DEFENDANTS' EXHIBIT 5**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


BEFORE HONORABLE DANA M. SABRAW, JUDGE PRESIDING

_____
                                        )
MS. L. AND MS. C.,                      )
                                        )CASE NO. 18CV0428-DMS
              PETITIONERS-PLAINTIFFS,   )
                                        )
VS.                                     )
                                        )SAN DIEGO, CALIFORNIA
U.S. IMMIGRATION AND CUSTOMS            )TUESDAY JULY 24, 2018
ENFORCEMENT ("ICE"); U.S. DEPARTMENT    ) 3:00 P.M. CALENDAR
OF HOMELAND SECURITY ("DHS"); U.S.      )
CUSTOMS AND BORDER PROTECTION ("CBP");  )
U.S. CITIZENSHIP AND IMMIGRATION        )
SERVICES ("USCIS"); U.S. DEPARTMENT     )
OF HEALTH AND HUMAN SERVICES ("HHS");   )
OFFICE OF REFUGEE RESETTLEMENT ("ORR"); )
THOMAS HOMAN, ACTING DIRECTOR OF ICE;   )
GREG ARCHAMBEAULT, SAN DIEGO FIELD      )
OFFICE DIRECTOR, ICE; ADRIAN P. MACIAS, )
EL PASO FIELD DIRECTOR, ICE; FRANCES M. )
JACKSON, EL PASO ASSISTANT FIELD        )
OFFICE DIRECTOR, ICE; KIRSTJEN NIELSEN, )
SECRETARY OF DHS; JEFFERSON BEAUREGARD  )
SESSIONS III, ATTORNEY GENERAL OF THE   )
UNITED STATES; L. FRANCIS CISSNA,       )
DIRECTOR OF USCIS; KEVIN K.             )
MCALEENAN, ACTING COMMISSIONER OF       )
CBP; PETE FLORES, SAN DIEGO FIELD       )
DIRECTOR, CBP; HECTOR A. MANCHA JR.,    )
EL PASO FIELD DIRECTOR, CBP;            )
ALEX AZAR, SECRETARY OF THE             )
DEPARTMENT OF HEALTH AND HUMAN          )
SERVICES; SCOTT LLOYD, DIRECTOR         )
OF THE OFFICE OF REFUGEE RESETTLEMENT,  )
                                        )
              RESPONDENTS-DEFENDANTS.   )
----------------------------------------

REPORTER'S TRANSCRIPT OF PROCEEDINGS
STATUS CONFERENCE

COUNSEL APPEARING:

FOR PLAINTIFF:                LEE GELERNT, ESQ.
                             ACLU IMMIGRANT RIGHTS PROJECT
                             125 BROAD STREET 18TH FLOOR
                             NEW YORK, NEW YORK 10004

                             BADIS VAKILI, ESQ.
                             ACLU FOUNDATION OF SAN DIEGO
                             AND IMPERIAL COUNTIES
                             P.O. BOX 87131
                             SAN DIEGO, CALIFORNIA 92138

                             SPENCER AMDUR, ESQ.
                             ACLU OF NORTHERN CALIFORNIA
                             39 DRUMM STREET
                             SAN FRANCISCO, CALIFORNIA 94111

FOR DEFENDANT:               SARAH B. FABIAN, ESQ.
                             SCOTT STEWART, ESQ.
                             U.S. DEPARTMENT OF JUSTICE
                             OFFICE OF IMMIGRATION LITIGATION
                             P.O. BOX 868
                             BEN FRANKLIN STATION
                             WASHINGTON, DC 20044

REPORTED BY:                 LEE ANN PENCE,
                             OFFICIAL COURT REPORTER
                             UNITED STATES COURTHOUSE
                             333 WEST BROADWAY, ROOM 1393
                             SAN DIEGO, CALIFORNIA 92101

| | |
|---|---|
| 1 | **SAN DIEGO, CALIFORNIA — TUESDAY, JULY 24, 2018 — 3:00 P.M.** |
| 2 | * * * |
| 3 | **THE CLERK:**  NO. 2 ON CALENDAR, CASE NO. 18CV0428, |
| 4 | MS. L. VERSUS U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; ON FOR |
| 5 | STATUS CONFERENCE. |
| 6 | **THE COURT:**  GOOD AFTERNOON. |
| 7 | CAN I HAVE APPEARANCES, PLEASE? |
| 8 | **MR. GELERNT:**  GOOD AFTERNOON, YOUR HONOR.  LEE |
| 9 | GELERNT FOR THE ACLU FOR PLAINTIFFS. |
| 10 | **MR. AMDUR:**  GOOD AFTERNOON.  SPENCER AMDUR FOR THE |
| 11 | PLAINTIFFS. |
| 12 | **MR. VAKILI:**  GOOD AFTERNOON, YOUR HONOR.  BARDIS |
| 13 | VAKILI FOR THE PLAINTIFFS. |
| 14 | **MR. STEWART:**  GOOD AFTERNOON, YOUR HONOR.  SCOTT |
| 15 | STEWART FOR THE DEFENDANTS. |
| 16 | **MS. FABIAN:**  GOOD AFTERNOON, YOUR HONOR.  SARAH |
| 17 | FABIAN FOR THE DEFENDANTS. |
| 18 | **THE COURT:**  THANK YOU.  AND WELCOME ALL. |
| 19 | LET'S GO THROUGH THE STATUS REPORT.  THERE IS A LOT |
| 20 | OF INFORMATION HERE, AND I HAVE SOME QUESTIONS. |
| 21 | THERE IS AN INDICATION OF 1,634 ELIGIBLE.  THAT'S |
| 22 | SIMILAR TO WHERE WE WERE LAST TIME WITH 1606. |
| 23 | **MS. FABIAN:**  YOUR HONOR, THAT IS 1637 TODAY. |
| 24 | **THE COURT:**  OKAY. |
| 25 | AND THERE IS AN INDICATION OF SUCCESSFUL |

```
 1   REUNIFICATION OF 879.

 2             MS. FABIAN:  THAT'S 1,012 TODAY.

 3             THE COURT:  1,012.  THAT SHOWS HOW FLUID AND ACTIVE

 4   THE PROCESS IS.

 5             OF THOSE 1,012, HOW MANY ARE DETAINED TOGETHER AND

 6   HOW MANY ARE BEING PAROLED INTO THE COMMUNITY?

 7             MS. FABIAN:  I DON'T HAVE THOSE NUMBERS, YOUR HONOR.

 8             THE COURT:  DO YOU HAVE AN APPROXIMATION?

 9             MS. FABIAN:  I DON'T THINK I DO AT THIS TIME, YOUR

10   HONOR.

11             THE COURT:  THE INDICATION ALSO IS THAT ALL

12   POTENTIAL CLASS MEMBERS HAVE BEEN -- HAVE COMPLETED THEIR

13   INTERVIEW, AND THE CHILD FILE REVIEW HAS BEEN COMPLETED AS

14   WELL.  AM I CORRECT?

15             MS. FABIAN:  THAT'S CORRECT.

16             THE COURT:  SO THE PROCESS, AT THIS POINT, INVOLVES

17   APPROXIMATELY 1,417 PEOPLE, AND THEN THE REUNIFICATION IS

18   PROGRESSING AS TO ALL.

19             MS. FABIAN:  THAT'S CORRECT.

20             THE COURT:  THE INFORMATION THAT WE DON'T HAVE IS

21   HOW MANY ARE BEING DETAINED TOGETHER, HOW MANY ARE BEING

22   PAROLED.

23             MS. FABIAN:  I DON'T HAVE THAT, NO, YOUR HONOR.

24             I CAN SEE FROM MY CLIENTS WHAT WE CAN PUT ON THAT IN

25   THE NEXT STATUS REPORT, IF THAT'S SOMETHING THE COURT IS
```

1   INTERESTED IN.

2           **THE COURT:**  YES.  WE WILL GET TO THAT IN A MOMENT.

3   LET'S KEEP GOING DOWN THE LIST.

4           THEN THE INITIAL DETERMINATION BY THE GOVERNMENT OF

5   PARENTS WHO ARE INELIGIBLE, THERE IS 917?

6           **MS. FABIAN:**  THAT'S 914.

7           **THE COURT:**  NOW 914.

8           THERE WERE TWO PARENTS IN CRIMINAL CUSTODY, THEY ARE

9   NOW OUT?

10          **MS. FABIAN:**  I DON'T KNOW HOW THAT NUMBER MOVED.  I

11  AM NOT SURE IF THAT -- WHERE THAT CHANGED.

12          **THE COURT:**  BECAUSE THE INDICATION IS THEY ARE NOW

13  ZERO.

14          PARENTS WHO WAIVED REUNIFICATION.  IT WAS 136 IT IS

15  NOW 130?

16          **MS. FABIAN:**  IT IS NOW 127.  MY UNDERSTANDING IS

17  SOME MAY HAVE CHANGED THEIR MIND.

18          **THE COURT:**  OKAY.  SO WHERE THEY WANT TO BE

19  REUNIFIED.

20          **MS. FABIAN:**  CORRECT.

21          **THE COURT:**  THAT COULD BE FOR A VARIETY OF REASONS,

22  EITHER TO PURSUE IMMIGRATION ISSUES TOGETHER -- COULD BE A

23  VARIETY OF REASONS.

24          **MS. FABIAN:**  I EXPECT, YOUR HONOR, THAT A LOT OF

25  TIMES THE DECISION TO WAIVE REUNIFICATION WOULD BE BASED ON

JULY 24, 2018

1   DESIRE TO HAVE THE CHILD BE RELEASED TO ANOTHER RELATIVE SO --

2   AND PERHAPS PURSUE RELIEF SEPARATELY, SO THEY MAY CHANGE THAT

3   DECISION FOR A VARIETY OF REASONS.

4         **THE COURT:**  ADULTS WITH PRECLUDING CRIMINAL HISTORY,

5   THAT WAS AT 91, IT IS NOW 64.  SO WE ARE 27 CLEARED?

6         **MS. FABIAN:**  THAT IS MY UNDERSTANDING.  THAT NUMBER

7   INCLUDED WHAT WE, I THINK, CALLED THE AMBER CATEGORY, FOLKS

8   WHO HAD INITIALLY BEEN DETERMINED TO HAVE A CRIMINAL RECORD

9   BUT THEN UPON EVALUATION IT WAS DETERMINED THAT THEY WERE

10  CLEARED FOR REUNIFICATION.

11        **THE COURT:**  OKAY.

12        THE NEXT CATEGORY INDICATES ADULTS NOT IN THE UNITED

13  STATES UNDER REVIEW, 463.  WHAT DOES THAT MEAN?

14        **MS. FABIAN:**  THE RECORDS RECORDED -- REFLECT 463

15  WITH A CODE THAT SUGGESTS THAT THEY MAY HAVE DEPARTED THE

16  UNITED STATES.

17        WHAT I UNDERSTAND WE ARE DOING IS TAKING A CLOSER

18  LOOK AT THOSE TO DETERMINE IF THAT IS, IN FACT, WHAT THE CODE

19  INDICATES, OR IF THERE IS SOMETHING ELSE INDICATED BY THAT

20  CODE, WHETHER IT IS -- SO IT MAY BE A REMOVAL OR IT MAY BE A

21  VOLUNTARILY DEPARTURE THAT IS UNRELATED TO A SEPARATION, OR IT

22  MAY BE A PRIOR CODE.  SO WE ARE JUST GOING THROUGH THOSE -- AS

23  I UNDERSTAND IT THE CLIENT IS GOING THROUGH THOSE TO DETERMINE

24  EXACTLY WHAT THAT CODE MEANS IN EACH OF THOSE CASES.

25        **THE COURT:**  WOULD THAT NUMBER REFLECT PARENTS WHO

1   HAVE BEEN REMOVED OR VOLUNTARILY DEPARTED WITHOUT THEIR CHILD?

2          **MS. FABIAN:**  IT MAY, YES.  THAT IS WHAT WE ARE

3   DETERMINING.  THAT IS WHAT WE ARE REVIEWING RIGHT NOW.

4          **THE COURT:**  DO YOU HAVE ANY INDICATION WHAT THE

5   NUMBERS MIGHT BE OF PARENTS WHO HAVE BEEN REMOVED OR

6   VOLUNTARILY DEPARTED WITHOUT THEIR CHILDREN?  DO YOU HAVE AN

7   ESTIMATE OF WHAT THAT PERCENTAGE WOULD BE OF THESE 463?

8          **MS. FABIAN:**  I DON'T, YOUR HONOR.  I THINK IT WOULD

9   ULTIMATELY BE SOMETHING LESS THAN THE 463, BUT IT COULD BE

10  THAT WHOLE NUMBER.  I THINK IT IS JUST A MATTER OF THE AGENCY

11  BEING ABLE TO LOOK AT EACH INDIVIDUALLY TO SEE WHAT THE

12  NUMBERS MEAN.

13         **THE COURT:**  THIS, TO BE CLEAR, COULD BE THE CATEGORY

14  WHERE PARENTS AND CHILDREN WERE SEPARATED, EITHER BEFORE OR

15  DURING THE ZERO TOLERANCE POLICY, AND THERE WASN'T

16  INFRASTRUCTURE IN PLACE TO DETERMINE, AT SEPARATE TIMES, WHERE

17  THE PARENT WAS VERSUS THE CHILD, WHICH THEN RESULTED IN A

18  NUMBER OF PARENTS BEING REMOVED WITHOUT CHILD.  AM I CORRECT?

19         **MS. FABIAN:**  IT COULD BE, YOUR HONOR.  THAT COULD

20  FALL UNDER THAT CATEGORY.

21         **THE COURT:**  THIS NUMBER COULD BE VERY SIGNIFICANT.

22  THERE IS 463 HERE, AND I THINK THERE WERE 12 WITH THE

23  UNDER-FIVE.

24         **MS. FABIAN:**  I DON'T REMEMBER WHAT THE FINAL NUMBER

25  WAS.  THAT SOUNDS RIGHT, I THINK IT WAS 12.

1          **THE COURT:**  ALL RIGHT.  WE WILL COME BACK TO THAT IN

2     A MOMENT.

3          THE NEXT CATEGORY IS FURTHER EVALUATION, 260.  WHAT

4     DOES THIS CATEGORY MEAN?

5          **MS. FABIAN:**  THOSE, AS I UNDERSTAND IT, ARE CHILDREN

6     THAT FOR WHOM O.R.R. IS DOING FURTHER EVALUATION.  THAT MAY BE

7     THAT THE PARENT WAS RELEASED AND O.R.R. HASN'T LOCATED THE

8     PARENT.  IT MAY BE THAT THE CHILD HAD BEEN POTENTIALLY

9     RELEASED TO ANOTHER SPONSOR.

10         SO I THINK THOSE ARE CHILDREN FOR WHOM O.R.R.

11    DOESN'T -- CAN'T CONCLUSIVELY PLACE THEM IN ONE OF THE OTHER

12    CATEGORIES AND SO THEY ARE REVIEWING TO DETERMINE IF THEY ARE,

13    IN FACT, CHILDREN OF CLASS MEMBERS.  AND THEN, IF SO, WHETHER

14    REUNIFICATION IS REQUIRED OR POSSIBLE.

15         **THE COURT:**  SO OF THESE 260, A NUMBER OF THESE MAY

16    BE CLASS MEMBERS RELEASED INTO THE INTERIOR.

17         **MS. FABIAN:**  SOME MAY BE, THAT IS MY UNDERSTANDING.

18    AND SOME MAY, IN FACT, NOT BE THE CHILDREN OF CLASS MEMBERS.

19         **THE COURT:**  SO THE 217 NUMBER OF CLASS MEMBERS

20    RELEASED INTO THE INTERIOR MAY INCREASE.

21         **MS. FABIAN:**  I THINK THAT IS RIGHT.  AS I UNDERSTAND

22    IT, 217 ARE THAT O.R.R. KNOWS ABOUT AND IS IN THE PROCESS OF

23    REUNIFICATION.

24         **THE COURT:**  AND THEN YOU HAVE INDICATED OF THIS 260

25    MANY OF THESE CHILDREN HAVE BEEN DISCHARGED BY O.R.R. IN

1   APPROPRIATE CIRCUMSTANCES.  WHAT DOES THAT MEAN?

2           **MS. FABIAN:**  IT MEANS THAT THEY MAY HAVE BEEN

3   RELEASED TO OTHER FAMILY MEMBERS, AND THAT MAY BE BECAUSE

4   EITHER THEY HAD JUST BEEN -- THE PARENT HAD DESIGNATED THEM TO

5   BE RELEASED TO OTHER CLASS MEMBERS AT CERTAIN TIMES.  SO NOT

6   ALL OF THOSE 260 REMAIN IN O.R.R. CUSTODY, SOME MAY HAVE BEEN

7   RELEASED TO OTHER FAMILY MEMBERS.  BUT THERE WOULD STILL, IN

8   SOME CASES, BE CONTINUED EVALUATION TO SEE IF THAT FURTHER

9   ACTION TOWARDS REUNIFICATION WOULD BE NECESSARY.

10          **THE COURT:**  SO OF THESE 260, SOME OF THESE PARENTS

11  MAY FALL INTO THE CATEGORY OF PARENTS WHO HAVE BEEN RELEASED

12  INTO THE INTERIOR, AND SOME OF THEM MAY FALL INTO THE CATEGORY

13  OF HAVING BEEN REMOVED ALREADY.

14          **MS. FABIAN:**  NOT THAT OUR RECORDS CURRENTLY

15  INDICATE, BUT I CAN'T SAY FOR SURE THAT THAT WOULDN'T BE THE

16  CASE.  BUT THE RECORDS DON'T INDICATE THAT BASED ON WHAT WE

17  HAVE RIGHT NOW AS ANY INDICATORS FOR THE PARENTS.

18          **THE COURT:**  WHAT DO THE RECORDS INDICATE?  HOW CAN

19  YOU RULE OUT THAT OF THIS 260 A CERTAIN PERCENTAGE HAVE NOT

20  ALREADY BEEN REMOVED, AS OPPOSED TO SAYING IT APPEARS THIS 260

21  MAY INCLUDE THOSE RELEASED INTO THE INTERIOR, BUT WE ARE

22  PRETTY SURE IT DOESN'T INCLUDE THOSE WHO HAVE ALREADY BEEN

23  REMOVED.

24          **MS. FABIAN:**  AS I UNDERSTAND IT, THE CHILDREN HAVE

25  BEEN LINKED TO A PARENT BY A-NUMBER.  SO FOR THE 463 THE

JULY 24, 2018

1    PARENT'S A-NUMBER IS LINKED TO A CODE THAT SUGGESTS THAT THEY

2    POTENTIALLY -- THAT POTENTIALLY COULD INDICATE REMOVAL OR

3    POTENTIALLY VOLUNTARY DEPARTURE.  SO FOR THE 260, THE PARENT'S

4    A-NUMBER THAT IS LINKED DOES NOT CONTAIN THAT CODE.

5              **THE COURT:**  OKAY.

6         **MS. FABIAN:**  IT LINKS TO SOME OTHER CODES THAT ARE

7    UNDER FURTHER EVALUATION TO DETERMINE IF THAT MEANS THEY HAVE

8    BEEN RELEASED AND NOT LOCATED OR SOME OF THE OTHER THINGS I

9    INDICATED.

10             **THE COURT:**  OKAY.  THANK YOU.

11             FINAL ORDER OF REMOVAL, THERE ARE 900.  IS THAT THE

12   CURRENT NUMBER OR IS THAT -- DO YOU HAVE A DIFFERENT NUMBER?

13        **MS. FABIAN:**  THAT WAS THE NUMBER AS OF YESTERDAY.  I

14   DID NOT GET AN UPDATED NUMBER TODAY.

15             **THE COURT:**  AND OF THAT NUMBER, DO WE KNOW HOW MANY

16   WERE REMOVED WITH THEIR CHILDREN VERSUS WITHOUT?

17        **MS. FABIAN:**  I BELIEVE THERE HAVE BEEN 20 REMOVALS,

18   BUT I WOULD HAVE TO CONFIRM THAT.

19             **THE COURT:**  20 --

20        **MS. FABIAN:**  20 REMOVALS OF -- I BELIEVE THAT IS 20

21   AFTER REUNIFICATION, BUT I WOULD HAVE TO CONFIRM THAT.

22             **THE COURT:**  20 AFTER REUNIFICATION.  SO THAT

23   WOULD -- DOES THAT MEAN 880 WERE REMOVED PRIOR TO

24   REUNIFICATION?

25        **MS. FABIAN:**  I AM SORRY.  THOSE 900 ARE NOT REMOVED.

JULY 24, 2018

1   THOSE -- THAT 900 WOULD SPAN -- I WOULD SAY THAT 900 IS MOSTLY

2   GOING TO BE FOUND IN THE TOP CATEGORY --

3          **THE COURT:**  YES.

4          **MS. FABIAN:**  -- OF THE POTENTIAL CLASS MEMBERS

5   ELIGIBLE FOR REUNIFICATION, BUT THAT DOES NOT INDICATE THAT

6   THEY HAVE BEEN REMOVED YET.

7          **THE COURT:**  OKAY.  SO YOU HAVE INDICATED THAT 1,012

8   CLASS MEMBERS HAVE BEEN REUNIFIED, AND 900 ARE SUBJECT TO A

9   FINAL ORDER OF REMOVAL.

10          WOULDN'T THAT THEN INDICATE THAT AT LEAST 900 OF THE

11   1,012 ARE DETAINED, WITH CHILD, IN ICE DETENTION?  SO THE

12   NUMBERS RELEASED INTO THE COMMUNITY WOULD BE VERY SMALL.

13          **MS. FABIAN:**  NOT NECESSARILY.  A FINAL -- A FINAL

14   ORDER AS USED IN THIS CATEGORY IS ACTUALLY DIFFERENT FROM AN

15   EXECUTABLE FINAL ORDER.  SO IN SOME CASES SOMEONE WITH A FINAL

16   ORDER MIGHT HAVE ADDITIONAL STEPS IN THEIR IMMIGRATION REVIEW.

17   AND SO I CAN'T -- I DON'T HAVE THE NUMBERS NECESSARILY TO SAY

18   IF THEN FOLKS AT THAT STAGE HAVE BEEN RELEASED.  BUT IT

19   DOESN'T CORRELATE THAT ALL OF THOSE 900 HAVE -- IN FACT IT IS

20   NOT TRUE THAT ALL OF THOSE 900 HAVE EXECUTABLE FINAL ORDERS.

21          I WOULD ALSO SAY THAT THAT 900 IS REALLY WITHIN THE

22   1600 NUMBER IN TERMS OF WHETHER ALL OF THOSE HAVE BEEN

23   REUNIFIED.  SOME OF THEM MAY ALSO BE WITHIN THE APPROXIMATELY

24   400 STILL AWAITING REUNIFICATION.

25          **THE COURT:**  OKAY.  WE MAY HAVE ALREADY TOUCHED ON

JULY 24, 2018

1   SOME OF THESE, BUT THERE ARE A FEW OTHER QUESTIONS ON THE

2   UPDATED NUMBERS.  AND MAYBE WE DON'T HAVE THIS INFORMATION

3   YET.

4            HOW MANY OF THE PARENTS THAT HAVE BEEN REUNITED ARE

5   SCHEDULED TO BE -- OR ARE SCHEDULED TO BE REUNITED HAVE FINAL

6   REMOVAL ORDERS?  IS THAT THE 900?

7            **MS. FABIAN:**  MOST LIKELY, YES.  SO I WOULD SAY THAT

8   THAT 900 COMES OUT OF THAT, THE TOP BULLET POINT, WHICH IS

9   INDIVIDUALS ELIGIBLE FOR REUNIFICATION.

10           **THE COURT:**  OF THOSE THAT HAVE BEEN REUNIFIED, HOW

11   MANY HAVE BEEN REMOVED ALREADY?  I THINK YOU SAID MAYBE 20.

12           **MS. FABIAN:**  THAT IS MY BEST GUESS, BUT I WOULD WANT

13   TO CONFIRM BEFORE.

14           **THE COURT:**  DO YOU KNOW, OF THAT NUMBER, HOW MANY

15   WERE REMOVED WITH THEIR CHILDREN?

16           **MS. FABIAN:**  I DON'T.

17           **THE COURT:**  OKAY.

18           **MS. FABIAN:**  I THINK I WOULD SAY, MORE ACCURATELY,

19   THE STATISTIC I HAVE IS THAT 20 CLASS MEMBERS, APPROXIMATELY

20   20, WERE REMOVED AFTER THE COURT'S ORDER, SO I CAN'T SAY AMONG

21   THOSE WHICH WERE REMOVED WITH THEIR CHILDREN OR WITHOUT.  THEY

22   WOULD HAVE ALL BEEN SUBJECT TO A WAIVER SUBJECT TO THE

23   PRELIMINARY INJUNCTION IF THEY WERE REMOVED WITHOUT THEIR

24   CHILDREN.  BUT I DON'T HAVE THE NUMBER AS TO HOW MANY OF THOSE

25   WERE REMOVED WITH OR WITHOUT THEIR CHILDREN.

JULY 24, 2018

1      **THE COURT:**  AND THERE IS A 136 PARENTS THAT WAIVED

2    REUNIFICATION AS OF THE PRESENT TIME.  DO YOU KNOW OF THOSE --

3    IT IS 127 -- OF THOSE 127 WAIVED REUNIFICATION AFTER RECEIVING

4    THE CLASS NOTICE?

5      **MS. FABIAN:**  SO THIS IS -- I THINK I EXPLAINED THIS

6    AT THE LAST HEARING AS WELL.  THERE IS REALLY -- THIS NUMBER

7    IS INDIVIDUALS WHO WAIVED REUNIFICATION AT THEIR INTERVIEW

8    WITH HHS, SO THAT IS NOT -- DOES NOT CORRELATE TO INDIVIDUALS

9    NECESSARILY HAVING A FINAL ORDER OF REMOVAL.  THAT IS, AS

10   COMMANDER WHITE EXPLAINED, THAT FINAL STEP BEFORE

11   REUNIFICATION IS ENSURING THAT THE PARENT IN FACT WANTS TO BE

12   REUNIFIED.  SO THAT NUMBER IS FOLKS THAT DECLINED

13   REUNIFICATION AT THAT STEP.

14       RELATEDLY I THINK YOU WILL SEE IN TODAY'S FILING BY

15   THE GOVERNMENT IN THE DECLARATION THAT ICE HAS IDENTIFIED 85

16   INDIVIDUALS WHO HAVE DECLINED -- HAVE WAIVED REUNIFICATION

17   WITH A FINAL ORDER ON THE NOTICE FORM.  I HAVEN'T -- SO

18   WHETHER THERE IS -- THERE IS LIKELY OVERLAP BETWEEN THAT 85

19   AND SOME NUMBER OF THIS 127, BUT IT IS TWO DIFFERENT PARTS OF

20   THE PROCESS.

21      **THE COURT:**  OKAY.  FROM THE GOVERNMENT'S

22   PERSPECTIVE, THEN, OF THE ELIGIBLE CLASS MEMBERS,

23   REUNIFICATION WILL BE COMPLETED BY THURSDAY, OR VERY CLOSE TO

24   IT.

25      **MS. FABIAN:**  THAT'S MY UNDERSTANDING.

JULY 24, 2018

```
 1              THE COURT:  BECAUSE EVERYONE HAS BEEN CLEARED, AND
 2    1,012 HAVE ALREADY BEEN REUNIFIED AND THE BALANCE ARE
 3    SCHEDULED, TRANSPORTATION PENDING, WHICH I ASSUME WOULD OCCUR
 4    BETWEEN NOW AND THURSDAY.
 5              MS. FABIAN:  I THINK MY COLLEAGUE MAY SPEAK TO THIS
 6    A LITTLE BIT.  THERE ARE SOME ISSUES WITH STAYS OR OTHER
 7    INJUNCTIONS BEING ISSUED IN OTHER COURTS THAT MAY IMPEDE THAT
 8    PROCESS FOR SOME SMALL NUMBER OF INDIVIDUALS.  BUT FOR THE
 9    MOST PART --
10              THE COURT:  THAT'S THE NEW YORK SITUATION?
11              MS. FABIAN:  YES.
12              THE COURT:  LET'S ADDRESS THAT IN A MOMENT.
13              BUT ASIDE FROM THAT, THAT WOULD BE A VERY SMALL
14    GROUP OF CHILDREN.
15              MS. FABIAN:  I AM NOT AWARE -- THE ONLY OTHER ISSUE
16    I HAD HEARD WAS POTENTIAL WEATHER-RELATED TRAVEL ISSUES.  BUT
17    OTHER THAN THAT I HAVE NOT HEARD OF ANY IMPEDIMENTS TO
18    COMPLETING THE PROCESS.
19              THE COURT:  OKAY.  AND THEN AS TO THE CATEGORY, I
20    THINK IT IS 914, OF INELIGIBLE, THAT'S THE CATEGORY WHERE THE
21    PLAINTIFFS, WITH THE APPROPRIATE INFORMATION, CAN EITHER AGREE
22    OR IF THERE IS DISAGREEMENT BRING IT TO THE COURT'S ATTENTION
23    AT A LATER TIME.
24              MS. FABIAN:  I THINK THAT IS RIGHT.  WE WILL NEED TO
25    GATHER THAT INFORMATION AND GIVE IT TO PLAINTIFFS, AND WE ARE
```

JULY 24, 2018

1    WORKING ON THAT.  AND I THINK THEN WE CAN MEET AND CONFER

2    FURTHER AS TO THE PROCESS.

3         **THE COURT:**  AND THEN ON THE LIST, THE INFORMATION,

4    LET'S RUN THROUGH THAT QUICKLY.

5         THERE IS SUPPOSED TO BE A LIST OF CLASS MEMBERS WHO

6    WAIVED REUNIFICATION PRIOR TO REMOVAL, AND THERE IS AN

7    INDICATION THAT THAT IS COMING.  WHAT'S THE PROFFER THERE?

8         **MS. FABIAN:**  I THINK WE HAVE GIVEN A LIST, AND I

9    THINK I UPDATED IT EARLIER TODAY, AND THAT IS OF THE 127 WHO

10   WAIVED DURING THE HHS INTERVIEW PROCESS THE -- I KNOW

11   PLAINTIFFS HAVE ASKED FOR THE INDIVIDUALS WHO WAIVED ON THE

12   FORM, THE COURT ORDERED FORM.  AND THAT SEEMS TO NOW HAVE BEEN

13   COMPLETED, AND I HOPE VERY SHORTLY WE WILL BE ABLE TO GIVE

14   THEM THAT LIST.

15        **THE COURT:**  AND THAT WOULD BE DONE -- YOU ARE IN A

16   POSITION TO DO THAT, FOR EXAMPLE BY TOMORROW SOMETIME?

17        **MS. FABIAN:**  I HAVE AN EMAIL OUT TO CONFIRM THAT,

18   BUT AS REFLECTED IN OUR DECLARATION FILED THIS MORNING, IT

19   APPEARS THAT WE HAVE IDENTIFIED THOSE 85 INDIVIDUALS, SO IT

20   SHOULD BE WE -- SHOULD BE ABLE TO PROVIDE THAT LIST VERY

21   SHORTLY.

22        **THE COURT:**  THEN HOW ABOUT THE LIST OF CLASS MEMBERS

23   WHO HAVE BEEN REMOVED.  WHERE ARE WE ON THAT?

24        **MS. FABIAN:**  THAT'S THE LIST THAT'S UNDER FURTHER

25   REVIEW, AS I JUST INDICATED.  I HAVE NOT RECEIVED A TIMETABLE

JULY 24, 2018

1   FOR THAT.  I HAVE ASKED FOR IT AS SOON AS POSSIBLE.  I KNOW

2   THAT WE COMMITTED TO DOING IT ON FRIDAY, AND THERE WAS A

3   MISUNDERSTANDING BETWEEN MYSELF AND MY CLIENT AS FAR AS WHAT

4   WAS BEING ASKED FOR.  SO I UNDERSTAND THAT THEY ARE PULLING

5   TOGETHER WHAT THEY CAN AS QUICKLY AS POSSIBLE, BUT I DON'T

6   HAVE THE TIMETABLE FOR THAT FROM THEM.

7          **THE COURT:**  IF THE COURT WERE TO ISSUE AN ORDER AS

8   TO WHEN THAT LIST SHOULD BE PRODUCED, DO YOU HAVE A POSITION

9   AS TO WHAT CAN BE DONE?  BECAUSE WHEN WE DISCUSSED THIS LAST

10  THERE WAS INDICATION THAT THE LIST WOULD BE COMING, I THINK

11  FRIDAY.  AND THEN THERE WAS SOME DISCUSSION ABOUT MAYBE

12  PRODUCING THE LIST ON MONDAY, WHICH WOULD HAVE BEEN YESTERDAY.

13         **MS. FABIAN:**  I HOPE TO HAVE A LIST TONIGHT THAT

14  WOULD HELP ME BETTER UNDERSTAND WHAT THAT LIST WILL CONTAIN.

15  SO WHAT -- I THINK WHAT I CAN SAY IS I HOPE THAT BY TOMORROW

16  WE COULD PROVIDE SOME INFORMATION.  WHAT I CAN'T COMMIT TO

17  RIGHT NOW IS EXACTLY WHAT THAT WILL CONTAIN BECAUSE I WON'T

18  KNOW UNTIL I SEE THAT LATER TODAY.

19         **THE COURT:**  AND THEN THERE WAS A LIST OF CLASS

20  MEMBERS WHO HAVE BEEN RELEASED FROM ICE CUSTODY.  YOU ARE

21  INDICATING YOU NEED ADDITIONAL TIME ON THAT.

22         **MS. FABIAN:**  I THINK SOME OF THAT -- AS I NOW

23  UNDERSTAND BETTER, I THINK SOME OF THAT MAY BE CONTAINED IN

24  TERMS OF THE -- THOSE REFLECTED IN THE TOP BULLET POINT.  I

25  THINK SOME OF THOSE MAY BE REFLECTED IN WHAT HAS ALREADY BEEN

JULY 24, 2018

```
 1    PRODUCED TO PLAINTIFFS.  IN TERMS OF THOSE INDIVIDUALS WHO
 2    MIGHT FALL IN THE BOTTOM CATEGORY, WHICH IS THE FURTHER REVIEW
 3    CATEGORY OR THOSE INDIVIDUALS THAT WE CAN'T LOCATE, I THINK
 4    THAT I DON'T HAVE YET.  AND I HOPE TO KNOW MORE ABOUT THAT
 5    SOON AS WELL.
 6             AND I KNOW THAT IS THE CATEGORY THAT PLAINTIFFS ARE
 7    INTERESTED IN, AND I SAID TO THEM THAT WE WILL CONTINUE TO
 8    WORK TO GET THAT TO THEM AS SOON AS WE CAN.
 9         THE COURT:  YOU COULD PROVIDE A LIST, THOUGH, FOR
10    EXAMPLE THE PARENTS YOU KNOW WHO HAVE BEEN RELEASED FROM ICE
11    CUSTODY, YOU CAN PROVIDE THAT SPECIFIC INFORMATION.  AND THEN
12    YOU COULD ALSO ARTICULATE HOW MANY PARENTS YOU DON'T KNOW
13    WHERE THEY ARE.
14         MS. FABIAN:  I THINK THAT IS RIGHT, YOUR HONOR.
15         THE COURT:  OKAY.  WHAT WOULD BE THE EXPLANATION FOR
16    NOT KNOWING WHERE THE PARENTS ARE?  WHAT HAPPENED?  IS THIS
17    BECAUSE DOJ DIDN'T HAVE THE INFORMATION, OR DHS DOESN'T HAVE
18    THE INFORMATION SO THERE IS AN INABILITY TO GIVE IT TO HHS AND
19    THEN TO GOVERNMENT COUNSEL HERE TODAY?  OR WHAT IS THE
20    EXPLANATION?
21         MS. FABIAN:  I THINK THAT IF THE PARENT WAS
22    TRANSFERRED INTO ANY SORT OF STATE CUSTODY, FOR EXAMPLE IF
23    THERE WAS A WARRANT OUT FOR STATE CRIMINAL ACTIVITY AND THE
24    PARENT WAS TRANSFERRED THERE, THAT THAT PARENT MAY HAVE BEEN
25    THEN RELEASED WITHOUT NOTICE TO THE GOVERNMENT.  SO IF THAT
```

JULY 24, 2018

```
1    PATIENT DID NOT THEN COME FORWARD TO HHS TO SEEK REUNIFICATION
2    HHS MIGHT NOT BE AWARE OF THEIR WHEREABOUTS OR HOW TO CONTACT
3    THEM.
4            RELATEDLY, IF THEY WERE RELEASED BY -- RELEASED FROM
5    CRIMINAL CUSTODY, AND EVEN FEDERAL CRIMINAL CUSTODY BUT DID
6    NOT GO TO ICE CUSTODY THE SAME SITUATION COULD HAVE OCCURRED.
7    SO I THINK IT IS MOST LIKELY INDIVIDUALS WHO WERE RELEASED
8    FROM SOME FORM OF CUSTODY AND -- MOST LIKELY PRIOR TO THE
9    ORDER BUT THEN DIDN'T REACH OUT TO O.R.R. TO MAKE CONTACT FOR
10   REUNIFICATION.
11           THE COURT:  MANY OF THESE PARENTS COULD BE IN ICE
12   CUSTODY, BUT BECAUSE OF THE LACK OF COMMUNICATION BETWEEN AND
13   AMONG THE AGENCIES IT IS UNCERTAIN WHERE THESE PARENTS
14   ACTUALLY ARE, WHETHER THEY ARE WITH ICE OR WHETHER THEY ARE
15   WITH B.O.P. OR WHETHER THEY HAVE BEEN RELEASED?
16           MS. FABIAN:  IF THEY REMAIN IN ICE CUSTODY I THINK
17   THAT WE WOULD HAVE IDENTIFIED THEM BY NOW.
18           IF THEY ARE IN B.O.P. CUSTODY, IT IS NOT IN THE ICE
19   RECORDS BUT THAT IS SOMETHING THAT AS WE NARROW THE NUMBER
20   DOWN -- THERE IS NO WAY TO SIMPLY RUN THAT NUMBER, BUT AS WE
21   NARROW THE NUMBER DOWN THAT IS A PLACE WE CAN CHECK.
22           SIMILARLY, IF WE WERE TO TRY TO REVIEW STATE CUSTODY
23   IT IS A MATTER OF REALLY HAVING TO CHECK ON AN INDIVIDUALIZED
24   BASIS.
25           THE COURT:  SO BY PROCESS OF ELIMINATION, THESE
```

JULY 24, 2018

1   PARENTS ARE LIKELY NOT IN ICE DETENTION BECAUSE IF THEY WERE

2   YOU WOULD KNOW.  IF THEY WERE RELEASED FROM ICE YOU WOULD KNOW

3   THAT.  SO IT WOULD APPEAR THEY ARE EITHER IN STATE OR FEDERAL

4   CUSTODY, EITHER B.O.P. OR THE STATE CUSTODY.

5        **MS. FABIAN:**  I THINK THAT WOULD BE MY BEST GUESS,

6   YOUR HONOR, YES.  OR RELEASED FROM ONE OF THOSE IN A MANNER

7   WHERE WE WEREN'T NOTIFIED AND THEY HAVEN'T THEN COME FORWARD.

8        **THE COURT:**  OKAY.  IF THERE WAS COMMUNICATION AMONG

9   THE THREE AGENCIES, B.O.P. UNDER DOJ, ICE UNDER DHS, AND THEN

10  O.R.R. UNDER HHS, IT WOULD BE -- YOU WOULD KNOW WHERE THE

11  PARENT IS.

12       **MS. FABIAN:**  I DON'T THINK THAT IN THOSE CASES IT

13  WOULD BE A COMMUNICATIONS ISSUE.  I THINK FOR THE MOST PART IF

14  AN INDIVIDUAL IS IN -- WELL, IN B.O.P. CUSTODY THERE IS --

15  BECAUSE ICE WOULD LIKELY PLACE A DETAINER AND THAT DETAINER

16  WOULD BE HONORED BY THE FEDERAL -- BY B.O.P., THAT THAT WOULD

17  LIKELY BE -- WE WOULDN'T LOSE TRACK.

18       SO THERE IS A SYSTEM OF COMMUNICATION THERE THAT I

19  THINK WOULD LIKELY NOT LOSE TRACK OF PARENTS IN THAT

20  SITUATION, BUT I THINK THE MOST LIKELY SCENARIO WOULD BE FOR

21  INDIVIDUALS WHO GO INTO STATE CUSTODY.

22       **THE COURT:**  OKAY.

23       MR. GELERNT, YOU HAVE BEEN SITTING PATIENTLY.

24       **MR. GELERNT:**  GOOD AFTERNOON, YOUR HONOR.

25       YOU ACTUALLY ASKED JUST ABOUT EVERYTHING WE WERE

JULY 24, 2018

1    GOING TO ASK ABOUT, SO I DON'T HAVE THAT MUCH.

2            YOU KNOW, THE INFORMATION YOU ASKED ABOUT WE

3    CERTAINLY WANT AND WE CERTAINLY, AS YOUR HONOR SEEMED TO BE

4    SUGGESTING, WILL TAKE PIECEMEAL INFORMATION BETTER THAN

5    NOTHING.

6            I JUST WANTED TO ASK ABOUT A COUPLE OF THINGS.

7            THE 20 WHO HAVE BEEN, I THINK REUNITED AND

8    REMOVED --

9            COUNSEL, MS. FABIAN.

10           **MS. FABIAN:**  SORRY.

11           **MR. GELERNT:**  THE 20 WHO WERE REMOVED, YOU MENTIONED

12   THOSE WERE REUNITED AND REMOVED AT SOME POINT.

13           **MS. FABIAN:**  THOSE ARE REFLECTED ON THE CHART THAT

14   WE PRODUCED TO YOU YESTERDAY.

15           **MR. GELERNT:**  WE HAVE NAMES FOR EACH OF THOSE 20?

16           **MS. FABIAN:**  YOU SHOULD, YES.

17           **MR. GELERNT:**  OKAY.

18           AND THE OTHER QUESTION I WANTED TO ASK IS ABOUT THE

19   37.  I THINK YOUR HONOR WAS ASKING ABOUT THE GOVERNMENT HAVING

20   BEEN UNABLE TO IDENTIFY WHERE PARENTS ARE.

21           BUT MY UNDERSTANDING -- AND CORRECT ME IF I AM

22   WRONG -- IS THAT THERE IS STILL 37 KIDS FOR WHOM THE IDENTITY

23   OF THE PARENT HAS NOT BEEN ESTABLISHED AT THIS POINT, OR IS

24   THAT WRONG?

25           **MS. FABIAN:**  I CAN'T CONFIRM THAT IT IS STILL

JULY 24, 2018

```
 1    EXACTLY THAT NUMBER.  THERE WERE SOME NUMBER OF MINORS WHO HAD

 2    NOT BEEN MATCHED TO A PARENT'S A-NUMBER.

 3              AS DISCUSSED A FEW TIMES THAT IS LIKELY BECAUSE THE

 4    OVER-INCLUSIVE NATURE OF O.R.R.'S ORIGINAL REVIEW AND

 5    IDENTIFICATION OF POTENTIAL CHILDREN OF CLASS MEMBERS MEANS

 6    THOSE PARENTS -- THOSE CHILDREN ARE IN FACT UAC'S.  I KNOW

 7    THERE IS 20-SOMETHING THAT ARE CURRENTLY BELIEVED TO BE UAC'S,

 8    BUT HAVEN'T CONFIRMED THAT SO WE HAVEN'T MOVED THEM OUT YET.

 9    SO THERE IS SOME NUMBER THAT HAS NOT BEEN LINKED TO --

10              THE COURT:  SO THAT NUMBER, THE 37 --

11              IS THAT THE NUMBER, 37?

12         MR. GELERNT:  YES, YOUR HONOR.

13              THE COURT:  WHAT BUCKET DID YOU PUT THEM IN?  ARE

14    THEY IN THE 1637 OR THE 914?

15         MS. FABIAN:  THEY WOULD BE IN THE 914, AND LIKELY IN

16    THE FURTHER REVIEW CATEGORY.

17              THE COURT:  FURTHER EVALUATION, THE 260 CATEGORY.

18    260 IS THE NUMBER?

19         MS. FABIAN:  YES.

20         THE COURT:  OKAY.

21         MR. GELERNT:  SO WE WOULD JUST ASK FOR YOU TO

22    CONTINUALLY UPDATE US ON THAT, BECAUSE THAT IS OBVIOUSLY A

23    CONCERNING BUCKET OF CHILDREN.

24         MS. FABIAN:  YES.

25         MR. GELERNT:  OKAY.
```

JULY 24, 2018

```
1              THEN I JUST WANTED ONE OTHER CLARIFICATION.

2              YOU SAID THAT WE HAD GOTTEN INFORMATION ABOUT THE

3    20.  THE ONE THING I WASN'T SURE ABOUT IS, WERE ALL 20

4    REUNIFIED WITH THEIR CHILDREN AND REMOVED TOGETHER WITH THEIR

5    CHILDREN?  I DON'T THINK THAT WAS REFLECTED ON THE INFORMATION

6    WE GOT.

7              MS. FABIAN:  I DON'T BELIEVE IT WAS REFLECTED THERE,

8    AND I WOULD HAVE TO CONFIRM.

9              MR. GELERNT:  OKAY.  I THINK THAT'S -- WELL, I THINK

10   THERE WAS ONE OTHER POINT, YOUR HONOR.

11             I THINK WHEN YOU WERE TALKING WITH THE GOVERNMENT

12   ABOUT WHY SOMEONE HAS NOT BEEN FOUND, FROM OUR UNDERSTANDING

13   FROM WHEN WE WERE DEALING WITH THE UNDER-FIVES IS THAT

14   SOMETIMES IF A PARENT HAD BEEN RELEASED THEY LEFT THEIR LAST

15   KNOWN ADDRESS, BUT THE GOVERNMENT HAD NOT BEEN ABLE TO CONTACT

16   THEM.

17             IS THAT STILL A PART OF THE GROUP WHERE THE

18   GOVERNMENT HAS NOT BEEN ABLE TO CONTACT THE PARENT.  NOT THAT

19   THEY NEVER HAD AN ADDRESS OR DIDN'T KNOW WHEN THEY WERE

20   RELEASED FROM STATE OR FEDERAL CUSTODY, BUT THAT THEY SIMPLY

21   HAVE NOT BEEN ABLE TO CONTACT THEM AFTER THEY WERE RELEASED BY

22   ICE.  PRESUMABLY THAT IS SOME OF THIS GROUP.

23             MS. FABIAN:  I AM NOT SURE I UNDERSTAND THE

24   QUESTION.

25             WHAT I CAN SAY IS THAT FOR PARENTS WHO HAVE BEEN
```

JULY 24, 2018

1   RELEASED WE HAVE THOSE WHO WE ARE IN CONTACT WITH, AND THEN

2   SOME NUMBER WITH WHOM THE GOVERNMENT HAS NOT YET MADE CONTACT.

3   AND I AM WORKING ON IDENTIFYING THOSE WITH WHOM WE HAVE NOT

4   BEEN IN CONTACT AS THE PRIORITY, AND TO GET YOU THEN ANY LAST

5   KNOWN CONTACT INFORMATION FOR THOSE INDIVIDUALS, BECAUSE THOSE

6   ARE THE ONES THAT I THINK YOU WERE MOST INTERESTED IN.

7            **MR. GELERNT:**  EXACTLY.  THOSE ARE THE ONES WHERE THE

8   NGO'S MAY BE ABLE TO HELP.  IF YOU ARE NOT ABLE TO CONTACT

9   THEM MAYBE WE KNOW AN AUNT OR SOMEBODY WHO THEN CAN MAKE SURE

10  AND KNOWS THAT THEIR CELL PHONE HAS BEEN TURNED OFF, SOMETHING

11  ALONG THOSE LINES.

12           I THINK THAT IS A CATEGORY OF PEOPLE WHO ICE KNOWS

13  ABOUT THEM, KNOWS THEY WERE RELEASED FROM ICE CUSTODY, BUT

14  JUST HAS NOT BEEN ABLE TO MAKE CONTACT WITH THEM IN THE

15  INTERIOR.

16           **THE COURT:**  YES.

17           **MR. GELERNT:**  THANK YOU, YOUR HONOR.

18           **MS. FABIAN:**  I DON'T KNOW THE NUMBER OF THAT, BUT I

19  UNDERSTAND THAT IS A PRIORITY, AND I AM TRYING TO PRIORITIZE

20  THAT.

21           **THE COURT:**  MR. GELERNT, IF I COULD ASK YOU ANOTHER

22  QUESTION.

23           WE MAY HAVE COUNSEL FROM NEW YORK ON THE PHONE, BUT

24  THIS IS A ONE-WAY CONVERSATION PRESENTLY.

25           **MR. GELERNT:**  RIGHT.

JULY 24, 2018

1      **THE COURT:**  SO IF COUNSEL FROM NEW YORK ARE ON THE

2   LINE, I AM INVITING THEM TO CALL BACK AFTER THIS STATUS

3   CONFERENCE CONCLUDES AND WE WILL HAVE A SECOND STATUS

4   CONFERENCE ON THE RECORD.

5      CAN YOU -- I KNOW GOVERNMENT COUNSEL IS READY TO

6   ADDRESS SOME OF THIS ISSUE, BUT DO YOU HAVE ANY INFORMATION IN

7   THAT REGARD?

8      **MR. GELERNT:**  WE DO NOT HAVE ANY MORE INFORMATION

9   THAN THE GOVERNMENT.  I THINK WE PROBABLY HAVE LESS

10   INFORMATION THAN THE GOVERNMENT, BECAUSE THAT IS A SUIT

11   BETWEEN THE NEW YORK FOLKS AND THE GOVERNMENT.

12      AND MY UNDERSTANDING IS IT INVOLVES A VERY SMALL

13   SUBSET OF INDIVIDUALS WHO NEW YORK HAS BEEN REPRESENTING AND

14   WANTS MORE INFORMATION ABOUT, AND I ASSUME AND HOPEFULLY BE

15   ABLE TO NEGOTIATE THAT WITH THE GOVERNMENT.  BUT I DO NOT HAVE

16   REAL INFORMATION ABOUT THAT.

17      **THE COURT:**  WHAT ABOUT THE STIPULATION THAT COUNSEL

18   WERE WORKING ON VERY DILIGENTLY AND FOR MANY DAYS THE LAST

19   WEEK, HAS THAT FALLEN THROUGH OR DO YOU STILL HAVE SOME

20   OPTIMISM ABOUT THAT?

21      I RECEIVED THE GOVERNMENT'S BRIEFING THIS MORNING

22   WHICH I HAVE NOT READ BECAUSE I HAVE BEEN IN TRIAL ALL DAY

23   LONG ON ANOTHER MATTER.  SO I READ THE INTRODUCTION, BUT I

24   HAVEN'T GOTTEN INTO THE ACTUAL POINTS AND AUTHORITIES, WHICH I

25   WILL DO LATER TONIGHT.

JULY 24, 2018

1          **MR. GELERNT:**  RIGHT.  IT APPEARS THAT THINGS HAVE

2     FALLEN THROUGH.

3          WHAT I WOULD SAY IS, YOUR HONOR, TALKING TO PEOPLE

4     ON THE GROUND NOW, AND WE HAVE AN ENORMOUS NUMBER OF

5     AFFIDAVITS WE ARE READY TO PUT IN FOR REPLY IF YOU WOULD LIKE

6     THEM.  THINGS ARE REALLY A MESS ON THE GROUND, AND WE

7     ABSOLUTELY NEED AT LEAST SEVEN DAYS TO BE COUNSELING THESE

8     FAMILIES.  THE GOVERNMENT IS PUTTING ROUGHLY 900 PEOPLE IN ONE

9     DETENTION CENTER AT ONE TIME.

10          **THE COURT:**  SO OF THIS 900 THAT IS REFERENCED, A

11     FINAL ORDER OF REMOVAL, IT IS YOUR VIEW THAT MOST OF THOSE ARE

12     DETAINED TOGETHER?

13          **MR. GELERNT:**  OUR UNDERSTANDING -- I DON'T KNOW IF

14     IT IS GOING TO BE EXACTLY 900 BUT I KNOW IT SEEMS AS THOUGH

15     SOMEWHERE OVER 700 ARE GOING TO BE PUT IN ONE FACILITY, THE

16     PARENTS OF CHILDREN DETAINED TOGETHER.  AND THERE SIMPLY NO

17     WAY IN A COUPLE OF DAYS TO PROVIDE MEANINGFUL CONSULTATION.

18          I WOULD ALSO SAY THE GOVERNMENT HAS -- AND THIS MAY

19     BE SOMETHING WE WANT TO TALK ABOUT AFTER YOU READ THE BRIEF.

20     I WOULD JUST SAY THAT THE GOVERNMENT HAS PUT IN THEIR VERSION

21     OF THE NEGOTIATIONS, PUTTING ASIDE WHETHER THAT'S SORT OF

22     PROPER TO TELL YOU WHAT WAS CONFIDENTIAL, WE DON'T BELIEVE IT

23     WAS REMOTELY ACCURATE.  IT DOES NOT REFLECT WHAT THEY ACTUALLY

24     AGREED TO.  SINCE YOU HAVEN'T READ IT, I WILL PUT THAT ASIDE.

25          I WOULD SAY WE DESPERATELY NEED THOSE SEVEN DAYS.

JULY 24, 2018

1      **THE COURT:**  THE INTRODUCTION DOES INDICATE A NUMBER

2  OF THINGS.  BUT WHAT ABOUT THE FACT THAT THERE HAS BEEN A

3  WEEK, A NUMBER OF THESE FAMILIES HAVE BEEN REUNIFIED.  THEY

4  WOULD HAVE HAD TIME TOGETHER, I WOULD ASSUME, TO TALK ABOUT

5  THESE IMPORTANT ISSUES, AND TO DO SO WITH THE CHILD

6  ADVOCATE --

7      **MR. GELERNT:**  RIGHT.

8      **THE COURT:**  -- ADVICE.  WOULDN'T THAT BE A LARGE

9  NUMBER?

10      **MR. GELERNT:**  YOUR HONOR, WE DON'T ACTUALLY KNOW --

11  AND MY COLLEAGUE CAN TELL ME, BUT WE DON'T ACTUALLY KNOW, WE

12  ARE NOT BEING TOLD WHO IS BEING REUNIFIED.  SO ONE OF THE

13  THINGS THAT WE NEED IS THE DAYS RUN FROM THE TIME WE ARE

14  ACTUALLY NOTIFIED ABOUT REUNIFICATION, BECAUSE THINGS DOWN

15  THERE ARE A MESS.

16      WHAT WE UNDERSTAND FROM THE LAST CLASS LIST -- I

17  JUST WANTED TO MAKE SURE I HAD THE NUMBER RIGHT -- IS THAT

18  THERE WERE VERY FEW PEOPLE NOW REUNITED AT KARNES, WHICH IS

19  THE FACILITY THE GOVERNMENT INTENDS TO USE, 20 OR 30.  SO IT

20  SEEMS LIKE THE VAST BULK HAVE NOT BEEN GIVEN SUFFICIENT TIME.

21  BUT WE ARE CERTAINLY READY TO WORK WITH YOUR HONOR IF SOME

22  INDIVIDUAL HAS ALREADY BEEN COUNSELED FOR A FEW DAYS WHETHER

23  THAT POTENTIALLY EATS INTO THEIR SEVEN DAYS.  BUT WE THINK THE

24  VAST BULK ARE GOING TO END UP AT THIS KARNES FACILITY IN SOUTH

25  TEXAS ALL AT ONCE, AND IT IS GOING TO BE IMPOSSIBLE.

JULY 24, 2018

1          **THE COURT:**  THAT'S THE REMOVAL LOCATION.

2          **MR. GELERNT:**  EXACTLY.

3          **THE COURT:**  THE GOVERNMENT ALSO INDICATED IN ITS

4    INTRODUCTION THAT THESE PARENTS NOW HAVE HAD TIME TO TALK WITH

5    THEIR CHILDREN, IF NOT IN PERSON THEN AT LEAST BY PHONE OR

6    VIDEO TELECONFERENCING, WHATEVER HAS BEEN IN PLACE.  AND

7    ARGUABLY THEY WOULD HAVE DISCUSSED THESE ISSUES WITH THEIR

8    CHILDREN, AND THEY COULD HAVE DISCUSSED THESE ISSUES WITH THE

9    CHILD'S ADVOCATE AS WELL.

10         **MR. GELERNT:**  WELL, YOUR HONOR, I THINK THOSE ARE

11   SOME OF THE THINGS THAT THE AFFIDAVITS ADDRESS.  WE SCRAMBLED

12   LAST NIGHT WHEN THE -- TO GET THE AFFIDAVITS.  WE WOULD MAKE A

13   FEW POINTS ABOUT THAT.

14         ONE IS, WHATEVER ACCESS THEY MAY HAVE HAD TO THEIR

15   CHILD ON THE PHONE, THEY DID NOT HAVE THAT ACCESS BY PHONE TO

16   THE CHILD'S ADVOCATE.

17         THE OTHER THING I WOULD SAY IS, THIS IS ONE OF THOSE

18   THE SITUATIONS -- AND I KNOW THE GOVERNMENT HAS PUT IN AN

19   AFFIDAVIT FROM THE TOP SAYING, HERE IS WHAT I DIRECTED.  IT IS

20   SHORT OF SPECIFICS, BUT AS YOUR HONOR KNOWS THERE IS A VAST

21   DIFFERENCE BETWEEN WHAT MAY HAVE BEEN DIRECTED FROM

22   HEADQUARTERS AND WHAT WAS ACTUALLY HAPPENING ON THE GROUND.

23         THE AFFIDAVITS EXPLAIN THAT PEOPLE HAD MAYBE ONE

24   SHORT CALL, WHERE IT IS JUST THE CHILD CRYING, CAN'T SEE THE

25   PARENT.  NOTHING COULD GET DONE IN THAT SITUATION.

```
 1              I THINK THE AFFIDAVITS FROM PARTNERS AND ASSOCIATES

 2   AT BIG LAW FIRMS, NGO'S, ARE ALL DOWN THERE, AND THEY SAY THAT

 3   THE PARENTS HAVE NO IDEA WHAT'S HAPPENING.  THAT THEY HAVE

 4   SIGNED THESE FORMS, MANY OF THEM -- TO SHOW YOU HOW MUCH

 5   CONFUSION THERE IS.  MANY OF THEM ACTUALLY SIGNED THE FORMS

 6   GIVING AWAY THEIR CHILD, EVEN THOUGH THEY DIDN'T HAVE A FINAL

 7   ORDER.  THERE WOULD BE NO SENSE IN A PARENT GIVING AWAY THEIR

 8   CHILD IF THE PARENT THEMSELVES CAN STAY IN.

 9              THERE ARE GROUP PRESENTATIONS, THE AFFIDAVITS FROM

10   THE LAW FIRMS SAY.  THE PARENTS WERE PUT IN GROUPS OF 50 AND

11   SAID, HERE ARE YOUR BASIC RIGHTS, YOU HAVE 3 MINUTES TO SIGN

12   THIS FORM.

13              I THINK YOU ARE GOING TO BE SHOCKED WHEN YOU SEE

14   THESE AFFIDAVITS HOW LITTLE THE PARENTS UNDERSTOOD BEFORE

15   GETTING TOGETHER, AND HOW DIFFICULT IT IS GOING TO BE NOW TO

16   PROVIDE MEANINGFUL CONSULTATION WITH THEM, WITH HUNDREDS AND

17   HUNDREDS OF PEOPLE SHOWING UP AT THIS DETENTION CENTER.

18              THE COURT:  HOW MUCH TIME ARE YOU REQUESTING?

19              MR. GELERNT:  RIGHT NOW OUR REQUEST IS SEVEN DAYS.

20   WHAT WE ARE HEARING ON THE GROUND --

21              THE COURT:  FOR YOUR BRIEFING.

22              MR. GELERNT:  OH, I AM SORRY, YOUR HONOR.  I THINK

23   IF YOU COULD GIVE US UNTIL TOMORROW MORNING AT 9:00, AND WE

24   COULD BE BACK HERE IN THE AFTERNOON IF YOUR HONOR WOULD SEE

25   THAT AS APPROPRIATE.
```

JULY 24, 2018

1      **THE COURT:**  ALL RIGHT.  PERHAPS I CAN HEAR FROM MR.

2  STEWART.

3      **MR. STEWART:**  THANK YOU, YOUR HONOR.

4      **THE COURT:**  HAVE YOU BEEN IN COMMUNICATION WITH THE

5  NEW YORK ATTORNEYS, OR DO YOU HAVE INFORMATION IN THAT REGARD?

6      **MR. STEWART:**  MY COLLEAGUES AND I -- IT IS SORT OF

7  HARD TO KEEP TRACK OF ALL OF THE COMMUNICATIONS, YOUR HONOR,

8  BUT I HAVE BEEN ON SOME OF THEM AND TRIED TO BE AS PRIVY AS I

9  CAN.

10      MY UNDERSTANDING, YOUR HONOR, IS ON THE NEW YORK

11  CASE --

12      **THE COURT:**  EIGHT OR NINE CHILDREN.

13      **MR. STEWART:**  EIGHT OR NINE CHILDREN.  THE ISSUE

14  THERE -- THE KEY ISSUE THERE AS I UNDERSTAND IT IS WHETHER

15  THEY WILL GET THE 48 HOURS' NOTICE PROVIDED BY THE NEW YORK

16  COURT'S ORDER.  WE ARE DOING WHAT WE CAN TO GET -- TO NOT MOVE

17  THEM BEFORE THAT 48 HOURS LAPSES.

18      **THE COURT:**  THOSE CHILDREN ARE STILL THERE.

19      **MR. STEWART:**  THAT IS MY UNDERSTANDING, YOUR HONOR,

20  YES.  FOR THE NINE THAT ARE AT ISSUE IN THE RECENTLY

21  TRANSFERRED HABEAS CASE.

22      **THE COURT:**  AS I UNDERSTAND IT, THERE WAS A REQUEST

23  IN NEW YORK THAT THERE BE AN ORDERLY PERIOD OF TIME BEFORE

24  REUNIFICATION, OR TO HAVE THE PARENTS RELOCATED TO NEW YORK.

25      SO IS IT YOUR THOUGHT THAT THOSE EIGHT OR NINE

JULY 24, 2018

1   CHILDREN WOULD BE -- WOULD REMAIN IN NEW YORK, AND THEN

2   THROUGH THAT PROCESS THAT THE PARENT, ARGUABLY, COULD BE IN

3   COMMUNICATION, AT LEAST TELEPHONICALLY WITH THE CHILD AND ANY

4   CHILD ADVOCATE, AND THEN MAKE A DECISION TO REMOVE SEPARATELY

5   OR TOGETHER OR --

6           **MR. STEWART:**  YOUR HONOR, I THINK THERE ARE A COUPLE

7   OF WAYS IT MIGHT BE DONE.  ONE IS THAT -- WE GAVE THE NOTICE

8   AS OF MONDAY MORNING FOR THESE EIGHT OR NINE ARE WAITING UNTIL

9   THE 48-PERIOD LAPSES BEFORE MOVING THEM, GIVEN THE DESIRE TO

10  COMPLY WITH THE REUNIFICATION DEADLINE.

11          ANOTHER OPTION, YOUR HONOR, IS THAT WE COULD GO AND

12  CONFER WITH COUNSEL FOR THE PLAINTIFFS IN THAT CASE, AND TRY

13  TO WORK SOMETHING OUT AS TO THE NINE, THAT WOULD JUST GET THAT

14  SET OF CHILDREN TAKEN CARE OF.  SO THAT WOULD BE ANOTHER

15  OPTION.

16          IT HAS BEEN A SOMEWHAT FAST-MOVING SITUATION AS YOUR

17  HONOR IS AWARE, SO EITHER OF THOSE OPTIONS WOULD BE FINE.

18          MY UNDERSTANDING IS THAT SEVERAL OF THE CHILDREN ARE

19  FROM THE SAME FAMILY AND ARE GOING TO BE RELEASED IN ANY

20  EVENT, SO THAT MIGHT SORT OF ASSUAGE CONCERNS THERE.

21          **THE COURT:**  AT LEAST INTO THE COMMUNITY?

22          **MR. STEWART:**  I BELIEVE SO, YOUR HONOR.

23          **THE COURT:**  OKAY.  WHY DON'T -- IF NEW YORK COUNSEL

24  ARE THE LINE WE CAN PERHAPS PUT THEM AT EASE NOW AND SIMPLY --

25  AND JUDGE RAKOFF HAS TRANSFERRED THAT CASE SO I WAS -- AS TO

JULY 24, 2018

JUDGE FURMAN LAST WEEK.  SO WITH RESPECT TO THE REUNIFICATION

IN PLACE HERE, LET'S KEEP THE CHILDREN THAT HAVE BEEN

IDENTIFIED IN THE NEW YORK FILING BEFORE JUDGE RAKOFF IN NEW

YORK.  THE PARENTS WILL NOT BE RELOCATED TO NEW YORK.  I THINK

THAT WAS ONE OF THE REQUESTS, AND THAT WILL NOT OCCUR.

BUT WHAT I WOULD LIKE THE PARTIES TO DO IS TO MEET

AND CONFER, AND IT MAY BE THAT THE PARENTS CAN COMMUNICATE

WITH THE CHILDREN TELEPHONICALLY AND COMMUNICATE WITH THE

CHILD ADVOCATE TELEPHONICALLY, MAKE AN INFORMED DECISION.  AND

IT MAY BE THAT THIS ISSUE CAN WORK OUT THAT WAY WITHOUT

FURTHER COURT INTERVENTION.

THEN, AS I MENTIONED BEFORE, IF NEW YORK COUNSEL ARE

ON THE LINE AND THEY WANT TO CALL IN AS SOON AS THIS

CONFERENCE IS OVER I CAN SPEAK TO THEM DIRECTLY.  OTHERWISE

THIS ISSUE, IT MAY WELL WORK OUT WITH THE UNDERSTANDING THAT

THE PROCESS, THE REUNIFICATION AND THE REMOVAL, AT LEAST WITH

RESPECT TO THESE EIGHT OR NINE CHILDREN, WILL BE ON HOLD UNTIL

I HEAR FROM COUNSEL.

MR. STEWART, DID YOU WANT TO COMMENT ON THE

STIPULATION THAT WAS IN PLACE BUT APPARENTLY HAS FALLEN

THROUGH AND WHERE WE ARE?

**MR. STEWART:**  SURE, YOUR HONOR.

I GUESS I HAD A FEW POINTS.  I DON'T WANT TO JUMP

THE GUN, I KNOW YOUR HONOR WANTS TO FINISH READING THE PAPERS.

THE POINTS I WOULD LIKE TO EMPHASIZE ARE THESE, YOUR

| | |
|---|---|
| 1 | HONOR.  AS YOU WILL SEE FROM THE BRIEF, THE GOVERNMENT HAS A |
| 2 | PRETTY STRONG JURISDICTIONAL OBJECTION TO THE ISSUE HERE THE |
| 3 | GOVERNMENT HAS TAKEN SERIOUSLY YOUR HONOR'S RECOGNITION THAT |
| 4 | THIS CASE IS NOT A CHALLENGE TO THE GOVERNMENT'S DISCRETIONARY |
| 5 | REMOVAL AUTHORITY AND ALL OF THAT. |
| 6 | DESPITE THOSE CONSIDERABLE, YOU KNOW, CONCERNS AND |
| 7 | RESERVATIONS, THE GOVERNMENT WORKED VERY, VERY HARD, IN LINE |
| 8 | WITH YOUR HONOR'S ENCOURAGEMENT AND ORDERS, TO TRY TO REACH |
| 9 | SOME WAY TO RESOLVE THIS ISSUE DESPITE THE PREVIOUS AGREEMENT |
| 10 | TO THE 48-HOUR PERIOD. |
| 11 | WE THOUGHT THAT IT WAS APPROPRIATE TO IDENTIFY WHERE |
| 12 | WE ENDED UP FOR THE COURT BECAUSE THE COURT DID ORDER US TO |
| 13 | MEET AND CONFER AND WE JUST WANTED TO BE CLEAR ON OUR GOOD |
| 14 | FAITH AND ALL WE TRIED TO DO AND THE EFFORTS WE MADE WITH THIS |
| 15 | KARNES FACILITY. |
| 16 | WHAT I WOULD EMPHASIZE THERE, YOUR HONOR, IS THAT WE |
| 17 | ARE TRYING TO DEDICATE THIS ENTIRE FACILITY TO, YOU KNOW, |
| 18 | RESOLVE THESE CLAIMS AND GIVE PEOPLE ACCESS LET THEM -- YOU |
| 19 | KNOW, WE PUT THAT OUT THERE AS A WAY FOR FOLKS TO GET THE |
| 20 | INFORMATION THEY NEEDED TO MAKE THE DECISIONS THAT PLAINTIFFS |
| 21 | COUNSEL PRESSED THEY NEEDED TO MAKE. |
| 22 | I JUST WANT TO EMPHASIZE THAT SIGNIFICANT |
| 23 | JURISDICTIONAL OBJECTIONS THAT AT ISSUE IN A LOT OF OTHER |
| 24 | CASES, AND WE FIGURED YOUR HONOR WOULD NOT WANT TO |
| 25 | UNNECESSARILY REACH OUT TO RESOLVE THAT ISSUE IF YOU DIDN'T |

JULY 24, 2018

1    NEED TO.  WE TRIED OUR BEST TO RESOLVE IT.  DESPITE THAT WE

2    JUST WEREN'T ABLE TO, UNFORTUNATELY.

3          SO I WOULD EMPHASIZE THE GOVERNMENT'S GOOD FAITH,

4    OUR EFFORTS TO PUT AN OFFER THAT ACCOMMODATED ALL CONCERNS.  I

5    WOULD EMPHASIZE THAT POINT AS YOUR HONOR IS KIND OF GOING

6    THROUGH THE PAPERS.

7          THE SECOND POINT I WOULD EMPHASIZE, YOUR HONOR, IS I

8    AM DISAPPOINTED TO HEAR THAT MR. GELERNT IS PLANNING TO

9    SUDDENLY FILE A RAFT OF AFFIDAVITS OR DECLARATIONS.  YOU KNOW,

10   THE GOVERNMENT WAS CAUGHT OFF-GUARD AND QUITE BY SURPRISE WHEN

11   THIS MOTION WAS FILED ABOUT A WEEK AND A HALF AGO.  WE GOT

12   ALMOST NO NOTICE OF IT.

13         THE OPENING PARAGRAPH ADMITTED THAT THE MOTION WAS

14   BASED ON RUMORS.  THAT IS THE DIRECT WORD FROM THE MOTION.

15         IT WAS BASED ON JUST SUPPOSITION, SO WE HAD TO RUSH

16   AROUND, FIND OUT WHAT WAS GOING ON.  AND NOW I GET A SIGNAL

17   THAT WE ABOUT TO BE, DESPITE OUR SIGNIFICANT JURISDICTIONAL

18   OBJECTIONS, OUR DAYS AND NIGHTS OF TRYING TO NEGOTIATE

19   SOMETHING HERE EFFECTIVELY DESPITE OUR CONCERNS, THAT WE ARE

20   ABOUT TO THE HIT, BLINDSIDED BY A RAFT OF AFFIDAVITS.  I THINK

21   THAT IS QUITE PROBLEMATIC.  I DON'T THINK IT IS IN THE SPIRIT

22   OF YOUR HONOR'S ORDERS.

23         AND I THINK IT IS PARTICULARLY IMPROPER THAT IT

24   SOUNDS LIKE MR. GELERNT IS TRYING TO WIDEN THE -- POTENTIALLY

25   WIDEN THE RELIEF THAT HIS MOTION WAS SEEKING WHICH I ALSO

JULY 24, 2018

1    WOULD SUBMIT IS IMPROPER.

2            AGAIN I DON'T WANT TO GET OUT AHEAD OF THE REPLY,

3    BUT I WOULD OBJECT TO THE SUBMISSION OF FACTUAL AVERMENTS IN

4    THE REPLY BRIEF, PARTICULARLY IF THE GOVERNMENT DOESN'T HAVE

5    AN ABILITY TO RESPOND TO THEM, ESPECIALLY BECAUSE IF THESE ARE

6    KIND OF ANECDOTAL, I MEAN, WE ARE KIND OF AT A DISADVANTAGE

7    BECAUSE WE HAVE TO RUSH AROUND AND FIND OUT WHAT PEOPLE ARE

8    TALKING ABOUT.

9            I WOULD ALSO EMPHASIZE, YOUR HONOR, THAT AS YOU

10   YOURSELF, YOUR HONOR, POINTED OUT, THERE HAS BEEN QUITE A

11   NUMBER OF DAYS TO TRY TO RESOLVE THIS, AND JUST GIVE PEOPLE

12   THE RIGHT NOTICE, GIVE THEM CONSULTATION, ALL OF THAT SORT OF

13   THING.  IT SOUNDS LIKE THOSE EFFORTS -- THINGS HAVE NOT

14   PROGRESSED ADEQUATELY THERE.

15           SO IN SHORT, YOUR HONOR, WE THE GOVERNMENT WOULD

16   STICK VERY FIRMLY ON OUR PAPERS.  WE ARE PROUD OF OUR EFFORTS

17   TO WORK IN GOOD FAITH TO TRY TO REACH A STIPULATION SO THAT

18   THE COURT DID NOT HAVE TO STEP IN AND RESOLVE THIS, DID NOT

19   HAVE TO STEP IN TO DO MORE INJUNCTIVE RELIEF.  AND WE WERE

20   PARTICULARLY ATTUNED TO THE SERIOUS LEGAL QUESTIONS AND

21   SERIOUS JURISDICTIONAL ISSUES PRESENTED BY THIS.  AND WE

22   WANTED TO TRY TO RESOLVE THAT BUT, YOU KNOW, IT IS UNFORTUNATE

23   THAT WE WERE NOT ABLE TO.  WE DID WHAT WE COULD.

24           SO I WOULD EMPHASIZE THOSE POINTS, YOUR HONOR, AND

25   OTHERWISE I WOULD STICK TO THE BRIEF.

JULY 24, 2018

1        **THE COURT:**  LET ME RUN THROUGH A NUMBER OF IDEAS,

2    THOUGHTS, AND THEN GET COUNSEL'S INPUT AS TO HOW WE MOVE

3    FORWARD.

4        FIRST, THE OBSERVATION I WOULD MAKE ABOUT THE

5    REUNIFICATION OF ELIGIBLE CLASS MEMBERS, THAT'S THE 1,637, IT

6    APPEARS 1,012 HAVE BEEN REUNIFIED.  THE BALANCE HAVE BEEN

7    CLEARED AND TRANSPORTATION IS PENDING.

8        THIS IS A REMARKABLE ACHIEVEMENT, AND COMMANDER

9    WHITE IS TO BE COMMENDED.  HE HAS DONE YEOMAN'S WORK HERE IN

10   ACCOMPLISHING THAT.

11       SO FOR CLASS MEMBERS WHO ARE ELIGIBLE, IT APPEARS

12   THAT WHEN WE MEET ON THIS ISSUE AGAIN ON FRIDAY THAT

13   REUNIFICATION WILL HAVE BEEN COMPLETED ON TIME; WHICH HAS TO

14   BE HIGHLIGHTED AND THE GOVERNMENT HAS TO BE COMMENDED FOR ITS

15   EFFORTS IN THAT REGARD.

16       THERE IS A SIGNIFICANT GROUP OF CLASS MEMBERS, ABOUT

17   914, WHO MAY BE INELIGIBLE.  THAT IS A DIFFERENT CATEGORY.  I

18   THINK MANY OF THOSE THE PLAINTIFFS ARE NOT GOING TO QUARREL

19   WITH THE GOVERNMENT MAKING A DETERMINATION NOT TO REUNIFY,

20   WHETHER IT IS CRIMINAL HISTORY OR OTHER PRECLUDING FACTORS.

21   CERTAINLY THERE ARE GOING TO BE SOME OF THOSE CLASS MEMBERS

22   WHERE THE PLAINTIFFS, WITH ADDITIONAL INFORMATION, WILL

23   CHALLENGE THAT, AND THEN THE COURT CAN ADDRESS THOSE ISSUES AT

24   A LATER TIME.

25       THERE NEEDS TO BE MORE INFORMATION PROVIDED TO

JULY 24, 2018

1    PLAINTIFFS.  AND AS I HAVE INDICATED, THIS SHOULD REALLY BE A

2    TRANSPARENT PROCESS.

3            SOME OF THIS INFORMATION IS UNPLEASANT.  IT IS THE

4    REALITY OF THE CASE.  IT IS THE REALITY OF A POLICY THAT WAS

5    IN PLACE THAT RESULTED IN LARGE NUMBERS OF FAMILIES BEING

6    SEPARATED WITHOUT FORETHOUGHT AS TO REUNIFICATION AND KEEPING

7    TRACK OF PEOPLE.  AND THAT'S THE FALLOUT WE ARE SEEING.

8            THERE MAY BE 463, THERE MAY BE MORE.  THAT'S NOT

9    CERTAIN, BUT IT APPEARS THERE IS A LARGE NUMBER OF PARENTS WHO

10   ARE UNACCOUNTED FOR OR WHO MAY HAVE BEEN REMOVED WITHOUT THEIR

11   CHILD.  THAT'S A DEEPLY TROUBLING REALITY OF THE CASE, AND THE

12   PLAINTIFFS ARE ENTITLED TO THAT INFORMATION.

13           SO THERE HAS TO BE AN ACCOUNTING.  AND THE LIST

14   NEEDS TO IDENTIFY THE PARENTS, IF YOU HAVE THE INFORMATION,

15   AND WHERE THEY ARE, WHETHER THEY HAVE BEEN REMOVED.  AND IT

16   NEEDS TO ALSO INCLUDE THE STATEMENT THAT THE GOVERNMENT

17   DOESN'T KNOW WHERE THE PARENT IS OR LACKS THAT INFORMATION.

18   PLAINTIFFS ARE ENTITLED TO THAT INFORMATION SO THAT WE CAN

19   MORE INTELLIGENTLY DISCUSS, WHERE DO WE GO FROM HERE.  HOW DO

20   WE -- FOR THOSE PARENTS WHO WERE REMOVED WITHOUT CHILD.  THE

21   SOONER THE PLAINTIFFS HAVE ALL OF THAT INFORMATION THEY

22   HOPEFULLY LOCATE THEM AND THEN A REUNIFICATION CAN BE IN

23   PROCESS DOWN THE ROAD.  WE CAN SET A SEPARATE TIMEFRAME THERE.

24   BUT WE ARE NOT ABLE TO DO ANYTHING WITHOUT THE INFORMATION.

25           SO I WOULD PROPOSE THAT THE LIST FOR CLASS MEMBERS

JULY 24, 2018

```
1    WHO WAIVE REUNIFICATION PRIOR TO REMOVAL, THAT'S THE 127, BE

2    PROVIDED BY TOMORROW AT 9:00 A.M.

3            IF I UNDERSTOOD YOU CORRECTLY THAT WOULD BE DO-ABLE,

4    OR AT LEAST YOU CAN DO IT AS TO SOME, BUT THEN INDICATE THERE

5    MAY BE OTHERS WHERE YOU NEED MORE TIME.

6            MS. FABIAN:  SO TO CLARIFY THE 127 LIST WE GAVE

7    TODAY, THERE IS THE SEPARATE LIST OF INDIVIDUALS WHO HAVE

8    WAIVED ON THE FORM.

9            THE COURT:  YES.

10           MS. FABIAN:  WE HAVE -- AS I -- TO CLARIFY WHAT I

11   SAID BEFORE, WE ARE IDENTIFYING ALL OF THOSE FORMS.  OF THE

12   ONES WE HAVE IDENTIFIED, 85 WAIVED.  THERE ARE STILL -- WE ARE

13   WORKING THROUGH TO MAKE SURE WE IDENTIFIED ALL OF THOSE FORMS.

14           THE COURT:  AND I THINK YOU SAID YOU ARE GETTING AN

15   EMAIL TONIGHT.

16           MS. FABIAN:  THAT IS A SEPARATE EMAIL.  TONIGHT I

17   WILL HAVE MORE INFORMATION ON THE REMOVAL -- ON THE

18   INDIVIDUALS REMOVED, THAT'S WHAT I WAS REFERENCING, TONIGHT.

19           AS FAR AS THOSE -- SO WE ARE IN THE PROCESS OF

20   IDENTIFYING ALL OF THE FORMS THAT HAVE BEEN SIGNED, AND THEN

21   WHICH OF THOSE HAVE WAIVED REUNIFICATION.  WE HAVE GONE

22   THROUGH 400-AND-SOME FORMS AND HAVE IDENTIFIED 85 OF THOSE WHO

23   WAIVED REUNIFICATION.  BUT THERE MAY BE MORE, BUT THAT'S WHERE

24   WE ARE RIGHT NOW IN THAT PROCESS.

25           THE COURT:  LET'S DO IT THIS WAY.
```

JULY 24, 2018

1    THERE IS A LIST THAT IS NEEDED FOR CLASS MEMBERS WHO

2 HAVE WAIVED REUNIFICATION PRIOR TO REMOVAL. THERE IS A LIST

3 THAT'S NEEDED OF CLASS MEMBERS WHO HAVE BEEN REMOVED. AND

4 THERE IS A LIST THAT IS NEEDED OF CLASS MEMBERS WHO HAVE BEEN

5 RELEASED FROM ICE CUSTODY.

6    IT SEEMS TO ME THOSE LISTS SHOULD BE PROVIDED TO THE

7 PLAINTIFFS BY TOMORROW, PERHAPS NOON WOULD BE A MORE

8 APPROPRIATE DEADLINE. AND IT MAY BE THAT THE LISTS ARE NOT

9 COMPLETE. BUT YOU COULD GIVE THE INFORMATION YOU HAVE, AND

10 THEN AS TO THE PARENTS, CLASS MEMBERS THAT YOU LACK

11 INFORMATION YOU CAN IDENTIFY HOW MANY, AND ARTICULATE THE

12 REASONS, WHAT CATEGORIES THEY MIGHT BE FALLING INTO.

13    AND THEN WHEN WE GET THE STATUS REPORT ON THURSDAY

14 WE WILL HAVE MORE INFORMATION THAT WE CAN ADDRESS

15 INTELLIGENTLY ON FRIDAY.

16    SO LET'S DO THAT. THOSE LISTS BY TOMORROW, NOON.

17    THE PLAINTIFFS' REPLY ON THIS JURISDICTIONAL ISSUE

18 AND TRO REQUEST BY TOMORROW AT -- I WOULD PROPOSE, IF THERE IS

19 NOT OBJECTION, BY TOMORROW 12:00 O'CLOCK NOON.

20    AND THEN THAT WE ADDRESS THE MATTER FRIDAY AT THE

21 STATUS CONFERENCE AT 1:30.

22    DOES THE GOVERNMENT OBJECT?

23    **MR. STEWART:** WE CAN GO ON JUST MAINTAINING OUR

24 JURISDICTIONAL OBJECTION.

25    **THE COURT:** YES.

JULY 24, 2018

1          **MR. STEWART:**  WOULD BE FINE FOR YOUR HONOR.

2   UNDERSTOOD.  FINE TO ADDRESS ON FRIDAY.

3          **MR. GELERNT:**  THAT'S FINE, YOUR HONOR.

4          **THE COURT:**  SO FILING BY NOON TOMORROW, THEN WE WILL

5   ADDRESS THIS ISSUE FRIDAY.

6          **MR. GELERNT:**  OKAY.  THANK YOU, YOUR HONOR.

7          **THE COURT:**  OKAY.

8          HAVE WE ADDRESSED ALL MATTERS?  ANY OTHER

9   HOUSEKEEPING MATTERS.

10         **MR. STEWART:**  CAN I FLAG AT LEAST ONE MORE, YOUR

11  HONOR?

12         **THE COURT:**  YES.

13         **MR. STEWART:**  AS YOUR HONOR IS AWARE, AND AS WE

14  DISCUSSED, A NUMBER OF OTHER CASES HAVE ARISEN, IN OBVIOUSLY

15  IN NEW YORK, AND SOME OF THOSE HAVE BEEN TRANSFERRED HERE.

16         **THE COURT:**  I AM ONLY AWARE OF TWO, THEY ARE BOTH IN

17  NEW YORK.

18         **MR. STEWART:**  BOTH IN NEW YORK.  THERE ARE SOME

19  INDIVIDUAL CASES, BUT THOSE ARE DIFFERENT -- BUT THOSE HAVE

20  BEEN RESOLVED, I THINK, PRETTY SPEEDILY, GENERALLY.

21         THE ONE I WANTED TO FLAG, THOUGH, YOUR HONOR, IS

22  THAT THERE IS A CASE PENDING IN THE WESTERN DISTRICT OF

23  WASHINGTON BEFORE JUDGE PECHMAN.

24         **THE COURT:**  YES.

25         **MR. STEWART:**  THIS INVOLVES 17 STATES AND THE

```
 1    DISTRICT OF COLOMBIA WHO FILED A SUIT THAT THEY ALLEGED ON
 2    BEHALF OF THEIR RESIDENTS IN CONNECTION WITH THE FAMILY
 3    SEPARATION POLICY.
 4            I RAISE IT SORT OF FOR -- WITHOUT GETTING AHEAD OF
 5    THINGS TOO MUCH, YOUR HONOR.  THE GOVERNMENT -- THE PLAINTIFFS
 6    IN THAT CASE SOUGHT EXPEDITED DISCOVERY ABOUT THE POLICY AND
 7    THAT SORT OF THING.  THE GOVERNMENT FILED A FAST MOTION THAT
 8    SOUGHT TRANSFER TO THIS COURT, AND KIND OF OTHER THINGS ON
 9    JURISDICTIONAL ISSUES.
10            JUDGE PECHMAN IN THAT CASE HAS ORDERED EXPEDITED
11    DISCOVERY WITHOUT RULING ON THE TRANSFER PIECE YET, BUT -- SO
12    THE TRANSFER PIECE IS STILL UNDER CONSIDERATION.  BUT THERE IS
13    A HEARING BEFORE JUDGE PECHMAN THIS FRIDAY ON THE EXPEDITED
14    DISCOVERY SCOPE AND SCHEDULE AND PRESUMABLY THOSE SORTS OF
15    THINGS.
16            THE COURT:  YES.
17            MR. STEWART:  I AM GUESSING.
18            I WANTED TO FLAG IT FOR YOUR HONOR BECAUSE THE
19    GOVERNMENT'S VIEW IS THAT THAT CASE -- THE CLAIMS
20    OVERWHELMINGLY OVERLAP WITH THIS ONE OR WITH OTHER LITIGATION.
21    IT IS PROPERLY TRANSFERRED TO THIS COURT FOR JUST THE REASONS
22    ARTICULATED BY JUDGE FURMAN IN HIS TRANSFER ORDER, AMONG
23    OTHERS.
24            IT DOESN'T LOOK -- IT IS NOT CLEAR THAT THAT
25    TRANSFER WILL HAPPEN, AND I WANTED TO JUST FLAG IT BECAUSE OF
```

JULY 24, 2018

1   CONCERNS THAT IF WE DO END UP WITH A SITUATION OF EXPEDITED

2   DIFFICULT DISCOVERY THERE IT WILL, UNFORTUNATELY, POTENTIALLY

3   OVERLAP WITH EFFORT HERE.

4            AND I DON'T RAISE IT TO KIND OF IDENTIFY A PROBLEM

5   MORE JUST WE ARE GOING TO LOOK FOR SOLUTIONS AND TRY TO DEAL

6   WITH IT.  BUT I JUST WANTED TO FLAG IT FOR YOUR HONOR SO YOU

7   KNOW OF IT AND YOU ARE NOT CAUGHT OFF-GUARD.  AND WE ARE

8   WORKING AS BEST WE CAN.  WE TRIED TO GET IT TRANSFERRED HERE,

9   WE ARE NOT SURE WE ARE GOING TO SUCCEED.  BUT WE ARE PREPARED

10  TO, YOU KNOW, WE ARE TRYING TO WORK WITH THAT ISSUE.

11           BUT I WANTED TO FLAG IT JUST BECAUSE THE MORE

12  RESOURCES WE HAVE TO DEVOTE TO EXPEDITED DISCOVERY

13  UNFORTUNATELY MANY OF THOSE FOLKS WILL I THINK BE PEOPLE WHO

14  ARE WORKING ON REUNIFICATION, SO WE ARE TRYING TO DEAL WITH

15  IT.  BUT I DID WANT TO RAISE THAT CASE FOR YOUR HONOR BEFORE

16  JUDGE PECHMAN.

17           **THE COURT:**  YES.  THANK YOU FOR MENTIONING THAT.

18           BUT OF THE ELIGIBLE CLASS MEMBERS IT APPEARS THAT'S

19  ALL UNDERWAY AND REUNIFICATION SHOULD OCCUR BY THURSDAY.

20           **MR. STEWART:**  I DON'T THINK THE CASE WILL AFFECT THE

21  STUFF YOU HAVE BEEN FOCUSING ON, YOUR HONOR.  I FLAG IT AS A

22  CONSIDERATION AS WE ARE, YOU KNOW, CONTINUING TO BEAR DOWN TO

23  COMPLETE THE REST OF THE REUNIFICATION.

24           **THE COURT:**  YES.  ALL I CAN SAY THERE IS ON THE NEW

25  YORK CASES, BOTH JUDGES FURMAN AND RAKOFF, WITH THE PARTIES

JULY 24, 2018

1    CONSENT, CALLED ME.  AND SO THEY TOOK THAT INITIATIVE, AND

2    THEN THEREAFTER THEY MADE THEIR OWN CONSIDERED JUDGMENT TO

3    TRANSFER THE CASES HERE.

4         I HAVE NOT HEARD FROM JUDGE PECHMAN, AND OF COURSE,

5    SHE IS GOING TO DO WHAT SHE CONSIDERS TO BE THE RIGHT DECISION

6    IN HIS CASE, SO I WOULD NOT HAVE ANY COMMENT OR OBSERVATION

7    OTHER THAN TO THANK COUNSEL FOR LETTING ME KNOW.

8         AND WE WILL STAND BY, AND AS I INDICATED TO JUDGES

9    FURMAN AND RADKOFF, WE ARE HERE AND READY TO TEND TO THE NEW

10   YORK CASE AS THE LAWYERS DEEM APPROPRIATE.

11        LET'S CLOSE THIS HEARING.  AND THEN I AM GOING TO

12   ASK COUNSEL JUST TO STAND BY FOR A MOMENT.  I DON'T KNOW IF

13   NEW YORK COUNSEL WILL CALL IN OR NOT, BUT I WANTED TO GIVE

14   THEM THE COURTESY TO DO THAT IF THAT'S WHAT THEY WANT TO DO.

15   THEY MAY ELECT NOT TO.  THEY MAY NOT BE ON THE LINE, I DON'T

16   KNOW.  I DON'T HAVE ANY OTHER INFORMATION, OTHER THAN I SPOKE

17   WITH JUDGE RADKOFF LATE THIS AFTERNOON, I THINK IT WAS

18   ABOUT -- WELL, IT WAS DURING THE RECESS WHEN I WAS IN TRIAL.

19   AND SO HE GAVE ME THE UPDATE, BUT I HAVEN'T HEARD ANYTHING

20   ELSE THAT HE HAS TRANSFERRED THE CASE.

21        **MR. STEWART:**  CAN I MAKE JUST ONE OR LIKE A

22   TWO-SENTENCE CLOSING OBSERVATION ON ONE OTHER PIECE OF THE

23   STAY MOTION?

24        **THE COURT:**  YES.

25        **MR. STEWART:**  OBVIOUSLY THERE IS GOING TO BE FURTHER

JULY 24, 2018

1   BRIEFING AND ARGUMENT AND I CAN ADDRESS -- HOPEFULLY ADDRESS

2   THIS FURTHER ON FRIDAY, YOUR HONOR.  BUT THE GOVERNMENT ALSO

3   WOULD TAKE ISSUE WITH THE SUGGESTION THAT THINGS ARE A MESS ON

4   THE GROUND.  AS COMMANDER WHITE HAS EXPLAINED THERE HAS

5   BEEN -- AND AS YOUR HONOR HAS RECOGNIZED, THERE HAS BEEN

6   TREMENDOUS EFFORT TO REUNIFY CONSISTENT WITH THIS COURT'S DUE

7   PROCESS REUNIFICATION FAMILY INTEGRITY RULING.  WE HAVE MANY

8   REASONS TO BE VERY PROUD OF THIS EFFORT SO WE STRONGLY CONTEST

9   THAT CHARACTERIZATION AND LOOK FORWARD TO THE OPPORTUNITY TO

10  PRESENT FURTHER VIEWS ON THAT.

11          **THE COURT:**  I WILL LOOK FORWARD TO THE ADDITIONAL

12  BRIEFING.  AND I THINK THE STATUS REPORT ON THURSDAY WILL BE

13  GOOD BECAUSE WE WILL HAVE A LOT OF OTHER ADDITIONAL

14  INFORMATION.  AND THEN FRIDAY, OF COURSE, WE CAN TAKE

15  INVENTORY ON WHAT ACTUALLY HAPPENED AT THE REUNIFICATION OF

16  ELIGIBLE CLASS MEMBERS, AND THEN ADDRESS THE JURISDICTIONAL

17  ISSUE.

18          **MS. FABIAN:**  YOUR HONOR, I JUST WANTED TO LET YOU

19  KNOW AS WELL ON FRIDAY I WILL BE APPEARING IN COURT IN LOS

20  ANGELES SO I AM GOING TO TRY TO PARTICIPATE BY PHONE HERE IN

21  THE AFTERNOON.

22          **THE COURT:**  MR. STEWART, YOU WILL BE HERE?

23          **MR. STEWART:**  I WILL BE HERE, YOUR HONOR.

24          **THE COURT:**  OKAY.  VERY GOOD.  THANK YOU VERY MUCH.

25          **MR. STEWART:**  THANK YOU, YOUR HONOR.

JULY 24, 2018

1          **(PAUSE IN PROCEEDINGS)**

2          **THE COURT:**  OKAY.  WE DON'T HAVE A CASE NUMBER OR A

3    CASE YET.  I HAVE JUST BEEN INFORMED BY JUDGE RAKOFF THAT THE

4    NEW YORK CASE WAS TRANSFERRED.

5          WE HAVE GOVERNMENT COUNSEL PRESENT AND PLAINTIFFS'

6    COUNSEL PRESENT.

7          AND I NOW UNDERSTAND WE HAVE NEW YORK COUNSEL ON THE

8    LINE, FROM LEGAL AID, REPRESENTING THE CHILDREN IN THAT CASE.

9          I HOPE YOU CAN HEAR ME.

10         CAN YOU STATE YOUR APPEARANCES?

11         **MR. GELERNT:**  CERTAINLY, YOUR HONOR.  THIS IS JUDITH

12   GOLDINER FROM THE LEGAL AID SOCIETY IN NEW YORK.  AND I AM

13   JOINED HERE -- WITH ME IS SARAH GILLMAN, GREGORY COPELAND, AND

14   BETH KRAUSE ALSO FROM NEW YORK CITY.

15         I KNOW WE HAVE OUR PRO BONO --

16         **MR. FRAHN:**  YOUR HONOR, THIS IS BUZZ FRAHN OF

17   SIMPSON THATCHER, PALO ALTO, CALIFORNIA, ON THE LINE AS WELL.

18         **THE COURT:**  VERY GOOD.  THANK YOU.

19         WERE COUNSEL ON THE LINE FOR THE LAST STATUS

20   CONFERENCE?

21         **MS. GOLDINER:**  YES, WE ARE WERE, YOUR HONOR.

22         **THE COURT:**  YOU HEARD THE DISCUSSION, THEN, THAT I

23   HAD WITH COUNSEL.

24         SO, MS. GOLDINER WHAT -- I AM ALL EARS.  I WOULD

25   LIKE TO HEAR FROM YOU AND GET YOUR PERSPECTIVE.


JULY 24, 2018

1      **MS. GOLDINER:**  THANK YOU, YOUR HONOR.

2      SO I GUESS I WANT TO START BY SAYING OUR CONCERN

3    HERE IS THAT OUR CLIENTS DON'T HAVE INFORMATION THEY NEED TO

4    MAKE MEANINGFUL PLANS, AND THEY HAVEN'T HAD THE OPPORTUNITY TO

5    TALK TO THEIR PARENTS ABOUT THOSE PLANS OR THERE PARENTS TO

6    THEIR COUNSEL, TO THE CHILDREN'S COUNSEL.

7      SO, YOU KNOW, WHAT WE ARE SEEING IS KIDS WHO VERY

8    MUCH WOULD LIKE TO BE WITH THEIR PARENTS BUT THEY DON'T WANT

9    TO BE IN LONG FAMILY DETENTION.  WHAT THEY DON'T KNOW, AND

10   WHAT THE GOVERNMENT HASN'T GIVEN US NOTICE OF, IS WHETHER THE

11   PLAN FOR THE FAMILIES IS POTENTIALLY DEPORTATION OR FAMILY

12   DETENTION WHILE OTHER RELEASE IS BEING WORKED OUT.

13     SO THAT'S BEEN THE PROBLEM.  AND THAT'S SPECIFICALLY

14   THE PROBLEM FOR THE YOUNG PEOPLE THAT WE FILED FOR TODAY.  SO

15   WHAT WE WERE HOPING FOR WAS -- AS YOU KNOW FROM OUR PREVIOUS

16   FILING WAS THAT THE NOTIFICATIONS WE WOULD GET WOULD GIVE US

17   BOTH THE INFORMATION ON WHAT THE ACTUALLY PLAN WAS --

18     **THE COURT:**  I AM SORRY, SOMEBODY IS TYPING AND SO IT

19   IS ACTUALLY INTERRUPTING MS. GOLDINER'S PRESENTATION.

20     CAN YOU GIVE ME THAT LAST SENTENCE AGAIN?

21     **MS. GOLDINER:**  I AM SORRY.

22     THE REASON WE WANTED THE NOTIFICATION WAS REALLY

23   TWOFOLD.  ONE WAS TO GET INFORMATION ON EXACTLY WHAT THE PLAN

24   WAS FOR THE KIDS SO THAT WE COULD ADVISE THEM.  AND SECOND SO

25   THAT WE WOULD ALSO HAVE A WAY OF CONTACTING THEIR PARENTS AND

1   GETTING THEIR PARENTS' INPUT INTO WHAT WAS GOING TO HAPPEN.

2           SO OF THE FIVE PARENTS THAT ARE INVOLVED IN THE KIDS

3   THAT WE FILED FOR, THREE OF THEM WE HAVE NOT BEEN ABLE TO TALK

4   TO.  AND THEIR CHILDREN HAVE NOT HAD ANY MEANINGFUL

5   OPPORTUNITY TO TALK TO THEM ABOUT WHAT THE PLANS ARE.

6           AND EVEN WERE THEY ABLE TO TALK TO THEIR PARENTS,

7   WITHOUT KNOWING WHETHER THEY ARE GOING TO BE DEPORTED OR

8   WHETHER THEY ARE GOING TO BE IN FAMILY DETENTION IS IMPORTANT

9   TO OUR KIDS TO KNOW WHETHER -- THAT IS SOMETHING THAT THEY

10  WANT OR WHETHER THEY WANT TO STAY AND PURSUE THE REMEDIES THEY

11  MIGHT HAVE.

12          **THE COURT:**  OKAY.

13          LET ME ASK MR. STEWART.  DO WE KNOW WHO THE FIVE

14  PARENTS ARE?

15          AND, MS. GOLDINER, DO YOU KNOW WHO THE FIVE PARENTS

16  ARE?  DO YOU HAVE THAT INFORMATION?

17          **MS. GOLDINER:**  WE KNOW WHO THEY ARE, WE HAVE NOT

18  BEEN ABLE TO CONTACT THEM.

19          **THE COURT:**  SO I AM JUST SPEAKING PRACTICALLY.  IF

20  YOU KNOW WHO THEY ARE, IT SEEMS THAT YOU COULD -- IT MAY BE

21  THAT GOVERNMENT COUNSEL IN NEW YORK KNOWS WHO THEY ARE AS

22  WELL, BUT I HAVE, OBVIOUSLY, GOVERNMENT COUNSEL HERE IN SAN

23  DIEGO, MS. FABIAN AND MR. STEWART.

24          IT MAY BE THAT IF THE INFORMATION IS SHARED WITH

25  THEM AS TO WHO THE PARENTS ARE, THEN THIS CAN WORK OUT

```
 1   INFORMALLY AND RELATIVELY EASILY WHERE THOSE PARENTS ARE NOT
 2   REMOVED, THE CHILDREN CAN REMAIN IN NEW YORK.  THERE COULD BE
 3   AN OPPORTUNITY WHERE PARENT AND CHILD COMMUNICATE AT LEAST
 4   TELEPHONICALLY, PARENT AND CHILD ADVOCATE COMMUNICATE,
 5   INFORMED DECISIONS ARE MADE.  AM I CORRECT?
 6            I AM ASKING MS. FABIAN NOW.
 7            MS. FABIAN:  LET ME STAND UP STRAIGHT WHILE I DO
 8   THIS.
 9            AND, YOU KNOW, IF I HAVE MISSED CONVERSATIONS I
10   APOLOGIZE.  I DON'T WANT TO MISREPRESENT ANYTHING.  MY
11   UNDERSTANDING IS -- I AM NOT AWARE IF WE HAVE BEEN TOLD THAT
12   THERE ARE DIFFICULTIES IN THE COMMUNICATION.  I THINK
13   FACILITATING COMMUNICATION IS SOMETHING WE CAN DO.
14            WE, AS I UNDERSTAND IT, GAVE NOTIFICATION OVER THE
15   WEEKEND.  WE HAVE NONETHELESS HELD TO ENSURE THAT THERE WERE
16   48 HOURS THAT WERE NOT ON THE WEEKEND ARRANGED FOR THE
17   REUNIFICATIONS TO HAPPEN TOMORROW.  AND, YOU KNOW, BASED ON
18   THE COURT'S EARLIER STATEMENT CAN HOLD THAT OFF FURTHER.  BUT
19   WE HAVE MADE ATTEMPTS TO PROVIDE ENOUGH TIME TO ALLOW THOSE
20   COMMUNICATIONS.  SO IF THOSE HAVEN'T HAPPENED I AM NOT AWARE
21   WHY THAT IS, BUT WE CAN CERTAINLY LOOK INTO ARRANGING THOSE.
22            MY UNDERSTANDING IS THAT WE HAVE ALSO GIVEN
23   INFORMATION AS TO THE CURRENT INTENTION WITH REGARD TO THE
24   FAMILY, WHICH IS I THINK FOR AT LEAST ONE FAMILY WHICH IS --
25   HAS MULTIPLE CHILDREN THAT THE CURRENT INTENTION IS THAT THEY
```

1   WOULD BE RELEASED UPON REUNIFICATION.  I AM NOT -- SO I AM NOT

2   SURE IF THE REMAINDER WOULD BE HELD TOGETHER IN FAMILY

3   DETENTION.  I BELIEVE THAT IS THE CURRENT PLAN AS WE

4   INDICATED, HOWEVER THAT IS THE CURRENT PLAN.  THINGS CAN

5   CHANGE AS NEW INFORMATION BECOMES AVAILABLE.

6        SO AS I UNDERSTAND IT, THAT WAS PART OF THE CONCERN

7   IS THAT WE CAN'T 100 PERCENT COMMIT AS TO THE SITUATION THAT

8   WILL BE DOWN THE LINE BUT THAT WE HAVE PROVIDED INFORMATION AS

9   TO OUR CURRENT UNDERSTANDING FROM ICE OF WHAT THE FAMILY

10  SITUATION WOULD BE.

11       **THE COURT:**  IT SEEMS THAT THIS IS A MATTER WITH A

12  VERY PRACTICAL SOLUTION.  AND SO PARTICULARLY SINCE, GIVEN THE

13  COURT'S ORDERS TODAY, THAT THE PARENTS WILL NOT BE REMOVED,

14  THE CHILDREN WILL NOT BE MOVED FROM NEW YORK PENDING WORKING

15  THIS OUT, THAT THE PARTIES CAN MEET AND CONFER.  AND IT SEEMS

16  LIKE THIS ISSUE, WITH COMMUNICATION, THERE CAN BE A MEANINGFUL

17  OPPORTUNITY FOR PARENT AND CHILD, PARENT AND CHILD ADVOCATE,

18  TO ADDRESS THE ISSUES, PERHAPS TELEPHONICALLY, BUT TO AT LEAST

19  ADDRESS THE ISSUES.  AND SO IT WOULD SEEM THAT THIS WHOLE AREA

20  COULD BE ADDRESSED THROUGH A JOINT MOTION AND ORDER.

21       DON'T YOU AGREE, MS. GOLDINER?

22       **MS. GOLDINER:**  YES, YOUR HONOR.

23       I DO WANT TO ADD, THOUGH, THAT WE STILL -- TO BE

24  ABLE TO APPROPRIATELY COUNSEL OUR CLIENTS, THE CHILDREN, AND

25  TALK TO THEIR PARENTS ABOUT WHAT THE OPTIONS ARE, WE NEED TO

1    KNOW THE ANSWER TO WHETHER IT IS REUNIFICATION AND DEPORTATION

2    OR REUNIFICATION AND BEING HELD IN FAMILY DETENTION.

3            AND THAT'S REALLY IMPORTANT TO OUR CLIENTS.  AND I

4    THINK THE GOVERNMENT KNOWS THE ANSWER TO THAT.  NOT A LOT OF

5    CHILDREN, AND I WOULD HOPE THEY COULD PROVIDE THAT TO US.  I

6    HAVE NO PROBLEM WITH CONFERRING WITH THEM, BUT I WOULD LIKE

7    TO -- WE NEED TO KNOW THE ANSWER TO THAT.

8            **THE COURT:**  I THINK THE GOVERNMENT, AS SOON AS YOU

9    KNOW WHO THE PARENTS ARE, YOU CAN INFORM PLAINTIFFS' COUNSEL,

10   WHETHER IT IS REUNIFY AND DEPORT, OR REUNIFY AND DETAIN

11   TOGETHER, OR PAROLE IN COUNTRY.

12           **MS. FABIAN:**  I THINK -- I THINK MY UNDERSTANDING IS

13   THAT WE HAVE MADE THAT AND THAT'S -- WE HAVE INDICATED THAT --

14   THE CURRENT PLAN.

15           I THINK THERE IS -- OUR POSITION WOULD BE THAT WE

16   CAN'T -- INCONSISTENT WITH THIS COURT'S ORDERS IS WE CAN'T

17   GUARANTEE A CERTAIN RESULT OR A CERTAIN OUTCOME FOR THAT

18   INFORMATION THAT CAME UP THAT CHANGED THE -- WHAT -- FOR

19   EXAMPLE SOMEONE OBTAINING AN EXECUTABLE FINAL ORDER MIGHT

20   CHANGE THE PLANS WITH REGARD TO DETENTION OR REMOVAL, ET

21   CETERA.

22           SO I THINK AS THINGS CHANGE, THE AGENCY RETAINS ITS

23   AUTHORITY TO MAKE DECISIONS BASED ON THE SITUATION WITH THE

24   FAMILY.  AND THAT'S WHY WE SAY WE HAVE GIVEN THE CURRENT

25   INFORMATION BUT CANNOT COMMIT THAT THAT INFORMATION WON'T

JULY 24, 2018

1    CHANGE AS THE PROCESS MOVES FORWARD.

2            **THE COURT:**  RIGHT.  I WOULD ASSUME, FOR EXAMPLE,

3    THAT THE ONE PLAN MIGHT BE TO REUNIFY AND DETAIN TOGETHER, OR

4    REUNIFY AND PAROLE INTO THE COMMUNITY, BUT THAT COULD CHANGE

5    AS THE PARENT AND/OR CHILD MIGHT LATER BECOME SUBJECT TO A

6    REMOVAL ORDER DOWN THE ROAD.

7            **MS. FABIAN:**  CORRECT.  I THINK -- I MEAN, I THINK TO

8    SOME EXTENT WE WOULD SAY THAT PROVIDING THAT INFORMATION IS A

9    COURTESY THAT WE HAVE BEEN WILLING TO DO TO FACILITATE THE

10   DECISION-MAKING BY THIS GROUP.  IT IS NOT NECESSARILY

11   INFORMATION THAT EVERYONE IS ENTITLED TO -- THAT WE WOULD

12   AGREE EVERYONE IS ENTITLED TO, BUT WE HAVE MADE AN EFFORT TO

13   PROVIDE THE INFORMATION THAT IS CURRENTLY AVAILABLE.  I WOULD

14   AGREE, WE CAN'T COMMIT THAT THINGS WON'T CHANGE.

15           **THE COURT:**  WHAT IF THE PARTIES HERE -- THAT WOULD

16   BE GOVERNMENT COUNSEL AND MS. GOLDINER AND OTHER PLAINTIFFS'

17   COUNSEL -- MEET AND CONFER.  AND I WOULD HOPE THAT THIS COULD

18   BE A MATTER WHERE YOU COULD REPORT TOMORROW, BY JOINT MOTION

19   AND ORDER.  OR IF THERE IS A NEED FOR THE COURT TO BECOME

20   INVOLVED OTHERWISE, THEN WE CAN ARRANGE FOR AN IMMEDIATE

21   TELEPHONIC CONFERENCE AND ARGUMENT SUBJECT TO BRIEFING.

22           **MS. GOLDINER:**  WE ARE HAPPY TO MEET AND CONFER.

23           **MR. STEWART:**  CAN I ALSO ADD THE POSSIBILITY, YOUR

24   HONOR, THAT MAYBE NOT EVEN AN ORDER BUT IF WE COULD COME TO A

25   MUTUAL UNDERSTANDING AND ALERT THE COURT TO IT?

JULY 24, 2018

```
 1              THE COURT:  YOU CAN JUST ALERT THE COURT, EXACTLY.

 2              MR. STEWART:  VERY GOOD.

 3              THE OTHER THING I MENTIONED -- YOUR HONOR, YOU

 4    MENTIONED, I THINK YOU USED THE WORD STAY OR NOT REMOVING.  I

 5    THINK WHAT YOU WERE SAYING WAS JUST PUT A PAUSE AS TO THESE

 6    FEW PARENTS.  DON'T RELOCATE THEM TO NEW YORK UNTIL WE FIGURE

 7    OUT THIS SMALL COHORT OF EIGHT OR NINE.

 8              THE COURT:  YES.  THAT'S EXACTLY RIGHT.

 9              MR. STEWART:  THANK YOU, YOUR HONOR.  I THINK WE

10    WILL WORK WITH THAT.

11              THE COURT:  MR. STEWART, YOU HAVE ALL OF THE CONTACT

12    INFORMATION FOR MS. GOLDINER AND PLAINTIFFS' COUNSEL?

13              MR. STEWART:  I BELIEVE SO.  I CERTAINLY HAVE A GOOD

14    COHORT OF HER COLLEAGUES, YOUR HONOR, SO WE WILL BE IN TOUCH.

15              THE COURT:  OKAY.

16              MR. GELERNT HAS BEEN SITTING VERY QUIETLY.  THIS IS

17    NOT YOUR CASE, BUT IS THERE ANY COMMENT OR OBSERVATION,

18    CONCERNS?

19              MR. GELERNT:  NO, YOUR HONOR.  I THINK WE WILL LET

20    THEM WORK IT OUT TOGETHER.

21              THE COURT:  OKAY.  I THINK WE WILL SIGN OFF.

22              AND I WILL ASK COUNSEL TO MEET AND CONFER RIGHT

23    AWAY, AND I WILL WAIT TO HEAR FROM COUNSEL.  OKAY.  THANK YOU.

24

25                             *  *  *
```

JULY 24, 2018

1

2          I CERTIFY THAT THE FOREGOING IS A CORRECT

3     TRANSCRIPT FROM THE RECORD OF PROCEEDINGS
      IN THE ABOVE-ENTITLED MATTER.
4
      S/LEEANN PENCE                    3/3/2018
5     LEEANN PENCE, OFFICIAL COURT REPORTER   DATE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JULY 24, 2018

**DEFENDANTS' EXHIBIT 6**

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   R.G.H., et al.,

 4         Plaintiffs-Petitioners,

 5             v.

 6   JEFFERSON BEAUREGARD SESSIONS,
                                        Order to Show Cause
 7         Defendant-Respondent.

 8   ------------------------------x
                                        New York, N.Y.
 9                                      July 27, 2018
                                        4:10 p.m.
10
     Before:
11
                 HON. JED S. RAKOFF
12
                                        District Judge
13

14

15           APPEARANCES

16
     GREENBURG TRAURIG
17         Attorneys for Plaintiffs-Petitioners
     BY:   CAROLINE HELLER
18         KEDAR S. BHATIA

19

20   SAFE PASSAGE PROJECT
           Attorneys for Plaintiffs-Petitioners
21   BY:   REX CHEN
           GUILLERMO STAMPUR

22

23   GEOFFREY S. BERMAN
           United States Attorney for the
24         Southern District of New York
           Attorneys for Defendant
25   BRANDON M. WATERMAN
           Assistant United States Attorney
```

1          (Case called)

2          THE COURT:  Good afternoon everyone.  Thank you for

3   your papers.  This appears to me to be identical in all

4   relevant respects to a matter that came before me earlier this

5   week, 18 CV 6654, in which the Legal Aid Society, representing

6   nine children, raised essentially the same issues raised in the

7   papers here and sought essentially the same relief.

8          On that occasion, after hearing from the government

9   and after consultation with Judge Sabraw, who is overseeing the

10  vast majority of these issues involving reunification in the

11  federal court in California, I transferred that case to Judge

12  Sabraw.  On that occasion Judge Sabraw had a hearing in the

13  matter coming up in a few hours and was kind enough to allow

14  the Legal Aid lawyers to appear telephonically.

15         I have just been on the phone with Judge Sabraw, who

16  indicated that if I were to transfer this new matter to him,

17  coincidentally he is having a hearing on all aspects of the

18  reunification process in approximately five minutes, and he

19  would be very pleased to have counsel for the petitioners here

20  participate in that conference if I transfer the case.

21         In the expectation that I will probably do that in

22  about two minutes, his number is 619-557-6262.  I told him that

23  if I did transfer it and if you did want to appear there, there

24  would be lawyers from Greenberg Traurig and from Safe Passage

25  Project who would be calling.  He is ready to receive your call

3

1   if that is the way things turn out.

2       The reason I transferred the other matter to Judge

3   Sabraw is because this whole reunification process has many,

4   many moving parts, and it doesn't make sense to have different

5   judges in different districts trying to deal piecemeal with the

6   issue.  There should be one judge looking at it overall.  Judge

7   Furman, for example, just a week earlier had transferred

8   another matter involving reunification to Judge Sabraw, and he

9   is exercising on a daily basis oversight of all aspects of the

10  reunification process.

11      Let me hear from petitioners' counsel as to why, if

12  you do oppose, I should not just transfer this forthwith to

13  Judge Sabraw, you can talk to him and make your arguments to

14  him as soon as you can call him?

15      MS. HELLER:  Thank you, your Honor.  Caroline Heller

16  for the plaintiff-petitioners.  The arguments that your Honor

17  presents do make sense.  We would not necessarily object to

18  having the petition transferred and having an opportunity to

19  argue our case before Judge Sabraw.  However, there is one

20  outstanding factor.

21      The Assistant U.S. Attorneys disagrees with us.  The

22  Assistant United States Attorney who is here today even asked

23  why are you not filing this in the Southern District of

24  California.  Our response was because this is an emergency, the

25  children are in New York.  But if the Assistant United States

1   Attorney would agree that these children won't be transferred

2   pending our application before Judge Sabraw, we could all come

3   to an agreement that that would be fine.

4        Our concern here, your Honor, is that while this case

5   is being transferred to the Southern District of California,

6   the current request for a temporary restraining order is not

7   before Judge Sabraw.

8        THE COURT:  It will be.  The way it will work is this.

9   The last time I had three hours to get it to him.  This time I

10  have five minutes.  But thanks to modern communication, that is

11  not very difficult.  If I issue the order that I anticipate I

12  will issue, I will immediately email to his chambers all your

13  papers.  I will email my written order, which will only be a

14  couple of sentences, transferring the case to him forthwith.

15  Therefore, it will be his case.

16       As I say, he is perfectly happy to hear you this

17  afternoon.  You are quite able to say to him the children

18  should not be transferred, period, or they certainly shouldn't

19  be transferred until you have ruled on our petition, and so

20  forth.  So I don't think you will be prejudiced.

21       I'm not quite sure why the Assistant U.S. Attorney put

22  the question to you why you didn't file in California.  If the

23  children are here, you have every legal right to file here,

24  which you have done.  But it makes perfect sense to bring this

25  before Judge Sabraw, who has the overall coordinating function

1   in this very difficult matter.

2          I assume the government can assure me that no transfer

3   is going to occur between now and when Judge Sabraw hears you

4   in a few minutes.  Let me hear from the government.

5          MR. WATERMAN:  Your Honor, for the reasons you

6   articulated on Tuesday as well as this afternoon, we do believe

7   this matter should be transferred forthwith to the Southern

8   District of California.

9          I don't believe that there is any imminent threat of

10  these individuals being moved.  As I understand it, I believe

11  the attorneys had asked for or filed a cease and desist letter

12  and moving them was put on hold temporarily.  As I understand

13  it, there is no current movement in light of counsel's actions

14  in the past day or two or communications with the government.

15         THE COURT:  So I will transfer it.  I am going to keep

16  this short because I think it is important that the

17  petitioners' counsel get right on the phone with Judge Sabraw.

18  Give me no more than five minutes.  I will make sure that Judge

19  Sabraw knows that the case has been transferred.  I will email

20  him your papers.

21         I will prepare my written order and have it docketed.

22  If you want to come down to my chambers, you can get a copy of

23  that as well.  Then you should call Judge Sabraw so you can

24  participate in his ongoing hearing, which has probably started

25  about five minutes ago, that embraces all aspects of this.

1          I will say to you, as I said to the lawyers on

2     Tuesday, if for any reason when you call they say who are you

3     or anything like that, let me know, and I'll call and make sure

4     that you get through, although there was no problem last

5     Tuesday and Judge Sabraw was ready to hear the lawyers from New

6     York.

7               MS. HELLER:  Your Honor, may I clarify the telephone

8     number with you?

9               THE COURT:  Yes.

10              MS. HELLER:  619-557-6262?

11              THE COURT:  Correct.

12              MS. HELLER:  Thank you, your Honor.

13              THE COURT:  Give me five minutes, and then you can

14    call.

15              MS. HELLER:  Should we go down to your chambers in

16    five minutes to get copies of the papers?

17              THE COURT:  Sure.

18              THE CLERK:  That's 1340, one floor down.

19              (Adjourned)

20

21

22

23

24

25

# DEFENDANTS' EXHIBIT 7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x
R.G.H. by and through his next friend     :
Desiree C. Hernandez Sanchez, J.E.R.S.    :
by and through his next friend Desiree    :
C. Hernandez Sanchez, V.E.C.C. by and     :
through their her next friend Desiree     :
C. Hernandez Sanchez, C.L.D.M. by and     :
through his next friend Richard P.        :
Leimsider, H.E.M. by and through his      :
next friend Richard P. Leimsider,         :
J.D.O.H. by and through his next friend   :
Richard P. Leimsider, R.J.C.A. by and     :
through his next friend Richard P.        :
Leimsider, N.O.O.Y. by and through his    :
next friend Richard P. Leimsider, and     :
W.O.S.L. by and through his next friend   :
Richard P. Leimsider.                     :
                                          :
            Plaintiff-Petitioners,        :      18-cv-6791(JSR)
                                          :
            vs.                           :      ORDER
                                          :
JEFFERSON B. SESSIONS III, Attorney       :
General of the United States;             :
DEPARTMENT OF HOMELAND SECURITY           :
"DHS"); KIRSTJEN NIELSEN, Secretary of    :
DHS; U.S. CUSTOMS AND BORDER PROTECTION   :
("CBP"); KEVIN K. MCALEENAN,              :
Commissioner of CBP; U.S. IMMIGRATION     :
AND CUSTOMS ENFORCEMENT ("ICE"); RONALD   :
D. VITIELLO, Acting Director of ICE;      :
U.S. CITIZENSHIP AND IMMIGRATION          :
SERVICES ("USCIS"); L. FRANCIS CISSNA,    :
Director of USCIS; U.S. DEPARTMENT OF     :
HEALTH AND HUMAN SERVICES ("HHS"); ALEX   :
AZAR, Secretary of the Department of      :
Health and Human Services; OFFICE OF      :
REFUGEE RESETTLEMENT ("ORR"); and SCOTT   :
LLOYD, Director of ORR,                   :
                                          :
            Defendants.                   :
----------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____

JED S. RAKOFF, U.S.D.J.

This motion comes before the undersigned, sitting in Part I,

because of the request for emergency relief. For the reasons stated

from the bench, see Transcript, 7/27/18, which are here incorporated

by reference, the Clerk of Court is directed to transfer this action

forthwith to the United States District Court for the Southern

District of California, to be assigned to Judge Sabraw as related to

Ms. L. v. U.S. Immigration and Customs Enforcement, No. 18-CV-0428.

The Clerk of Court is directed to effectuate the transfer immediately,

notwithstanding Local Rule 83.1, and then to close the case in this

Court.

SO ORDERED

Dated:    New York, NY

          July 2‾, 2018                     JED S. RAKOFF, U.S.D.J.